# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | | |
|---|---|---|
| **CAMPAIGN FOR SOUTHERN EQUALITY and THE REV. DR. SUSAN HROSTOWSKI,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 3:16-cv-442-DPJ-FKB** |
| | § | |
| **PHIL BRYANT, in his official capacity as Governor of the State of Mississippi; JIM HOOD, in his official capacity as Mississippi Attorney General; JOHN DAVIS, in his official capacity as Executive Director of the Mississippi Department of Human Services; and JUDY MOULDER, in her official capacity as Mississippi State Registrar of Vital Records,** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs the Campaign for Southern Equality and The Rev. Dr. Susan Hrostowski submit this Memorandum of Law in support of their Motion for a Preliminary Injunction in this action challenging the constitutionality of HB 1523 under the First Amendment's Establishment Clause.

PRELIMINARY STATEMENT

In 1776, the founders of our nation declared that "all men are created equal" and that they are "endowed" with "certain unalienable rights," including "life, liberty, and the pursuit of happiness." Declaration of Independence, U.S. 1776. Three years later, shortly after he had been elected Governor of Virginia, Thomas Jefferson introduced "An Act for establishing religious Freedom" in the Virginia legislature. That statute, which was not passed until 1786 cited the "imperious presumption of legislators and rulers . . . who, being themselves but fallible and uninspired men have assumed dominion over the faith of others, setting up their own opinions and modes of thinking as the only true and infallible, and as such endeavoring to impose them on other[s]." Thomas Jefferson, Virginia Statute for Religious Freedom (1785); cited with approval in *Reynolds* v. *United States*, 98 U.S. 145, 162 (1878). It also noted that "[o]ur civil rights have no dependence on our religious opinions . . . ." *Id.* That Virginia statute was then used by James Madison as the model for the First Amendment to the United States Constitution, which states in pertinent part that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

Almost 240 years after the Declaration of Independence, on July 1 of this year, the State of Mississippi intends to enforce a law that could hardly be more inconsistent with these core principles of our nation. That law, HB 1523, declares that certain Mississippians—namely, only those who hold specified "religious beliefs or moral convictions"—should have

special rights and privileges, including the right to discriminate against and undermine the dignity of their fellow LGBT citizens.  HB 1523 actually uses those words—"religious belief or moral conviction"—and provides that three such sectarian beliefs, which are held by some, but certainly not by all religious persons, are to be given special protection:  (1) that marriage should only be between a man and a woman; (2) that sexual relations should be saved for marriage; or (3) that a person's gender must be the same as the sex they were assigned at birth.

Although its authors named HB 1523 the "Protecting Freedom of Conscience from Government Discrimination Act," the law is intended to accomplish exactly the opposite. Shielded by HB 1523, both private citizens and state officers in Mississippi will be entitled, even encouraged, to deny the dignity of LGBT Mississippians by refusing to provide them with marriage licenses, adoption and fertility services, access to health care, and public accommodation in restaurants, hotels, wedding halls, and more.  In other words, rather than "protecting" anyone "*from discrimination*," HB 1523 is actually a license *to discriminate*, without any consideration of the burden imposed on the believer, the societal interest in the equality of all Mississippians, or even whether the "religious belief" is simply a pretext for hatred and bigotry.

For these reasons, it is hard to imagine a clearer violation of the First Amendment than HB 1523.  "[O]ur constitutional tradition, from the Declaration of Independence . . . down to the present day, has . . . ruled *out of order* government-sponsored endorsement of religion . . . where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ)."  *Lee* v. *Weisman*, 505 U.S. 577, 641 (1992) (Scalia, J., dissenting) (emphasis added).  In other words, "the separation of church and state is,

fundamentally, about equality, about the idea that no religion will be set up as *the* religion of our nation." Martha Nussbaum, *Liberty of Conscience: In Defense of America's Tradition of Religious Equality* 12 (2008). By conferring benefits exclusively on adherents of only certain religious beliefs, HB 1523 is, as Justice Scalia explained, "out of order"—it clearly and unambiguously violates the Establishment Clause of the First Amendment to the United States Constitution. And because "[i]t is emphatically the province and duty of the [federal courts] to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), this Court can and should enjoin the enforcement of HB 1523 here.

FACTUAL BACKGROUND

While a fuller recitation of the relevant facts is set forth in Plaintiffs' Complaint, Dkt. No. 1, we discuss below certain of the key facts relevant to this motion seeking preliminary injunctive relief.

Events Leading Up to the Passage of HB 1523

In 2014, this Court affirmed the equal citizenship of gay men and lesbians by striking down Mississippi's ban on their ability to marry because it "deprive[d] same-sex couples and their children of equal dignity under the law," relegated gay and lesbian Mississippians to "second-class citizenship," and violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. *Campaign for S. Equal.* v. *Bryant*, 64 F. Supp. 3d 906, 913 (S.D. Miss. 2014) ("*CSE I*"). The Court in *CSE I* acknowledged that while supporters of Mississippi's marriage ban "were simply trying to preserve their view of what a marriage *should* be, whether by religion or tradition," *id.* at 913, the clear intent and import of the Mississippi marriage ban "was (and is) to label same-sex couples as different and lesser, demeaning their sexuality and humiliating their children." *Id.* at 948. "That is something the voters cannot do." *Id.* at 949.

While the State's appeal of *CSE I* was pending before the United States Court of Appeals for the Fifth Circuit, the United States Supreme Court, on June 26, 2015, recognized that, like all Americans, gay and lesbian Americans are endowed with "the fundamental right to marry" and cannot be deprived of that right. *Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2604–05 (2015). The Supreme Court concluded that the United States Constitution does not permit states to "exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 2605.

As other Mississippi politicians had in decades past, Mississippi's Governor Phil Bryant and Mississippi's senior Senator Thad Cochran reacted negatively to the Supreme Court's ruling in *Obergefell*.[1] On the day that the Supreme Court decided *Obergefell*, for example, Governor Bryant issued the following public statement: "a federal court has usurped that right to self-governance and has mandated that states must comply with federal marriage standards— standards that are out of step with the wishes of many in the United States and that are certainly out of step with the majority of Mississippians." *See Governor Bryant Issues Statement on Supreme Court Obergefell Decision*, Governor Phil Bryant (June 26, 2015), http://www.governorbryant.com/governor-bryant-issues-statement-on-supreme-court-obergefell-decision/. Senator Cochran, in turn, anticipating legislative action in response to *Obergefell* that would ultimately culminate in HB 1523, declared that "The Supreme Court decision does not

---

[1] The statements of Defendant Bryant and Senator Cochran cited above are reminiscent of statements made by Mississippi officials after the United States Supreme Court decided *Brown* v. *Board of Educ.*, 347 U.S. 483 (1954). "U.S. Senator James Eastland of Mississippi, for example, upon learning of the ruling [in *Brown*], immediately issued a written statement affirming that "[t]he South will not abide by nor obey this legislative decision by a political court." Joel Wm. Friedman, *Desegregating the South: John Minor Wisdom's Role in Enforcing Brown's Mandate*, 78 Tul. L. Rev. 2207, 2212 (2004). Moreover, following *Brown*, national associations of Southern Baptists, Methodists, and Presbyterians endorsed the ruling and issued statements opposing segregation. Mississippi churches revolted and threatened to break with their national governing bodies. *See* Carolyn Renee Dupont, *Mississippi Praying: Southern White Evangelicals and the Civil Rights Movement, 1945-1970* 63–65 (2013). Thus, for example, "Reverend R. L. McLaurin of Oakland Heights Presbyterian Church in Meridian defended segregation as the will of God: 'I am opposed to and think that the recent Supreme Court decision is in violation and contradiction to the Scripture teachings on segregation.'" *Id.* at 74.

and cannot change the firmly held faith of most Mississippians.  I believe marriage is defined as the union of one man and one woman.  The court's decision raises questions about the protection of religious liberties and First Amendment rights, which the Congress may have to address.  It is important that this ruling does not result in individuals, businesses, and religious-oriented schools and organizations being penalized by the government for their belief in the traditional definition of marriage."  *See Cochran Statement on Supreme Court Ruling on Same-Sex Marriage*, Thad Cochran: United States Senator for Mississippi (June 26, 2015), http://www.cochran.senate.gov/public/index.cfm/2015/6/cochran-statement-on-supreme-court-ruling-on-same-sex-marriage.

Structure and Impact of HB 1523

Less than a year after marriage rights were extended to same-sex couples in Mississippi as a result of *CSE I* and *Obergefell*, and not even one week after the state's discriminatory adoption ban was invalidated by Judge Jordan, *Campaign for S. Equal.* v. *Miss. Dep't of Human Servs.*, __ F. Supp. 3d __, 2016 WL 1306202, at *11 (S.D. Miss. Mar. 31, 2016) (*"CSE II"*), the State of Mississippi again sought to authorize and even promote discrimination against LGBT people and their families, this time by affording special legal status to persons who hold certain sincerely held "religious beliefs or moral convictions" pursuant to HB 1523. More specifically, HB 1523 confers exclusive benefits upon Mississippians who adhere to one or more of the following three statutorily designated religious beliefs: (a) that "[m]arriage is or should be recognized as the union of one man and one woman," (b) that "[s]exual relations are properly reserved to a marriage between one man and one woman," or (c) that male and female "refer to an individual's immutable biological sex as objectively determined by anatomy and genetics at the time of birth" *Id.* § 2 (together, the "Preferred Religious Beliefs").

These Preferred Religious Beliefs are not espoused by all religions, by all Christian denominations, or even by all Christians in Mississippi. Some religious organizations, such as the Southern Baptist Convention and the Catholic Church, teach that marriage is properly limited to straight couples. But other sects, based on their religious belief that every human being is created in the divine image and "from the Biblical injunction that it is 'not good' for a person to be alone," among others, have affirmed that gay men and lesbians have inherent and equal dignity. Jan Urbach, *A Conservative Rabbi's Case for Marriage Equality*, Wash. Post, Mar. 18, 2013, https://www.washingtonpost.com/national/on-faith/a-conservative-rabbis-case-for-marriage-equality/2013/03/18/45d04ac4-8fe9-11e2-9cfd-36d6c9b5d7ad_story.html. In some traditions, such as the Episcopal Church, this affirmation has led to the ordination of gay and lesbian clergy, such as Plaintiff The Rev. Dr. Susan Hrostowski. In others, it has led to various forms of religious affirmation of the marriages of gay and lesbian couples and their families, including solemnizing gay and lesbian couples' marriages. Indeed, in a letter dated June 3, 2016, the Rt. Rev. Brian R. Seage, The Episcopal Bishop of Mississippi, gave permission for congregations and clergy in the Diocese of Mississippi to use specific liturgies to perform marriage "for all couples legally entitled to marry." Compl. Ex. A at 1. While recognizing that there remain differing views among Episcopal clergy in the Diocese, Bishop Seage explained that he arrived at his support for marriage equality "after a lot of prayer and discernment, as well as engagement with Holy Scripture, the traditions of the Church and human reason." *Id.* at 2.[2]

---

[2] As a broad coalition of religious leaders explained in an amicus brief filed with the Supreme Court in *Obergefell*: "Faiths embracing same-sex couples—both theologically and with respect to the distinct issue of equality under civil law—participate in the mainstream of American religious observance. They include Mainline Protestant denominations such as the United Church of Christ, the Episcopal Church, and the Presbyterian Church; the Unitarian Universalist Church, portions of the Religious Society of Friends (Quakers); and Judaism's Reform, Reconstructionist, and Conservative movements. Millions of religious individuals from other faiths also embrace and celebrate same-sex couples, including members of many other Mainline and Evangelical Protestant denominations, Roman Catholics, Mormons, Orthodox Jews, and Muslims." Brief of President of the House of

By singling out these three sectarian Preferred Religious Beliefs for special treatment and affording their adherents rights beyond the federal and state protections for any other belief, HB 1523 expresses the State's clear and unequivocal endorsement of the Preferred Religious Beliefs above all others.  HB 1523 creates special privileges for adherents of the Preferred Religious Beliefs in a wide variety of everyday contexts.  For example, it authorizes state officials who issue marriage licenses to invoke the Preferred Religious Beliefs to deny service to gay and lesbian couples.  § 3(8)(a).  It forbids the government and even private state-court plaintiffs from taking action against individuals or businesses that invoke the Preferred Religious Beliefs as justification for refusing to provide LGBT people with a litany of goods and services, including counseling, fertility services, and commercial products, services, and accommodations "related to the solemnization, formation, celebration, or recognition of any marriage." *See id.* at §§ 3, 4, 9(2), 9(3).  HB 1523 also permits the imposition of restrictive gender-based policies on employees' or students' attire, grooming, and bathroom or locker room usage, so long as those policies are consistent with the Preferred Religious Beliefs.  *Id.* at § 3(6).  It further forbids any government or state-court action against a "religious organization"— whether affiliated with a house of worship or not and whether acting as a government contractor or grant recipient or not—for using the Preferred Religious Beliefs as grounds for making discriminatory decisions about whom it employs, rents real estate to, or provides with adoption or foster care services.  *See id.* at §§ 3(1)–3(2), 4(1)(c), 9(4).

In addition, HB 1523 imposes a meaningful burden on LGBT Mississippians who attempt to vindicate their civil rights by defining "state government" to include not only government agencies and employees, but also any "private party or third party suing under or

<hr />

Deputies of the Episcopal Church, et al. as Amici Curiae Supporting Petitioners at 4, *Obergefell* v. *Hodges*, 135 S.Ct. 2584 (2015) (Nos. 14-556 et al.).

enforcing a law, ordinance, rule or regulation of the state or political subdivision of the state."
*Id.* at § 9(2).  Individuals or entities who discriminate in the name of any of the Preferred Religious Beliefs can thus obtain an injunction against any private party's effort to obtain relief under an anti-discrimination law, and may even be able to seek "compensatory damages" and attorneys' fees and costs from a private plaintiff who continues to pursue relief despite entry of an injunction under HB 1523.  *Id.* at § 6.  Accordingly, pursuant to HB 1523, private victims of discrimination could be held liable for the "harm" their complaint causes the person who claims that HB 1523's religious accommodation entitled him to discriminate against them.  HB 1523 similarly bars state judges and courts from imposing a "fine, fee, penalty, or injunction" against individuals claiming HB 1523's religious exemption—a provision that presumably purports to prohibit them from deciding even claims under federal law against individuals who claim their actions were consistent with adherence to the Preferred Religious Beliefs.  § 4(1)(e).

Legislative History of HB 1523

HB 1523 was drafted in large part by the sectarian Christian lobbying organization Alliance Defending Freedom ("ADF"), based in Arizona.  *See* Adam Ganucheau, *Mississippi's 'Religious Freedom' Law Drafted out of State*, Mississippi Today, May 17, 2016, https://mississippitoday.org/2016/05/17/mississippis-religious-freedom-law-drafted-out-of-state/. In its advertising materials, ADF defines itself as a "Christ-Centered" "ministry" that fights to "keep[] the door open for the Gospel," including opposing equal rights for gay and lesbian people and "redefining marriage."  *See* ADF, *Statement of Faith*, https://www.adflegal.org/about-us/careers/statement-of-faith; Katie Heller, *Keeping the Door Open for the Gospel Requires an Army*, ADF (June 07, 2016), https://www.adflegal.org/detailspages/blog-details/allianceedge/2016/06/07/keeping-the-door-open-for-the-gospel-requires-an-army. "Alliance Defending Freedom remains committed to promoting the truth that marriage is the

lifelong union of one man and one woman." *See* Supreme Court Redefines Marriage, https://www.adflegal.org/campaigns/scotus/marriage-decision (last accessed June 12, 2016). Gregory S. Baylor, ADF Senior Counsel, has described gay and lesbian relationships as "both morally wrong and personally damaging." Defending Laws Affirming Marriage, Alliance Defending Freedom, https://www.adflegal.org/issues/marriage/redefining-marriage/key-issues/laws-affirming-marriage. The President and CEO of ADF, Alan Sears, has actually gone so far as to condemn Christian denominations that may disagree with ADF on these issues: "Unfortunately, just as some in the church have shown a total lack of grace, the theologically liberal church has gone the other direction and totally capitulated on the issue without ever dealing with the sin and sorrow. Rather than helping those engaging in forbidden behaviors to turn from their sin by pointing to Christ, the theologically liberal church is providing 'spiritual' cover that enables their actions and the terribly destructive results." Alan Sears and Craig Osten, The Homosexual Agenda: *Exposing the Principal Threat to Religious Freedom Today* 130 (2013).[3]

HB 1523's sponsors and supporters have made it clear that the statute's purpose is to extend benefits only to those who hold particular religious beliefs in order to promote and advance those beliefs and the sects that adhere to them, but no others. State Representative Dan Eubanks, a co-sponsor of HB 1523, for example, stated during floor debate that the bill was intended to protect "Christians" like him. Referring to same-sex relationships, Representative Eubanks said: "It's very clear what God says. Go back and look at your Bible. He calls sin,

---

[3] The American Family Association ("AFA"), a fundamentalist Christian organization that "believes that a culture based on biblical truth best serves the well-being of our nation and our families," also participated in drafting HB 1523. Am. Fam. Ass'n, *Our Mission*, http://www.afa.net/who-is-afa/our-mission/. Like ADF, the AFA strongly opposes equal rights for gays and lesbians on religious grounds. The AFA teaches that "[h]omosexual behavior is sinful and unnatural," that "homosexual lust is highly addictive and difficult to stop," and that all gays and lesbians live in "rebellion against God and His created order." Patrick Vaughn, *Serpents & Doves*, Am. Fam. Ass'n (October 7, 2014), http://www.afa.net/the-stand/homosexuality/2015/serpents-doves/.

'sin.'" Referring to his fellow Christians, Representative Eubanks said: "This [bill] is about aligning our right to worship, to speak, to do with our faith. And our faith is pretty clear." Representative Eubanks closed by saying that HB 1523 "protects what I am willing to die for— and what I hope you who claim to be Christians are willing to die for—which is your beliefs." Statement of Rep. Dan Eubanks, February 19, 2016.[4]

State Senator Jenifer Branning similarly acknowledged that although there are Mississippians with deeply held religious beliefs regarding gambling, the death penalty, and alcohol, HB 1523 does nothing to protect people who hold those religious beliefs because it is "very specific to same-sex marriage." Statement of Sen. Jenifer Branning, March 30, 2016. State Representative Andy Gipson, a co-sponsor of HB 1523, stated in a Facebook post that HB 1523 was supported by "[m]ore than 270 pastors," religious leaders including Rev. Franklin Graham, and churches and church organizations including the Southern Baptist Convention, Bethany Christian Services, the Catholic Dioceses of Mississippi, the National Hispanic Christian Leadership Conference, the United Pentecostal Church, and the American Association of Christian Schools.

That HB 1523 systematically places the burden of its religious accommodation squarely on the shoulders of gays and lesbians is no accident. To the contrary, HB 1523—which was enacted less than a year after the Supreme Court invalidated Mississippi's ban on gay and lesbian couples' ability to marry and less than one week after Judge Jordan enjoined Mississippi's ban on their ability to adopt children, *CSE II*, 2016 WL 1306202 (S.D. Miss. Mar. 31, 2016)—intentionally promotes the Preferred Religious Beliefs at the expense of LGBT people. State Senator Jenifer Branning, a proponent of HB 1523 who met with the bill's drafters,

---

[4] Video of the legislative debate regarding HB 1523 is available at http://law.mc.edu/legislature/bill_details.php ?id=4621&session=2016. All of the following statements have been transcribed from these videos.

described HB 1523 as "balancing legislation" to the Supreme Court's *Obergefell* decision. Statement of Sen. Jenifer Branning, March 30, 2016. Senator Branning's floor statements confirm that the primary purpose of HB 1523 was to encourage and enable anti-gay discrimination in furtherance of the Preferred Religious Beliefs. As she stated during floor debate, under HB 1523, it would not be discrimination for Mississippi College, as a "Baptist college," to fire or deny employment to "homosexual people on their staff." When asked by Senator Willie Simmons whether refusing to employ gays and lesbians was a form of discrimination, Senator Branning replied, "If this bill is passed, it would not be." Statement of Sen. Jenifer Branning, March 30, 2016.

ARGUMENT

A plaintiff seeking a preliminary injunction must establish "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest." *Valley* v. *Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). As discussed below, Plaintiffs clearly meet this familiar and well-established standard here.

I.      Likelihood of Success on the Merits

        A.      HB 1523 Violates Plaintiffs' First Amendment Rights

                The Establishment Clause of the First Amendment to the United States Constitution prohibits the making of any law "respecting an establishment of religion." U.S. Const. amend I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente*, 456 U.S. 228, 244 (1982); *accord* Miss Const. art. 3 § 18 ("[N]o preference shall be given by law to any religious sect . . . ."). Yet this is precisely what HB 1523 does—it expresses an official preference for

those religious denominations that subscribe to the Preferred Religious Beliefs over all religions, including the Episcopal Church and other Christian denominations that do not adhere to the Preferred Religious Beliefs. HB 1523 thus constitutes a grave violation of Plaintiffs' Establishment Clause rights in at least three separate ways.

       1.      HB 1523 Impermissibly Discriminates Between Religious Sects

Before HB 1523 was enacted, the First Amendment, Article 3, Section 18 of the Mississippi Constitution, and the Mississippi Religious Freedom Restoration Act ("Mississippi RFRA"), Miss. Code Ann. § 11-61-1, all protected all Mississippians' free exercise of religion from government intrusion. Significantly, however, not one of these statutory and constitutional protections for religious beliefs singles out any particular religious belief or creed as better than any other. The Mississippi RFRA, for example, provides that any individual who believes that the government has substantially burdened his or her exercise of religion can sue in order to seek an exemption from the allegedly burdensome law or regulation. *Id.* at § 11-61-1 (6).[5] The Mississippi RFRA does not specify or even suggest any particular religious belief that may have been substantially burdened.

HB 1523, by marked contrast, extends additional benefits only to Mississippians who hold one or more of the three specified Preferred Religious Beliefs, making it clear that the State of Mississippi considers those beliefs to be more important and more deserving of special protection than all others. As discussed above, however, the Preferred Religious Beliefs are not espoused by all religions or even by all Christian denominations. While the Southern Baptist Convention, for example, teaches that marriage should be limited to straight couples, the Episcopal Church allows ministers even in Mississippi to solemnize gay and lesbian couples'

---

[5] Mississippians who wish to challenge *federal* government intrusion upon their free exercise rights are also protected by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb et seq. *See generally City of Boerne* v. *Flores*, 521 U.S. 507 (1997).

marriages and regards such marriages as equal to the marriages of straight couples. HB 1523

thus prefers the Southern Baptist Convention's beliefs to the Episcopalians'—in patent violation

of state and federal constitutional guarantees of neutrality between religious denominations. *See*

Miss. Const. art. III, § 18 ("No preference shall be given by law to any religious sect or mode of

worship; but the free enjoyment of all religious sentiments and the different modes of worship

shall be held sacred."); *see also* U.S. Const. amend. 1. The Supreme Court expressed this

sentiment in no uncertain terms when it explained that "[w]hatever else the Establishment Clause

may mean . . . it certainly means at the very least that government may not demonstrate a

preference for one particular sect or creed (including a preference for Christianity over other

religions)." *Cnty. of Allegheny* v. *Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492

U.S. 573, 605 (1989), *abrogated on other grounds*, *Town of Greece* v. *Galloway*, 134 S.Ct. 1811

(2014).[6]

More specifically, although any Mississippian who believes that the government

has substantially burdened his or her exercise of religion can invoke the Mississippi RFRA to

seek an exemption from the alleged burden to defend against government enforcement action,

Miss. Code Ann. § 11-61-1(6), HB 1523 excuses adherents of the Preferred Religious Beliefs

from the procedures established by the Mississippi RFRA and affords them and only them the

unique ability to obtain a religious accommodation automatically. Thus, when it comes to the

Preferred Religious Beliefs, HB 1523 prohibits the state from taking nearly *any* "discriminatory

---

[6] In *Town of Greece*, the Supreme Court found that sectarian references in the context of legislative prayer are permitted because to require otherwise "would force the legislatures that sponsor prayers and the courts that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." *Town of Greece, N.Y.* v. *Galloway*, 134 S. Ct. 1811, 1822 (2014). Here, however, the Mississippi legislature has done precisely what both *Allegheny* and *Town of Greece* caution against. The State has selected particular sectarian religious beliefs and expressly chosen to promote and give them alone the State's endorsement, to the significant detriment of those who do not share such beliefs. *See also id.* at 1823.

action"—defined expansively to include "alter[ing] in any way" a person or group's tax treatment, materially altering the terms and conditions of any entitlement or benefit, and disciplining a state employee—"wholly or partially on the basis" of specified conduct based on those beliefs. § 4. Moreover, to invoke the protections of HB 1523, a holder of the Preferred Religious Beliefs need not to show *any burden* on his free exercise of religion at all, let alone a substantial burden. *Cf. Tilton* v. *Richardson*, 403 U.S. 672, 689 (1971) (denying Free Exercise claim because plaintiff-appellants were "unable to identify any coercion directed at the practice or exercise of their religious beliefs").

Similarly, the Mississippi RFRA permits the government to "substantially burden a person's exercise of religion" if it demonstrates that doing so "[i]s in furtherance of a compelling government interest" and is also the "least restrictive means" of furthering that interest. Miss. Code Ann. § 11-61-1(5)(b). HB 1523, on the other hand, grants an accommodation to holders of the Preferred Religious Beliefs that purports to override *all* government interests, no matter how compelling. For example, under Sections 3(5), 3(7), and 3(8) of HB 1523, the government is precluded from enforcing anti-discrimination laws that protect gay and lesbian Mississippians, even though the Supreme Court has repeatedly affirmed that the government has a compelling interest in eradicating invidious discrimination. *See, e.g.*, *Roberts* v. *U.S. Jaycees*, 468 U.S. 609, 623 (1984) (recognizing that Minnesota had "compelling interest in eradicating discrimination against its female citizens"); *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 604 (1983) ("[T]he Government has a fundamental, overriding interest in eradicating racial discrimination in education."); *see also Windsor* v. *United States*, 699 F.3d 169, 181–85 (2d Cir. 2012) (concluding that in order to survive constitutional scrutiny, statute that discriminates against gay people must be "substantially related to an important government

interest," the "explanation" for the statute must be "exceedingly persuasive" as well as "genuine, not hypothesized or invented *post hoc* in response to litigation.") (citations omitted), *aff'd*, 133 S.Ct. 2675 (2013); *CSE I*, 64 F. Supp. 3d at 942.  And under Section 3(4), state agencies, including state licensure boards, are prohibited from taking any action against doctors or therapists who refuse to treat gay, lesbian, and transgender patients notwithstanding the government's "compelling interest in safeguarding the public health."  *See Mead* v. *Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011).

HB 1523 thus affords far greater benefits and protections to people who hold the Preferred Religious Beliefs than to others, including religious persons like The Rev. Dr. Susan Hrostowski, or the Executive Director of the Campaign for Southern Equality, Rev. Jasmine Beach-Ferrara, who is an ordained minister in the United Church of Christ.  Such blatant discrimination between and among different religious beliefs is a core violation of the Establishment Clause.  "Government in our democracy . . . may not aid, foster, or promote one religion or religious theory against another . . . . The First Amendment mandates government neutrality between religion and religion[.]"  *Epperson* v. *Arkansas*, 393 U.S. 97, 103–04 (1968).  *See also Larson*, 456 U.S. at 246 ("[T]his Court has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'"); *Sch. Dist. of Abington Tp., Pa.* v. *Schempp*, 374 U.S. 203, 215 (1963) (holding that, with respect to the diversity of "religious opinions and sects," government "is neutral, and, while protecting all, it prefers none, and it disparages none"); *Zorach* v. *Clauson*, 343 U.S. 306, 314 (1952) ("government must be neutral when it comes to competition between sects.  It may not thrust any sect on any person."); *Ingebretsen* v.

*Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279 (5th Cir. 1996); *Herdahl* v. *Pontotoc Cnty. Sch. Dist.*, 887 F. Supp. 902, 908 (N.D. Miss. 1995).

It is plain that HB 1523 has the aim and effect of "aid[ing], foster[ing], or promot[ing] one . . . religious theory against another," *Epperson*, 393 U.S. at 104, by affording special treatment and extra protections to the Preferred Religious Beliefs. Although Defendants have characterized HB 1523 as merely a protection for some Mississippians' free exercise rights, *see* Opp. Br. at 9–10, *Alford* v. *Moulder*, No. 3:16-CV-350 (S.D. Miss. May 24, 2016), Dkt. No. 15, as the Supreme Court has recognized, the First Amendment "can be guaranteed only when legislators . . . are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations." *Larson*, 456 U.S. at 245. No one could credibly argue that the religious organization that drafted HB 1523 or the Mississippi legislators who sponsored it have done that here.

2.      HB 1523 Impermissibly Favors Religion over Nonreligion

Even if HB 1523 treated the views and beliefs of all religious sects equally (which it does not), it would still violate the Establishment Clause by imposing the weighty burden of religious accommodations on innocent third parties. In *Estate of Thornton* v. *Caldor Inc.*, the Supreme Court considered a Connecticut religious accommodation law providing that "[n]o person who states that a particular day of the week is observed as his Sabbath may be required by his employer to work on such day." 472 U.S. 703, 706 (1985). Like HB 1523, the Sabbath law at issue in *Thornton* was purportedly enacted to protect the free exercise of religion. *See id.* at 712 (O'Connor, J., concurring). And like HB 1523, the Sabbath law "arm[ed]" people who held the state's preferred religious belief, to wit, Sabbath observance, "with an absolute and unqualified right." *Id.* at 709–10. By commanding that the preferred religious belief "automatically control[led] over all secular interests at the workplace" and taking "no account of

the convenience or interests of the employer or . . . other employees who do not" share the preferred religious belief, the Sabbath law impermissibly imposed "significant burdens on other employees."[7] *Id.* It therefore had "a primary effect that impermissibly advances a particular religious practice," in violation of the Establishment Clause. *Id.* at 710.

HB 1523 similarly imposes significant burdens on Mississippians who do not hold the Preferred Religious Beliefs. But unlike the Sabbath law at issue in *Thornton*, HB 1523 does not merely inconvenience atheists or non-religious persons. Instead, it violates the fundamental constitutional rights of gay and lesbian Mississippians, a "quasi-suspect class" who have long "been treated differently due to prejudice." *See CSE I*, 64 F. Supp. 3d at 940. Across a wide variety of contexts, HB 1523 exhorts Mississippians to discriminate against their LGBT neighbors—in violation of state and federal laws as well as the United States Constitution—by providing an absolute immunity to people who trample upon Plaintiffs' rights. An illustrative, though far from comprehensive, list of the burdens imposed upon Plaintiffs by HB 1523 is as follows:

- <u>Marriage</u>. HB 1523 substantially burdens the fundamental right of gay and lesbian Mississippians to marry. *See Obergefell*, 135 S. Ct. at 2604–05. Section 3(8) permits anyone "employed or acting on behalf of the state government who has authority to authorize or license marriages" to "seek recusal from authorizing or licensing lawful marriages" based upon any of the three Preferred Religious Beliefs. As Plaintiff Campaign for Southern Equality has argued in a pending motion for injunctive relief in a related case, the law provides no enforcement mechanism for ensuring that the fundamental right to marry is not unduly

---

[7] In *Burwell* v. *Hobby Lobby Stores, Inc.,* the United States Supreme Court held that the plaintiffs' requested religious accommodation was lawful in part because it had "precisely zero" effect on third parties—in that case, female employees covered by plaintiffs' health plans. 134 S. Ct. 2751, 2760 (2014). Here, however, HB 1523 has a significant deleterious effect on gay and lesbian Mississippians.

impeded, delayed, or otherwise burdened. Mot. to Reopen J., File Suppl. Pleading, and Modify

the Permanent Inj., *Campaign for S. Equal.* v. *Bryant*, No. 3:14-cv-818 (S.D. Miss. May 10,

2016), ECF No. 39.[8] Under HB 1523, every or nearly every clerk and deputy clerk in a county

could theoretically recuse himself or herself, such that no state employees will be available to

issue marriage licenses to same-sex couples, without any mechanism to ensure that gay or

lesbian couples would receive licenses without "imped[iment] or delay[]." HB 1523 § 3(8)(a).

Moreover, HB 1523 does not even acknowledge, much less attempt to address, the humiliation

and stigmatic harm that Plaintiffs will endure when they are informed that an agent of the State

refuses to provide them service because of their sexual orientation. *See, e.g.*, *CSE I*, 64 F. Supp.

3d at 939 ("Mississippi law perpetuates the false notion of gay inferiority by denying equal

marriage rights to gay and lesbian citizens[.]").

- Access to Public Accommodations. HB 1523 also makes it harder for gay

and lesbian couples to celebrate marriage—before, during, and after their weddings. Section

3(5) permits a person or business claiming the Preferred Religious Beliefs who provides

"services, accommodations, facilities, goods, or privileges for a purpose related to the

solemnization, formation, celebration, or recognition of any marriage" to deny services to LGBT

Mississippians with impunity. The array of covered goods and services includes, but is not

limited to, "[p]hotography," "videography," "printing," "publishing," "[f]loral arrangements,"

"dress making," baking, "assembly-hall" rentals, "car-service rentals," and "jewelry sales and

services." HB 1523 § 3(5). The statute is worded so expansively that it could apply to not just

wedding-related businesses but also almost any business that serves gay or lesbian married

---

[8] Although the relief sought by the plaintiffs in the motion to reopen *CSE I* will not be necessary if the Court enjoins enforcement of HB 1523 in its entirety, given the high likelihood of an appeal to the Fifth Circuit and possibly the Supreme Court on all issues currently before the Court, CSE respectfully requests that the Court rule on the relief sought by CSE in *CSE I* as well.

couples.  For example, a restaurant could potentially refuse to seat a married lesbian couple like Susan and her wife at a table for two if it viewed the couple's dinner date as a "celebration" or "recognition" of their marriage.  *See id.*  A hotel could refuse to let them stay in a room together. Even a furniture store could turn Susan and her wife away with impunity if it fears that supplying home furnishings relates to the "formation" or "recognition" of their marriage.  Every time this religious accommodation is invoked, Susan will suffer the tangible and dignitary harm that arises from being turned away because of someone else's religious views about her sexual orientation.

- <u>Protection from Discrimination</u>.  HB 1523 forbids the government, and even private state-court plaintiffs, from taking action against individuals or businesses that invoke the Preferred Religious Beliefs as a justification for violating preexisting antidiscrimination protections.  Under HB 1523, government officials are prohibited from taking nearly any action—including withholding, denying, or changing the conditions of a license or certification, *see* § 4(1)(f)—against someone who declines to provide treatment, counseling, fertility services, or surgeries due to their Preferred Religious Beliefs. § 3(4).

The government is likewise prohibited from taking action against someone who has declined to provide services, accommodations, facilities, goods, or privileges related to celebrating or recognizing a marriage, if the refusal is based upon or done "in a manner consistent with" one of the three Preferred Religious Beliefs. § 3(5).  This section could be interpreted to prohibit a municipality, like Jackson, from enforcing its own laws aimed at prohibiting discrimination against LGBT people.  *See, e.g.*, Jackson, Mississippi Code of Ordinances § 86-193 (prohibiting differential treatment by a police officer on the basis of, among other things, sexual orientation and gender identity); *id.* § 126-161 (prohibiting passenger

discrimination, including on the basis of sex and sexual orientation, by drivers of a vehicle for hire).

And if the government were to take action, an adherent of a Preferred Religious Belief could seek injunctive relief that prevents or "remedies" any resulting adverse governmental action against them, effectively tying the hands of government agencies or officials who would otherwise enforce anti-discrimination protections. § 6. Meanwhile, private state-court plaintiffs could be denied relief because HB 1523 defines "state government" to also include any "private party or third party suing under or enforcing a law, ordinance, rule or regulation of the state or political subdivision of the state." § 9(2)(d).

- <u>Family and Parenthood</u>. HB 1523 creates barriers to raising children despite Judge Jordan's recent holding in *CSE II* that there is *no* constitutionally permissible basis for preventing same-sex couples from adopting and raising children, *CSE II*, 2016 WL 1306202, at *13–14. Section 3(2) of HB 1523 permits adoption and foster care agencies to invoke the Preferred Religious Beliefs to refuse to place children with same-sex parents. Such a decision imposes an enormous burden both on would-be parents and on children who are denied loving homes. *See, e.g.*, *Bd. of Dirs. of Rotary Int'l* v. *Rotary Club of Duarte*, 481 U.S. 537, 545 (1987). HB 1523 also creates a similarly unrestricted ability for holders of the Preferred Religious Beliefs to deny fertility-related services to a gay or lesbian couple. HB 1523 § 3(4). The Supreme Court explained in *Obergefell* that "[t]here is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices." 135 S. Ct. at 2599. And yet the decision to raise a child—one of the most "profound choices" a couple can make—is entirely disregarded when HB 1523's religious exemption is invoked, regardless of

the extent to which facilitating an adoption or providing fertility services would actually burden anyone's exercise of religion.

- Access to Health Services.  Last, but certainly not least, HB 1523's religious accommodation burdens gay and lesbian couples' ability to keep their relationships and families strong by erecting obstacles to accessing essential health services.  Section 3(4) permits healthcare professionals and staff who adhere to any of the Preferred Religious Beliefs to deny marriage counseling or other psychological or counseling services to a gay or lesbian patient, or to the child of a gay or lesbian couple.

*       *       *

Indeed, like the Sabbath law at issue in *Thornton*, HB 1523 provides that the interests of people who hold the Preferred Religious Beliefs "automatically control" over the interests of their gay and lesbian neighbors.  *See* 472 U.S. at 709.  In her concurring opinion in *Thornton*, Justice O'Connor emphasized that this "absolute" nature of the religious accommodation in that case was its fatal flaw.  *Id.* at 712 (O'Connor, J., concurring) ("Since Title VII['s religious accommodation provision] calls for reasonable rather than absolute accommodation and extends that requirement to all religious beliefs and practices rather than protecting only [the preferred religious beliefs], I believe that an objective observer would perceive it as an anti-discrimination law rather than an endorsement of religion or a particular religious practice."); *see also Cutter* v. *Wilkinson*, 544 U.S. 709, 720–24 (2005) (upholding the Religious Land Use and Institutionalized Persons Act against an Establishment Clause challenge because, unlike the statute at issue in *Thornton*, it allowed courts to "take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries" and "[did] not differentiate among bona fide faiths").  By singling out certain religious beliefs and preventing

courts from considering the burdens HB 1523 imposes upon gay and lesbian Mississippians, HB 1523 impermissibly endorses the "particular religious practice" of discriminating against gays and lesbians. *See Thornton*, 472 U.S. at 712 (O'Connor, J., concurring); *Cutter*, 544 U.S. at 720.

      3.      HB 1523 Was Enacted With the Impermissible Purpose of Advancing Religion

That HB 1523 advances and promotes particular religious beliefs is surely no accident. Even if the text of the bill itself did not include phrases like "religious belief" and left any ambiguity as to its purpose, HB 1523's authors, sponsors and supporters have made it crystal clear that it was enacted with the express purpose of declaring official governmental support for the Preferred Religious Beliefs and promoting and advancing those beliefs over all others. *See Doe* v. *Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 294 (5th Cir. 2001) (considering "legislators' contemporaneous statements" in determining that a statute was enacted with the impermissible purpose of advancing religion).

For example, State Representative Dan Eubanks, a co-sponsor of HB 1523, stated during floor debate that the bill was intended to protect "Christians" like him. Statement of Rep. Dan Eubanks, February 19, 2016. Referring to his fellow Christians, Representative Eubanks said: "This [bill] is about aligning our right to worship, to speak, and to do according to our faith. And our faith is pretty clear." *Id.* He closed by saying that HB 1523 "protect[s] . . . what I am willing to die for—as I hope you that claim to be Christians are willing to die for as well— and that is your beliefs." *Id.* Similarly, State Senator Angela Burks Hill stated during floor debate that HB 1523 was intended to protect people who "want to exercise [their] religion not just in their church on Sunday but throughout their daily life." Statement of Sen. Angela Burks Hill, March 30, 2016. And State Senator Chris McDaniel stated during floor debate that under

HB 1523, "now the state can't force a Christian, or whomever, to violate" their religious beliefs. Statement of Sen. Chris McDaniel, March 30, 2016.

The law's sponsors and supporters were just as explicit about its pro-Christian purpose in other public statements. For example, State Representative Andy Gipson, a co-sponsor of HB 1523, stated in a Facebook post that HB 1523 was supported by "[m]ore than 270 pastors," religious leaders including Rev. Franklin Graham, all of whom are Christian organizations. Andy Gipson, Facebook (April 4, 2016), https://www.facebook.com/repandygipson/posts/10204530323092860. In a blog post on his campaign website, State Representative Dana Criswell stated that HB 1523 is opposed by "those who oppose basic [C]hristian values." Dana Criswell, *Rep. Dana Criswell – At Your Capitol, Week of March 28*, Dana Criswell for Mississippi (Apr. 2, 2016), http://www.danacriswellformississippi.com/rep_dana_criswell_at_your_capitol_week_of_march_28.

Governor Bryant, who signed HB 1523 into law, has also made it clear that the bill was explicitly intended to protect and uplift certain sectarian Christian religious beliefs. The Family Research Council, a conservative Christian ministry whose self-proclaimed "mission is to advance faith, family and freedom in public policy and the culture from a Christian worldview," Family Research Council, Vision and Mission Statements, http://www.frc.org/mission-statement (last visited June 12, 2016), recently presented Governor Bryant with an award for having signed HB 1523 into law. Leah Jessen, *'We Will Never Be Silent': Mississippi Governor Receives Religious Freedom Award*, The Daily Signal (May 27, 2016), http://dailysignal.com/2016/05/27/we-will-never-be-silent-mississippi-governor-receives-religious-freedom-award/. Governor Bryant accepted the award at a convention on May 26, 2016, where Family Research Council president Tony Perkins introduced him to the audience of

conservative Christian ministers by remarking, "You are not the only ministers that God has called . . . God has also called ministers to government." *Id.* Governor Bryant rallied the audience by noting that "the secular, progressive world" was angry with him for signing HB 1523. "They don't know that Christians have been persecuted throughout the ages," Bryant said. "They don't know that if it takes crucifixion, we will stand in line before abandoning our faith and our belief in our Lord and savior, Jesus Christ." Emily Wagster Pettus, *Mississippi Governor: 'Secular' World Angry at LGBT Law*, The Clarion-Ledger (June 1, 2016), http://www.clarionledger.com/story/news/politics/2016/05/31/mississippi-governor-secular-world-angry-over-lgbt-law/85208312/.

HB 1523 was drafted at least in part by two Christian advocacy groups. Both groups have been clear that all of their work—including the drafting of HB 1523—is motivated by a desire to conform government to their sectarian Christian worldview, which includes the religious practice of discriminating against gays and lesbians. For example, a year after *Obergefell* was decided, ADF stated that it "remains committed to promoting the truth that marriage is the lifelong union of one man and one woman," and that gay and lesbian relationships are "both morally wrong and personally damaging." *Marriage is Our Future*, Alliance Defending Freedom, https://www.adflegal.org/issues/marriage/marriage-is-our-future (last visited June 9, 2016); Gregory Baylor, *"Say You're 'Gay,' Get a Scholarship"*, Alliance Defending Freedom Blog (Aug. 26, 2011), http://adflegal.org/detailspages/blog-details/allianceedge/2011/08/26/say-you're-'gay-'-get-a-scholarship. Like ADF, the AFA teaches that "[h]omosexual behavior is sinful and unnatural," that "homosexual lust is highly addictive and difficult to stop," and that all gays and lesbians live in "rebellion against God and His

created order." Patrick Vaughn, *Serpents & Doves*, Am. Family Ass'n (Oct. 7, 2014, 12:52 pm), http://www.afa.net/the-stand/homosexuality/2015/serpents-doves/.

HB 1523's origins and legislative history thus confirm that this promotion of the Preferred Religious Beliefs, and not any secular objective, is the purpose of the bill itself. HB 1523's provisions ensure that the bill has the primary effect of advancing the Preferred Religious Beliefs, even at the cost of LGBT Mississippian's fundamental rights. By identifying particular state-sanctioned sectarian beliefs and requiring the state to afford special privileges so long as those beliefs are "sincerely held" and that an actor's conduct is "consistent with" them, *see, e.g.,* HB 1523 § 3(7), HB 1523 excessively entangles government and religion by requiring "surveillance by state authorities" over matters of theology. *Lemon* v. *Kurtzman*, 403 U.S. 602, 616 (1971). HB 1523 thus fails all three prongs of the *Lemon* test. *See id.* at 612–13 (A "statute must have a secular legislative purpose," its "primary effect must be one that neither advances nor inhibits religion," and it "must not foster an excessive government entanglement with religion.") (internal quotation marks and citation omitted).

It cannot be seriously disputed that HB 1523 was enacted with the impermissible purpose of promoting certain sectarian Christian religious beliefs. HB 1523 was not "motivated by any clearly secular purpose—indeed, the statute had *no* secular purpose." *Wallace* v. *Jaffree*, 472 U.S. 38, 43, 56 (1985) (invalidating law providing for a minute of "mediation or voluntary prayer" at beginning of school day because explicitly enacted in "effort to return voluntary prayer to the public schools"). Such "endorsement sends a message to nonadherents [of the Preferred Religious Beliefs] that they are outsiders, not full members of the political community, and an accompanying message to adherents [of the Preferred Religious Beliefs] that they are insiders, favored members of the political community." *Lynch* v. *Donnelly*, 465 U.S. 668, 688

(1984) (O'Connor, J., concurring); *accord Santa Fe Indep. Sch. Dist.* v. *Doe*, 530 U.S. 290, 309–10 (2000). As the Supreme Court has held, the professed purpose of advancing religion, standing alone, is sufficient to give rise to an Establishment Clause violation: "[T]he purpose apparent from government action can have an impact more significant than the result expressly decreed: when the government maintains Sunday closing laws, it advances religion only minimally because many working people would take the day as one of rest regardless, but if the government justified its decision with a stated desire for all Americans to honor Christ, the divisive thrust of the official action would be inescapable." *McCreary Cnty., Ky.* v. *Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 860 (2005) (citing *McGowan* v. *Maryland*, 366 U.S. 420 (1961)); *see also Am. Civil Liberties Union of Miss.* v. *Miss. State Gen. Servs. Admin.*, 652 F. Supp. 380, 383 (S.D. Miss. 1987) ("If there is no clearly secular purpose for [a challenged government] activity, then the activity is illegal." (internal quotation marks omitted)).

B.      Plaintiffs Have Standing to Sue

In order to establish standing in Federal court, a plaintiff must satisfy three elements: "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second . . . the injury has to be fairly traceable to the challenged action of the defendant . . . . Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan* v. *Def's of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, citations, and alterations omitted).

In a suit under the Establishment Clause, plaintiffs can show "standing based on the direct harm of what is claimed to be an establishment of religion" or "on the ground that they have incurred a cost or been denied a benefit on account of their religion." *Arizona Christian Sch. Tuition Org.* v. *Winn*, 563 U.S. 125, 129–30 (2011). Further, even though taxpayers

generally do not have standing to challenge the government's spending choices, a taxpayer does have standing to challenge a direct government expenditure that violates the Establishment Clause. *Id.* at 138–39. As set forth below, Plaintiffs have standing under each of these theories.

1.      HB 1523 Causes Plaintiffs "Direct Harm"

"A person or a family may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause[.]" *Ass'n of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 154 (1970). Although the "psychological consequence . . . produced by observation of conduct with which one disagrees" ordinarily will not constitute an injury in fact for standing purposes, *Valley Forge Christian Coll.* v. *Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485, where the plaintiff's injury has a direct and personal nexus to a government action, the plaintiff has sustained a constitutionally cognizable injury and has standing to challenge it. *Murray* v. *City of Austin, Tex.*, 947 F.2d 147, 151–52 (5th Cir. 1991).

In *Murray*, for example, the Fifth Circuit held that an Austin resident who regularly used Austin public services had standing to challenge the city's use of a Latin cross as part of its city insignia which appeared on government correspondence, on city vehicles, and on government buildings. *Id.* at 150–52. Because the plaintiff "personally confront[ed] the insignia in many locations around the City" and the city's use of "such a religious symbol truly offends" him, the court found his case readily distinguishable from one in which the "plaintiffs learned of challenged conduct through the media and did not live in or near the alleged offending state." *Id.* at 150–52 (citing *Valley Forge*, 454 U.S. at 485–87). Here, as in *Murray*, Plaintiffs are state residents who are forced to confront their local government's endorsement of certain religious doctrines not only in the media, but in their conversations with friends and neighbors and in their everyday lives. As a married lesbian Episcopalian, The Rev. Dr. Susan Hrostowski is singled

out because the State of Mississippi has decreed that other Christian sects are more favored than her own and has dictated that those who adhere to the Preferred Religious Beliefs are entitled to a religious accommodation that directly burdens her as a married lesbian mother and infringes on even her most fundamental constitutional rights. *See supra* at 17-21. She clearly has a personal and direct nexus to the statute's elevation of the Preferred Religious Beliefs since HB 1523 unambiguously signals to both religious and nonreligious Plaintiffs that they are outsiders and not full members of the political community. *See Lynch*, 465 U.S. at 688 (O'Connor, J., concurring). Even more so than the city insignia at issue in *Murray*, HB 1523 causes a psychological and dignitary injury to Plaintiffs sufficient to give rise to standing.

Recent circuit court decisions are directly on point. In *Catholic League for Religious and Civil Rights* v. *City and County of San Francisco*, for example, Catholic plaintiffs challenged the San Francisco Board of Supervisors' adoption of a nonbinding resolution denouncing the Archbishop of San Francisco and condemning Catholic doctrine. 624 F.3d 1043, 1047 (9th Cir. 2010) (en banc). Although the nonbinding resolution did not require any particular action or inaction or the expenditure of any government funds, the court nevertheless found that it caused plaintiffs concrete stigmatic injury giving rise to standing.[9] *Id.* at 1052–53. Much like the Fifth Circuit in *Murray*, the *Catholic League* court distinguished *Valley Forge* by analogizing the plaintiffs in that case to "Protestants in Pasadena suing San Francisco over its

---

[9] This holding drew a powerful dissent by Judge Susan Graber, which Defendants may be tempted to quote from in their opposition brief. 624 F.3d at 1062. Judge Graber emphasized that the challenged resolution was "entirely non-binding" and "has no legal effect," and therefore could not have caused a concrete redressable injury to plaintiffs. *Id.* at 1076; *see also id.* at 1079 ("The mere existence of an enactment on the books (or virtual books) is not enough."). This case can easily be distinguished from the dissent on the facts—unlike the challenged San Francisco resolution, HB 1523 is not merely hortatory but rather imposes both benefits and burdens on state residents. Moreover, Judge Graber speculated that "the parties who [were] personally the subjects of the resolution . . . [i.e. the officials and groups singled out for condemnation by name] could demonstrate cognizable harm." *See id.* at 1081. Here, given the breadth of its reach into nearly every facet of everyday life, HB 1523 condemns not just a particular gay individual, but rather all gay and lesbian people and all those who recognize the inherent dignity of gay people and their relationships.

anti-Catholic resolution"—in other words, they had no personal nexus to the challenged government action. *Id.* at 1052. "A 'psychological consequence' does not suffice as concrete harm where it is produced merely by 'observation of conduct with which one disagrees.' But it does constitute concrete harm where the 'psychological consequence' is produced by government condemnation of one's own religion or endorsement of another's *in one's own community.*" *Id.* (emphasis added) (quoting *Valley Forge*, 454 U.S. at 485). In *Catholic League*, the plaintiffs had standing to challenge a "stigmatizing resolution [that left] them feeling like second-class citizens of the San Francisco political community, and express[ed] to the citizenry of San Francisco that they are. The cause of the plaintiff's injury here is not speculative: it is the resolution itself." 624 F.3d at 1052.

Similarly, in *Awad* v. *Ziriax*, a Muslim plaintiff was found to have standing to seek a preliminary injunction preventing the certification of election results approving a state constitutional amendment barring Oklahoma courts from considering Sharia law. 670 F.3d 1111, 1118–19 (10th Cir. 2012). Although "the amendment had not yet taken effect or been interpreted by any Oklahoma court," the plaintiff had nevertheless suffered a cognizable constitutional injury: the imminent enactment of a state law that "expressly condemns his religion and exposes him and other Muslims in Oklahoma to disfavored treatment." *Id.* at 1123. The *Awad* court distinguished *Valley Forge*, holding that the plaintiff had not suffered mere "hurt feelings" but rather a statutory "directive of exclusion and disfavored treatment." *Id.*

Like the laws at issue in *Catholic League* and *Awad*, HB 1523 communicates to Mississippians that Plaintiffs—who do not hold the Preferred Religious Beliefs and in fact engage in conduct condemned by the favored religious beliefs—are second-class citizens.

2.      HB 1523 Subjects Plaintiffs to Illegitimate, Unequal Treatment

HB 1523 also causes cognizable injury to Plaintiffs by excluding them from a benefit—the absolute right to a religious accommodation—that the statute extends to people who hold the Preferred Religious Beliefs.  *See Larson*, 456 U.S. at 246 (invalidating a "state law granting a denominational preference").  This is so even though the only available relief is to remove the unconstitutional benefit from the favored group, rather than providing the withheld benefit to the burdened group.  *See Heckler* v. *Matthews*, 465 U.S. 728, 740 (1984) ("[W]hen the right invoked is that of equal treatment,  the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class."  (internal quotation marks omitted)).

In *Peyote Way Church of God, Inc.* v. *Thornburgh*, the Fifth Circuit considered an analogous claim and found that plaintiffs who were excluded from a religious accommodation (specifically, a DEA regulation providing that peyote was not a controlled substance for members of a designated church) had standing to challenge the sect-discriminatory grant of the accommodation under the Establishment Clause.  922 F.2d 1210, 1213–14 (5th Cir. 1991).  Plaintiffs had not been the subject of any civil or criminal enforcement action—they merely sought a declaratory judgment that the challenged religious accommodation was unconstitutional.  *Id.*  The court held that plaintiffs had standing because the "Supreme Court recognizes that illegitimate unequal treatment is an injury unto itself."  *Id.* at 1214 n.2 (citing *Heckler*, 465 U.S. at 739).  Plaintiffs had alleged a cognizable injury in fact because "they would suffer unjust unequal treatment if the exemptions accorded the [designated church] stand and if those exemptions unconstitutionally exclude [plaintiffs'] membership."  *Id.*

Like the DEA regulation at issue in *Peyote Way*, HB 1523 makes a religious accommodation available to some Mississippians while excluding others, including Plaintiffs.

Plaintiffs therefore have standing to challenge this "illegitimate unequal treatment" and seek appropriate injunctive relief.

### 3. Plaintiffs Have Taxpayer Standing

Of course, like other Mississippians, The Rev. Dr. Susan Hrostowski and the CSE members who live in Mississippi pay state taxes, including state income tax. "Unlike the general test for taxpayer standing, which requires 'direct injury' to the taxpayer . . . the Supreme Court's test in Establishment Clause cases requires only income taxpayer status and the showing of a direct expenditure of income tax revenues on the allegedly unconstitutional program." *Henderson* v. *Stalder*, 287 F.3d 374, 381 n.7 (5th Cir. 2002) (citing *Flast* v. *Cohen*, 392 U.S. 83, 88 (1962)); see also *Doe ex rel. Doe* v. *Beaumont Indep. Sch. Dist.*, 173 F.3d 274, 282 & n.22 (5th Cir. 1999) (plaintiffs seeking to establish "state or municipal" taxpayer standing need not show direct injury); *Doe* v. *Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995) (Establishment Clause plaintiff asserting taxpayer standing must "show that tax revenues are expended on the disputed practice").

In *Henderson*, the Fifth Circuit found that plaintiffs lacked taxpayer standing because the challenged statute (creating a pro-life license plate that supported pro-life charities) expressly provided that no public funds would be expended on the "Choose Life Council." 287 F.3d at 381. HB 1523, however, contains no such provision. To the contrary, the primary function of the statute is to create a new private right of action against the State of Mississippi that expressly permits the award of "[c]ompensatory damages," "attorneys' fees and costs", and "[a]ny other appropriate relief." The scheme created by HB 1523 would be toothless and could not function without the direct expenditure of income tax revenues expressly provided for in § 6—the damages award is intended to serve as a meaningful check on government action.

HB 1523 further provides for the direct expenditure of tax dollars to fund advocacy of the Preferred Religious Beliefs by prohibiting the government from withholding, reducing, or materially altering the terms or conditions of "any state grant, contract, subcontract, cooperative agreement, guarantee, loan scholarship, or other similar benefit" or the employment of any individual on the basis of advocacy of the Preferred Religious views, even when this advocacy is funded by taxpayer dollars. *See* §§ 3(7), 4(5). In addition, HB 1523 requires the direct expenditure of taxpayer funds to maintain a system that requires the State Registrar of Vital Records to keep records of officials who refuse to serve gay and lesbian people due to adherence to Preferred Religious Beliefs. *Id.* § 3(8)(a). These direct expenditures of taxpayer revenues are also integral to HB 1523's overall statutory scheme.

II.     HB 1523 Causes Plaintiffs Irreparable Harm

By depriving Plaintiffs of basic constitutional protections, HB 1523 inflicts continuous injury on gay and lesbian Mississippians that constitutes irreparable harm *per se*. "It is well settled that the loss of First Amendment freedoms even for minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Deerfield Medical Center* v. *City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir. Unit B 1981) (citing *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *see also Opulent Life Church* v. *City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Doe* v. *Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993) (granting preliminary injunction because plaintiffs' likely success on the merits of their Establishment Clause claim constituted a "threat of irreparable injury"); *Springtree Apartments, ALPIC* v. *Livingston Par. Council*, 207 F. Supp. 2d 507, 515 (M.D. La. 2001) ("It has been repeatedly recognized by the federal courts that violation of constitutional rights constitutes irreparable injury as a matter of law.") (citing *Elrod*

v. *Burns*, 427 U.S. 347, 373 (1976)); *Cohen* v. *Coahoma Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992).

Even if Plaintiffs' Establishment Clause injury did not constitute irreparable harm *per se*, "[a]n injury is irreparable if money damages cannot compensate for the harm." *De Leon* v. *Perry*, 975 F. Supp. 2d 632, 663 (W.D. Tex. 2014). There is obviously no dollar amount that can make Plaintiffs or their family members whole for the humiliation and stigma inflicted by the State's endorsement of the Preferred Religious Beliefs. There is no actuary who could quantify the pain The Rev. Dr. Susan Hrostowski feels by virtue of the fact that her State has declared that neither the Church to which she has devoted her life nor the family she has built around her faith (including her teenage son, Hudson Garner) are worthy of respect, dignity, or equality under the law.

III.     The Threatened Harm if the Injunction is Denied Outweighs Any Harm That May Result

Defendants' inability to enforce an illegal and unconstitutional statute privileging Preferred Religious Beliefs are not "harms" that this Court should recognize. As a result, Mississippi is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd.* v. *Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). *See also De Leon*, 975 F. Supp. 2d at 664; *Bassett* v. *Snyder*, 951 F. Supp. 2d 939, 971 (E.D. Mich. 2013).

By contrast, the Plaintiffs' harms—the deprivation of their First Amendment freedoms—are immediate and irreparable. Without a preliminary injunction, Plaintiffs will suffer from the denial of their rights under the Establishment Clause which far outweighs any potential damage that the requested injunction may cause to the State of Mississippi. *See New Orleans Secular Humanist Ass'n, Inc.* v. *Bridges*, Civil Action No. 04-3165, 2006 WL 1005008,

at *5 (E.D. La. Apr. 17, 2006) ("The plaintiff is being denied its First Amendment freedoms while the statute remains in operation. In contrast, the State, at a minimum, does not appear to be at risk of suffering any harm from a grant of the preliminary injunction.").

Ultimately, granting a preliminary injunction simply returns Mississippi to the status quo following the Supreme Court's recognition of gay and lesbian couples' fundamental right to marry. *See Jackson Womens' Health Org.* v. *Currier*, 940 F. Supp. 2d 416, 424 (S.D. Miss. 2013), *aff'd as modified sub nom. Jackson Women's Health Org.* v. *Currier*, 760 F.3d 448 (5th Cir. 2014) ("the Court concludes that the threatened injury outweighs any harm that will result if the injunction is granted. This order essentially continues the status quo.").

IV.     The Grant of an Injunction Will Not Undermine the Public Interest

Finally, and for similar reasons, a preliminary injunction vindicating Plaintiffs' most basic constitutional rights would only serve to reinforce this "Nation's basic commitment . . . to foster the dignity and well-being of all persons within its borders." *Goldberg* v. *Kelly*, 397 U.S. 254, 264–65 (1970). *See also Doe* v. *Duncanville Indep. Sch. Dist.,* 994 F.2d 160, 166 (5th Cir. 1993) ("Assuming that the [plaintiffs'] Establishment Clause rights have been infringed, the threat of irreparable injury to the [plaintiffs] and to the public interest that the clause purports to serve are adequately demonstrated."); *Am. Civil Liberties Union of Mississippi* v. *Mississippi State Gen. Servs. Admin.*, 652 F. Supp. 380, 383 (S.D. Miss. 1987) ("The public interest must fall on the side of Constitutional rights of individuals over the will of the majority. That is the underlying fundamental of the Bill of Rights of our Constitution."). *Keyes* v. *Sch. Dist. No. 1, Denver, Colorado*, 396 U.S. 1215, 1216 (1969); *Ingebretsen* v. *Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996). For this reason, injunctions protecting constitutional rights "are always in the public interest." *Opulent Life Church* v. *City of Holly Springs, Miss.*, 697 F.3d 279, 298

(5th Cir. 2012). *See also Tanco* v. *Haslam*, No. 3:13-CV-01159, 2014 WL 997525, at *8 (M.D. Tenn. Mar. 14, 2014).

CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their Motion for a Preliminary Injunction and such other and further relief as the Court may deem proper.

Dated:  June 13, 2016

| | |
|---|---|
| **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP** | **FISHMAN HAYGOOD, LLP** |
| By: /s/ Roberta A. Kaplan | By: /s/ Alysson Mills |
| Roberta A. Kaplan* | Alysson Mills |
| Joshua D. Kaye* | Bar No. 102861 |
| Jacob J. Taber* | 201 St. Charles Avenue, Suite 4600 |
| 1285 Avenue of the Americas | New Orleans, Louisiana 70170 |
| New York, NY 10019-6064 | Tel:  (504) 586-5253 |
| Tel:  (212) 373-3000 | Fax:  (504) 586-5250 |
| Fax:  (212) 757-3990 | amills@fishmanhaygood.com |
| rkaplan@paulweiss.com | |
| jkaye@paulweiss.com | |
| jtaber@paulweiss.com | |

Zachary A. Dietert*
2001 K Street NW
Washington, DC 20009
Tel: (202) 223-7300
Fax: (202) 223-7420
zdietert@paulweiss.com

*Attorneys for Plaintiffs Campaign for Southern Equality and Susan Hrostowski*
*\*Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 13, 2016, I electronically transmitted the

above and foregoing document to the Clerk of the Court using the ECF system for filing.

By: /s/ Alysson Mills
    Alysson Mills
    Bar No. 102861
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: (504) 586-5253
Fax: (504) 586-5250
amills@fishmanhaygood.com