**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | |
|---|---|
| RIMS BARBER; CAROL BURNETT; JOAN BAILEY; KATHERINE ELIZABETH DAY; ANTHONY LAINE BOYETTE; DON FORTENBERRY; SUSAN GLISSON; DERRICK JOHNSON; DOROTHY C. TRIPLETT; RENICK TAYLOR; BRANDIILYNE MANGUM-DEAR; SUSAN MANGUM; JOSHUA GENERATION METROPOLITAN COMMUNITY CHURCH; CAMPAIGN FOR SOUTHERN EQUALITY; and SUSAN HROSTOWSKI | **PLAINTIFFS** |

|  |  |
|---|---|
| **V.** | **CAUSE NO. 3:16-CV-417-CWR-LRA** *consolidated with* **CAUSE NO. 3:16-CV-442-CWR-LRA** |

| | |
|---|---|
| PHIL BRYANT, Governor; JIM HOOD, Attorney General; JOHN DAVIS, Executive Director of the Mississippi Department of Human Services; and JUDY MOULDER, State Registrar of Vital Records | **DEFENDANTS** |

---

**MEMORANDUM OPINION AND ORDER**

---

The plaintiffs filed these suits to enjoin a new state law, "House Bill 1523," before it goes into effect on July 1, 2016. They contend that the law violates the First and Fourteenth Amendments to the United States Constitution. The Attorney General's Office has entered its appearance to defend HB 1523. The parties briefed the relevant issues and presented evidence and argument at a joint hearing on June 23 and 24, 2016.

The United States Supreme Court has spoken clearly on the constitutional principles at stake. Under the Establishment Clause of the First Amendment, a state "may not aid, foster, or

promote one religion or religious theory against another." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). "When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides." *McCreary Cnty., Kentucky v. ACLU of Kentucky*, 545 U.S. 844, 860 (2005) (citation omitted). Under the Equal Protection Clause of the Fourteenth Amendment, meanwhile, a state may not deprive lesbian and gay citizens of "the protection of general laws and policies that prohibit arbitrary discrimination in governmental and private settings." *Romer v. Evans*, 517 U.S. 620, 630 (1996).

HB 1523 grants special rights to citizens who hold one of three "sincerely held religious beliefs or moral convictions" reflecting disapproval of lesbian, gay, transgender, and unmarried persons. Miss. Laws 2016, HB 1523 § 2 (eff. July 1, 2016). That violates both the guarantee of religious neutrality and the promise of equal protection of the laws.

The Establishment Clause is violated because persons who hold contrary religious beliefs are unprotected – the State has put its thumb on the scale to favor some religious beliefs over others. Showing such favor tells "nonadherents that they are outsiders, not full members of the political community, and . . . adherents that they are insiders, favored members of the political community." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 309-10 (2000) (quotation marks and citation omitted). And the Equal Protection Clause is violated by HB 1523's authorization of arbitrary discrimination against lesbian, gay, transgender, and unmarried persons.

"It is not within our constitutional tradition to enact laws of this sort." *Romer*, 517 U.S. at 633. The plaintiffs' motions are granted and HB 1523 is preliminarily enjoined.

I.      **The Parties**

A.      **Plaintiffs**

The plaintiffs in this matter are 13 individuals and two organizations – Joshua Generation Metropolitan Community Church (JGMCC) and the Campaign for Southern Equality (CSE).

All of the individual plaintiffs are residents, citizens, and taxpayers of Mississippi who disagree with the beliefs protected by HB 1523. They fall into three broad and sometimes overlapping categories: (1) clergy and other religious officials whose religious beliefs are not reflected in HB 1523; (2) members of groups targeted by HB 1523; and (3) other citizens who, based on their religious or moral convictions, do not hold the beliefs HB 1523 protects.

The first group includes Rev. Dr. Rims Barber, Rev. Carol Burnett, Rev. Don Fortenberry, Brandiilyne Mangum-Dear, Susan Mangum, and Rev. Dr. Susan Hrostowski. Rev. Dr. Barber is an ordained minister in the Presbyterian church. Rev. Burnett is an ordained United Methodist minister. Rev. Fortenberry is an ordained United Methodist minister and the retired chaplain of Millsaps College. Mangum-Dear is the pastor at JGMCC, while Mangum is the director of worship at that church. Rev. Dr. Hrostowski is the vicar of St. Elizabeth's Episcopal Church in Collins, Mississippi, as well as an employee of the University of Southern Mississippi.

Katherine Elizabeth Day, Anthony (Tony) Laine Boyette, Dr. Susan Glisson, and Renick Taylor comprise the second group of plaintiffs.[1] Day is a transgender woman; Boyette is a transgender man. Dr. Glisson, an employee of the University of Mississippi, is unmarried and in a long-term sexual romantic relationship with an unmarried man. Taylor is a gay man who is engaged to his male partner. The couple plans to marry in the summer of 2017.

The third group of individual plaintiffs includes Joan Bailey, Derrick Johnson, and Dorothy Triplett. Bailey is a retired therapist whose practice was primarily devoted to lesbians.

---

[1] Mangum-Dear, Mangum, and Rev. Dr. Hrostowski also fall into this group.

Johnson is the Executive Director of the Mississippi State Conference of the NAACP, and Triplett is a retired government employee and a longtime activist.

JGMCC is a ministry in Forrest County, Mississippi, whose members fall into all three categories. It "welcomes all people regardless of age, race, sexual orientation, gender identity, or social status." Docket No. 1, ¶ 16, in Cause No. 3:16-CV-417 [hereinafter *Barber*]. In particular, the church sponsors "a community service ministry that promotes LGBT+ equality." *Id.* Approximately 90% of its members in Forrest County identify as LGBT. Transcript of Hearing on Motion for Preliminary Injunction at 168, Barber v. Bryant, No. 3:16-CV-417 (S.D. Miss. June 23, 2016) [hereinafter Tr. of June 23]. There are over 400 Metropolitan Community Churches worldwide. *Id.*

CSE is a non-profit organization that works "across the South to promote the full humanity and equality of lesbian, gay, bisexual, and transgender people in American life." Docket No. 2-2, at 2, in Cause No. 3:16-CV-442 [hereinafter *CSE IV*]. It is based in North Carolina but has worked in Mississippi since 2012. *Id.* CSE claims to advocate for Mississippians in all three categories of plaintiffs. *Id.* at 4.

### B.     Defendants

Governor Phil Bryant is sued in his official capacity as the chief executive of the State of Mississippi. State law charges him with the responsibility to "see that the laws are faithfully executed." Miss. Code Ann. § 7-1-5(c).

Attorney General Jim Hood is also sued in his official capacity. Among his powers and duties, he is required to "intervene and argue the constitutionality of any statute when notified of a challenge." *Id.* § 7-5-1; *see In the Interest of R.G.*, 632 So. 2d 953, 955 (Miss. 1994).

John Davis is the Executive Director of the Mississippi Department of Human Services.

Under Mississippi Code § 43-1-2(5), he is tasked with implementing state laws protecting

children. One of the offices under his purview, the Division of Family and Children's Services, is

"responsible for the development, execution and provisions of services" regarding foster care,

adoption, licensure, and other social services. Miss. Code Ann. § 43-1-51.[2]

Judy Moulder is the Mississippi State Registrar of Vital Records. She is responsible for

"carry[ing] into effect the provisions of law relating to registration of marriages." *Id.* § 51-57-43.

HB 1523 requires Moulder to collect and record recusal notices from persons authorized to issue

marriage licenses who wish to *not* issue marriage licenses to certain couples due to a belief

enumerated in HB 1523. HB 1523 § 3(8)(a).

## II.    Factual and Procedural History

### A.    Same-Sex Marriage

Because HB 1523 is a direct response to the Supreme Court's 2015 same-sex marriage

ruling, it is necessary to discuss the background of that ruling.

This country had long debated whether lesbian and gay couples could join the institution

of civil marriage. *See, e.g.*, Andrew Sullivan, *Here Comes the Groom*, The New Republic, Aug.

27, 1989. The debate played itself out on the local, state, and national levels via constitutional

amendments, legislative enactments, ballot initiatives, and propositions.

In its most optimistic retelling, "[i]ndividuals on both sides of the issue passionately, but

respectfully, attempted to persuade their fellow citizens to accept their views." *Obergefell v.*

*Hodges*, 135 S. Ct. 2584, 2627 (2015) (Scalia, J., dissenting). *But see* David Carter, Stonewall:

The Riots that Sparked the Gay Revolution 109-10, 183-84 (2004) (describing the 1966

---

[2] During the 2016 legislative session, Mississippi's lawmakers created the Department of Child Protective Services, a standalone agency independent of the Department of Human Services. *See* 2016 Miss. Laws, SB 2179. The new department was created upon passage, but the bill allows a transition period of up to two years. *Id.*

Compton's Cafeteria riots by transgender citizens in San Francisco, and the famous 1969 Stonewall riots in New York City). Less charitably, but also true, is the reality that every time lesbian and gay citizens moved one step closer to legal equality, voters and their representatives passed new laws to preserve the status quo.

In the 1990s, for example, Hawaii's same-sex marriage lawsuit inspired the federal Defense of Marriage Act (DOMA) and a wave of state-level "mini-DOMAs." *Campaign for Southern Equality v. Bryant*, 64 F. Supp. 3d 906, 915 (S.D. Miss. 2014) [hereinafter *CSE I*]. Mississippi's politicians joined the movement by issuing an executive order and passing a law banning same-sex marriage. *Id.* It was not until 2013 that DOMA was struck down in part. *United States v. Windsor*, 133 S. Ct. 2675 (2013). Mississippi's mini-DOMA lasted until 2015. *CSE I*, 64 F. Supp. 3d at 906.

In the early 2000s, *Lawrence v. Texas* and *Goodridge v. Department of Public Health*, cases that found in favor of lesbian and gay privacy and marriage rights, respectively, resulted in a wave of state constitutional amendments banning same-sex marriage. *CSE I*, 64 F. Supp. 3d at 915. Mississippians approved such a constitutional amendment by the largest margin in the nation. *Id.*; *see* Michael Foust, *'Gay Marriage' a Loser: Amendments Pass in all 11 States*, Baptist Press, Nov. 3, 2004.

The lawfulness of same-sex marriage was finally resolved in 2015. The Supreme Court ruled in *Obergefell v. Hodges* that same-sex couples must be allowed to join in civil marriage "on the same terms and conditions as opposite-sex couples." 135 S. Ct. at 2605. The decision applies to every governmental agency and agent in the country. "The majority of the United States Supreme Court dictates the law of the land, and lower courts are bound to follow it."

6

*Campaign for Southern Equality v. Mississippi Dep't of Human Servs.*, --- F.3d ---, 2016 WL 1306202, at *14 (S.D. Miss. Mar. 31, 2016) [hereinafter *CSE III*].

Many celebrated the ruling as overdue. Others felt like change was happening too quickly.[3] And some citizens were concerned enough to advocate new laws "to insulate state officials from legal risk if they do not obey the decision based on a religious objection."[4] Lyle Denniston, *A Plea to Resist the Court on Same-Sex Marriage*, SCOTUSblog, July 9, 2015.

The Supreme Court's decision *had* taken pains to reaffirm religious rights. Its commitment to the free exercise of religion is important and must be quoted in full.

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered. . . . In turn, those who believe allowing same-sex marriage is proper or indeed essential, whether as a matter of religious conviction or secular belief, may engage those who disagree with their view in an open and searching debate. The Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex.

*Obergefell*, 135 S. Ct. at 2607.

"As the *Obergefell* majority makes clear, the First Amendment must protect the rights of [religious] individuals, even when they are agents of government, to *voice* their personal objections – this, too, is an essential part of the conversation – but the doctrine of equal dignity prohibits them from *acting on* those objections, particularly in their official capacities, in a way that demeans or subordinates LGBT individuals . . . ." Laurence H. Tribe, *Equal Dignity:*

---

[3] It is fair to say that same-sex marriage rights went "from unthinkable to the law of the land in just a couple of decades." Nate Silver, *Change Doesn't Usually Come This Fast*, FiveThirtyEight, June 26, 2015.

[4] Sadly, this was predicted years ago. In 1999, four members of Congress expressed concern that religious freedom legislation "would not simply act as a shield to protect religious liberty, but could also be used by some as a sword to attack the rights of many Americans, including unmarried couples, single parents, lesbians and gays." H.R. Rep. No. 106-219, at 41 (1999), *available at* 1999 WL 462644.

*Speaking Its Name*, 129 Harv. L. Rev. F. 16 (Nov. 10, 2015). *Obergefell*'s author, Justice

Kennedy, had also reaffirmed this principle in *Burwell v. Hobby Lobby Stores*. "[N]o person may

be restricted or demeaned by government in exercising his or her religion. Yet neither may that

same exercise unduly restrict other persons . . . in protecting their own interests." 134 S. Ct.

2751, 2786-87 (2014) (Kennedy, J., concurring).

In the immediate wake of *Obergefell*, the Fifth Circuit issued a published opinion

declaring that "*Obergefell*, in both its Fourteenth and First Amendment iterations, is the law of

the land and, consequently, the law of this circuit and should not be taken lightly by actors within

the jurisdiction of this court." *Campaign for Southern Equality v. Bryant*, 791 F.3d 625, 627 (5th

Cir. 2015) [hereinafter *CSE II*]. The court issued the mandate forthwith. *Id.*

A few hours later, with this mandate in hand, this Court issued a Permanent Injunction

and a Final Judgment enjoining enforcement of Mississippi's statutory and constitutional same-

sex marriage ban. The Attorney General's Office soon advised Circuit Clerks to issue marriage

licenses "to same-sex couples on the same terms and conditions accorded to couples of the

opposite sex." *In re Steve Womack*, 2015 WL 4920123, at *1 (Miss. A.G. July 17, 2015).

In physics, every action has its equal and opposite reaction. In politics, every action has

its predictable overreaction. Politicians reacted to the Hawaiian proceedings with DOMA and

mini-DOMAs. *Lawrence* and *Goodridge* birthed the state constitutional amendments. And now

*Obergefell* has led to HB 1523. The next chapter of this back-and-forth has begun.

### B.      House Bill 1523

Mississippi's highest elected officials were displeased with *Obergefell*. Governor Bryant

stated that *Obergefell* "usurped [states'] right to self-governance and has mandated that states

must comply with federal marriage standards—standards that are out of step with the wishes of

8

many in the United States and that are certainly out of step with the majority of Mississippians."[5] Governor Phil Bryant, *Governor Bryant Issues Statement on Supreme Court Obergefell Decision*, June 26, 2015. [6]

Legislative leaders felt similarly. Lieutenant Governor Tate Reeves, who presides over the State Senate, called the decision an "overreach of the federal government." Geoff Pender, *Lawmaker: State Could Stop Marriage Licenses Altogether*, The Clarion-Ledger, June 26, 2015.[7] Speaker of the House Philip Gunn said *Obergefell* was "in direct conflict with God's design for marriage as set forth in the Bible. The threat of this decision to religious liberty is very clear." *Id.*[8] Representative Andy Gipson, Chairman of the House Judiciary B Committee, pledged to study whether Mississippi should stop issuing marriage licenses altogether. *Id.*[9]

---

[5] Governor Bryant's statement is only partially true. While states have mostly been permitted to regulate marriage within their borders, the Supreme Court has stepped in to ensure that "self-governance" complies with equal protection. *See Loving v. Virginia,* 388 U.S. 1, 12 (1967) ("Marriage is one of the basic civil rights of man, fundamental to our very existence and survival. To deny this fundamental freedom on so unsupportable a basis as the racial classifications embodied in these statutes . . . is surely to deprive all the State's citizens of liberty without due process of law.").

[6] The Governor's remarks sounded familiar. In the mid-1950s, Governor J.P. Coleman said that *Brown v. Board of Education* "represents an unwarranted invasion of the context in which the statute was enacted and the powers of the states." Charles C. Bolton, William F. Winter and the New Mississippi: A Biography 97 (2013). In 1962, before a joint session of the Mississippi Legislature – and to a "hero's reception" – Governor Ross Barnett was lauded for invoking states' rights during the battle to integrate the University of Mississippi. Charles W. Eagles, The Price of Defiance: James Meredith and the Integration of Ole Miss 290-91 (2009) [hereinafter Price of Defiance].

[7] The State has objected to the Court's use of newspaper articles. In an Establishment Clause challenge, however, a District Court errs when it takes "insufficient account of the context in which the statute was enacted and the reasons for its passage." *Salazar v. Buono*, 559 U.S. 700, 715 (2010). The Fifth Circuit agrees: "context is critical in assessing neutrality" in this area of the law. *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 473 (5th Cir. 2001).

[8] Using God as a justification for discrimination is nothing new. It was Governor Barnett who proclaimed that "[t]he Good Lord was the original segregationist. He made us white, and he intended that we stay that way." Price of Defiance at 282. Warping the image of God was not reserved to Mississippi politicians. In testimony before Congress during the debate on the Civil Rights Act of 1964, a Maryland businessman testified before a Senate committee that "God himself was the greatest segregationist of all time as is evident when he placed the Caucasians in Europe, the black people in Africa, the yellow people in the Orient and so forth." Linda C. McClain, *The Civil Rights Act of 1964 and "Legislating Morality": On Conscience, Prejudice, and Whether "Stateways" Can Change "Folkways"*, 95 B.U. L. Rev. 891, 917 (2015). He continued, "Christ himself never lived an integrated life, and . . . when he chose His close associates, they were all white. This doesn't mean that He didn't love all His creatures, but it does indicate that He didn't think we had to have all this togetherness in order to go to heaven." *Id.*

[9] The suggestion was (again) familiar. A few months after the Supreme Court's decision in *Brown*, Mississippians – those who were permitted to vote, that is – "voted two to one approving a constitutional amendment abolishing the state schools system if it integrated." Dennis J. Mitchell, A New History of Mississippi 404 (2014).

The angst was not limited to the executive and legislative branches. Two Justices of the Mississippi Supreme Court also expressed their disgust with *Obergefell*. In 2014, a lesbian had petitioned that body for the right to divorce her wife in a Mississippi court. *Czekala-Chatham v. State ex rel. Hood*, --- So. 3d ---, 2015 WL 10985118 (Miss. Nov. 5, 2015). While her case was pending, the U.S. Supreme Court handed-down *Obergefell*. Although a majority of the Mississippi Supreme Court concluded that *Obergefell* resolved her case in her favor, Justices Dickinson and Coleman argued that the *Obergefell* Court had legislated from the bench and overstepped its authority. *Id.* at *3 (Dickinson, J., dissenting). They opined that "state courts are not required to recognize as legitimate legal authority a Supreme Court decision that is in no way a constitutional interpretation," and claimed "a duty to examine those decisions to make sure they indeed are constitutional interpretations, rather than . . . an exercise in judicial will." *Id.* at *4, *6.[10] *Obergefell* was "[w]orthy only to be disobeyed," they said. *Id.* at *5.

Mississippi's legislators formally responded to *Obergefell* in the next legislative session.[11] Speaker Gunn drafted and introduced HB 1523, the "Protecting Freedom of Conscience from Government Discrimination Act."[12] The bill overwhelmingly passed both chambers, and the Governor signed it into law on April 5, 2016. It goes into effect on July 1.

HB 1523's meaning is contested. A layperson reading about the bill might conclude that it gives a green light to discrimination and prevents accountability for discriminatory acts.

---

[10] *But see James v. City of Boise, Idaho*, 136 S. Ct. 685, 686 (2016) (per curiam) ("The Idaho Supreme Court, like any other state or federal court, is bound by this Court's interpretation of federal law. The state court erred in concluding otherwise.").

[11] This had happened before in the religious liberty context. In 1994, "[o]n a wave of public sentiment and indignation over the treatment of a Principal . . . who allowed students to begin each school day with a prayer over the intercom, the Mississippi legislature passed the School Prayer Statute at issue here." *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 277 (5th Cir. 1996). The statute was unconstitutional. *Id.*

[12] "'After the Supreme Court decision in Obergefell (v. Hodges), it became apparent that there would be a head-on collision between religious convictions about gay marriage and the right to gay marriage created by the decision,' [Speaker] Gunn said." Adam Ganucheau, *Mississippi's 'Religious Freedom' Law Drafted Out of State*, Mississippi Today, May 17, 2016. One commentator concluded that "HB 1523 was hatched" after the issuance of this Court's Permanent Injunction. Sid Salter, *Constitutional Ship has Sailed on Same-Sex Marriage*, The Clarion-Ledger, May 8, 2016. "Clearly, House Bill 1523 seeks to work around the federal *Obergefell* decision at the state level." *Id.*

Arielle Dreher, *Hundreds Rally to Repeal HB 1523, State Faces Deadline Today Before Lawsuit*,

Jackson Free Press, May 2, 2016 (quoting Chad Griffin, President of the Human Rights

Campaign, as saying, "it's sweeping and allows almost any individual or organization to justify

discrimination against LGBT people, against single mothers and against unwed couples.").

Someone else reading the same article might conclude that HB 1523 simply "reinforces" the

First Amendment. *Id.* (quoting Speaker Gunn as saying the gay community "can do the same

things that they could before"). So any discussion should begin with the plain text of the bill.

HB 1523 enumerates three "sincerely held religious beliefs or moral convictions" entitled

to special legal protection. They are,

> (a) Marriage is or should be recognized as the union of one man and one woman;
> (b) Sexual relations are properly reserved to such a marriage; and
> (c) Male (man) or female (woman) refer to an individual's immutable biological
> sex as objectively determined by anatomy and genetics at time of birth.

HB 1523 § 2. These will be referred to as the "§ 2" beliefs.

The bill then says that the State of Mississippi will not "discriminate" against persons

who act pursuant to a § 2 belief. *Id.* §§ 3-4.[13] For example, if a small business owner declines to

provide goods or services for a same-sex wedding because it would violate his or her § 2 beliefs,

HB 1523 allows the business to decline without fear of State "discrimination."

"Discrimination" is defined broadly. It covers consequences in the realm of taxation,

employment, benefits, court proceedings, licenses, financial grants, and so on. In other words,

the State of Mississippi will not tax you, penalize you, fire you, deny you a contract, withhold a

diploma or license, modify a custody agreement, or retaliate against you, among many other

---

[13] HB 1523 § 9(2)-(3) defines "State government" to include private persons, corporations, and other legal entities.

enumerated things, for your § 2 beliefs. *Id.*[14] An organization or person who acts on a § 2 belief is essentially immune from State punishment.[15]

The Governor's signing statement recognized that consequences under federal law are unchanged. States "lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies." *Haywood v. Drown*, 556 U.S. 729, 736 (2009).

Parts of the law provide fodder for both its opponents and its proponents. One section of HB 1523 guarantees that the State will not take adverse action against a religious organization that declines to solemnize a wedding because of a § 2 belief. *Id.* § 3. There is nothing new or controversial about that section. Religious organizations already have that right under the Free Exercise Clause of the First Amendment.

Citizens also enjoy substantial religious rights under existing state law. The Mississippi Constitution ensures that "the free enjoyment of all religious sentiments and the different modes of worship shall be held sacred," and "no preference shall be given by law to any religious sect or mode of worship."[16] Miss. Const., § 18. In addition, a 2014 law called the "Mississippi Religious Freedom Restoration Act" (RFRA) states that the government "may substantially burden a person's exercise of religion *only* if it demonstrates that application of the burden to the person: (i) Is in furtherance of a compelling governmental interest; and (ii) Is the least restrictive means of furthering that compelling governmental interest." Miss. Code Ann. § 11-61-1(5)(b) (emphasis added). HB 1523 does not change either of these laws.[17]

---

[14] This is more expansive than other anti-discrimination laws, such as Title VII or Title IX.

[15] The broad immunity provision may violate the Mississippi Constitution, which provides that "every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice shall be administered without sale, denial, or delay." Miss. Const. § 24.

[16] Despite the inclusive language just quoted, § 18 of the Mississippi Constitution then says that "[t]he rights hereby secured shall not be construed . . . to exclude the Holy Bible from use in any public school."

[17] Mississippi's RFRA is also part of the political back-and-forth on LGBT rights. "State-based RFRAs were passed to preemptively provide religious exemptions to people in advance of a Supreme Court ruling on gay marriage, [Professor Doug] NeJaime said." Alana Semuels, *Should Adoption Agencies Be Allowed to Discriminate Against*

We return to HB 1523. Several parts of the bill are unclear. One says the State will not take action against foster or adoptive parents who intend to raise a foster or adoptive child in accordance with § 2 beliefs. HB 1523 § 3(3). It is not obvious how the State would respond if the child in urgent need of placement was a 14-year-old lesbian.

Another section discusses a professional's right to refuse to participate in "psychological, counseling, or fertility services" because of a § 2 belief. *Id.* § 3(4). But some professions' ethical rules prohibit "engag[ing] in discrimination against prospective or current clients . . . based on . . . gender, gender identity, sexual orientation, [and] marital/ partnership status," to name a few categories. American Counseling Association, Code of Ethics § C.5 (2014). Under HB 1523, though, a public university's faculty must confer a degree upon, and the State must license, a person who refuses to abide by her chosen profession's Code of Ethics.[18]

Section 3(8)(a) of the law, in contrast, is crystal clear. It says that a government employee with authority to issue marriage licenses may recuse herself from that duty if it would violate one of her § 2 beliefs. HB 1523 § 3(8)(a). The employee must provide prior written notice to the State Registrar of Vital Records and be prepared to "take all necessary steps to ensure that the authorization and licensing of any legally valid marriage is not impeded or delayed as a result of any recusal." *Id.* The State's attorneys agree that this section "effectively amends Mississippi County Circuit Clerks' Office's marriage licensing obligations under state law by specifying conditions under which a clerk's employee may recuse himself or herself from authorizing or licensing marriages." Docket No. 41, at 6, in Cause No. 3:14-CV-818.

---

*Gay Parents?*, The Atlantic, Sept. 23, 2015. Mississippi's RFRA fits this timeline perfectly. In summer 2013, the Supreme Court's ruling in *United States v. Windsor* foreshadowed an imminent victory for same-sex marriage. A few months later, Mississippi's elected officials enacted the State RFRA.

[18] Relatedly, in other states, citizens have successfully sued so-called "gay conversion" therapists for consumer fraud and professional malpractice. *See* Olga Khazan, *The End of Gay Conversion Therapy*, The Atlantic, June 26, 2015. HB 1523 § 4 would bar a Mississippi court from enforcing such a verdict.

The significance of this section is in the eye of the beholder. The plaintiffs argue that it facilitates discrimination against LGBT Mississippians by encouraging clerks to opt-out of serving same-sex couples.

HB 1523's defenders respond that the bill protects *against* discrimination by ensuring that clerks do not have to violate their religious beliefs. When Senator Jenifer Branning shepherded the bill through the Senate floor debate, she argued that the legislation actually *lifts* a burden imposed by *Obergefell*.[19] H.B. 1523, Debate on the Floor of the Mississippi Senate, at 7:02 (Mar. 31, 2016) (statement of Sen. Jenifer Branning) [hereinafter Senate Floor Debate]. In her view, HB 1523 is "balancing" legislation allowing those who oppose same-sex marriage to continue to perform their jobs with a "clear conscience," while protecting the rights of same-sex couples to receive a marriage license from another clerk. *Id.* at 26:55, 32:27.[20]

### C.    These Suits

On June 3, 2016, Rev. Dr. Barber, Rev. Burnett, Bailey, Day, Boyette, Rev. Fortenberry, Dr. Glisson, Johnson, Triplett, Taylor, Mangum-Dear, Mangum, and JGMCC filed the first suit encompassed by this Order. *See* Docket No. 1, in *Barber*. They asserted Establishment and Equal Protection claims against Governor Bryant, General Hood, Executive Director Davis, and Registrar Moulder. *Id.* They requested a declaratory judgment that HB 1523 is unconstitutional on its face, as well as preliminary and permanent injunctive relief enjoining its enforcement.

---

[19] Mississippi does not have formal legislative history; however, the Mississippi College School of Law's Legislative History Project archives the floor debate for bills that pass. The HB 1523 videos are available at http://law.mc.edu/legislature/bill_details.php?id=4621&session=2016. Unofficial transcripts were also introduced into evidence. *See* Docket No. 33-14, in *CSE IV*.

[20] These arguments are apparently increasingly common. *See* Douglas Nejaime & Reva B. Siegel, *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516, 2560-61 (2015) (arguing that proponents of traditional morality "now emphasize different justifications for excluding same-sex couples from marriage -- for example, that marriage is about biological procreation or that preserving 'traditional marriage' protects religious liberty. At the same time, in anticipation of the possibility of defeat, they argue for exemptions from laws that recognize same-sex marriage. In so doing, they shift from speaking as a majority enforcing customary morality to speaking as a minority seeking exemptions based on religious identity.").

CSE and Rev. Dr. Hrostowski sued the same defendants on June 10, 2016. *See* Docket No. 1, in *CSE IV*. They asserted an Establishment Clause claim and sought the same relief as the *Barber* plaintiffs. *Id.*

The various plaintiffs conferred and moved to consolidate. The State was prepared to argue *Barber*, but objected to consolidation to avoid an abbreviated briefing schedule and a hearing in *CSE IV*. *See* Docket No. 22, in *Barber*. During a status conference, the Court heard the parties' positions and granted the State its requested response deadline. The Court also delayed the motion hearing – which was converted into a joint hearing – by two days. The State renewed its objection to the consolidated hearing and was overruled. These reasons follow.

The State essentially argued that there were too many HB 1523-related lawsuits – there are four – to fully prepare for a hearing in *CSE IV*. It entered into the record a Mississippi Today article in which General Hood said, "'I and over half of our lawyers in the Civil Litigation Division are working overtime and weekends attempting to prepare for the hearings.'" Docket No. 22-2, in *Barber*. General Hood added that budget cuts prevented him from hiring an expert to prepare "for the highly specialized area of the law seldom litigated in Mississippi -- the Establishment Clause." *Id.* (ellipses omitted).

The first hurdle for the State is the substantial overlap in subject matter between *Barber* and *CSE IV*. The similar briefing suggests that little additional work was required to defend *CSE IV*. *Barber*, in fact, has a greater number of substantive claims than *CSE IV*. Having prepared for the more comprehensive hearing, it is difficult for the State to object to the narrower one.

The second, more significant problem with the State's argument is the utter predictability of these lawsuits. The media started reporting the likelihood of litigation on April 5, the day the Governor signed HB 1523 into law. *See, e.g.*, Arielle Dreher, *'Total Infringement': Governor*

*Signs HB 1523 Over Protests of Business Leaders, Citizens*, Jackson Free Press, Apr. 5, 2016

("'You will see several lawsuits filed before it becomes law if the governor signs it,'" one

attorney said); Caray Grace, *Local Residents and City Leaders React to House Bill 1523*,

WLOX, Apr. 5, 2016 ("'the lawyers were already starting to draft up lawsuits so that as soon as

he signed it, they could start filing them,' said [Molly] Kester.").

General Hood apparently knew these lawsuits were coming as early as April 5, when he

said he would make "case-by-case" decisions on whether to defend the lawsuits, and warned that

the bill doesn't override federal or constitutional rights. *Legal Pressure May Be Ahead for*

*Mississippi Law Denying Service to Gays*, Chicago Tribune, Apr. 5, 2016.

The media even telegraphed the exact Establishment Clause arguments the plaintiffs

eventually asserted. In early April, the press reported that 10 law professors from across the

country released a memorandum outlining several ways in which HB 1523 violates the

Establishment Clause. *See* Sierra Mannie, *Will Mississippi's "Religious Freedom" Act Impact*

*Children in Public and Private Schools?*, The Hechinger Report, Apr. 8, 2016. In May, Jackson

attorney Will Manuel, a partner at Bradley LLP, said, "'[b]y only endorsing certain religious

thought, I believe it is in violation of the Establishment Clause of the First Amendment which

prohibits government from establishing or only protecting one religion. That should be a fairly

clear cut constitutional challenge." Ted Carter, *Feds Unlikely to Ignore Mississippi's HB1523,*

*Lawyers Say*, Mississippi Business Journal, May 26, 2016; *see also* Arielle Dreher, *HB 1523:*

*Bad for the Business Sector*, Jackson Free Press, June 8, 2016 (noting other legal concerns).

Perhaps the State's best argument against a hearing in *CSE IV* was that it would be

unprepared to cross-examine religion experts because it did not have time to find its own

16

expert.[21] Its objection fell flat when its attorneys filed the article in which General Hood said that *budget cuts* caused the lack of expert assistance.[22] If budget cuts explain the State's lack of expert assistance, no extension of time could have helped it prepare for a hearing.

For these reasons, the hearings were consolidated. Now, having considered the evidence and heard oral argument, the motions for preliminary injunction have been consolidated into this Order. The cases remain their separate identities pending further motion practice.

That brings us to the State's initial legal arguments.

## III.   Threshold Questions

### A.      Standing

The State first challenges the plaintiffs' capacity to bring these suits.

The United States Constitution limits the jurisdiction of federal courts to actual cases and controversies. U.S. Const. art. III, § 2. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quotation marks and citation omitted). "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 99 (1968).

As the party seeking to invoke this Court's jurisdiction, the plaintiffs must demonstrate all three elements of standing: (1) an injury in fact that is concrete and particularized as well as imminent or actual; (2) a causal connection between the injury and the defendant's conduct; and

---

[21] The Court has sought to understand what kind and amount of evidence would show a forbidden religious preference. In this case, it finds the plain language of HB 1523 and basic knowledge of local religious beliefs to be sufficient. Today's outcome is informed by but does not turn on the expert testimony heard in *CSE IV*.

[22] It also weakens the State's objection to the Court's use of newspaper articles.

(3) that a favorable decision is likely to redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In a standing analysis, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975). Standing is not handed out in gross. *CSE III*, 2016 WL 1306202, at *2. A case with multiple plaintiffs can move forward as long as one plaintiff has standing as to each claim. *CSE I*, 64 F. Supp. 3d at 916.

### 1.   Injury in Fact

To establish an injury in fact, the plaintiffs must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and citation omitted). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 560 n.1. An injury is concrete when it is "real, not abstract." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1556 (2016) (quotation marks and citation omitted). Intangible injuries can satisfy the concreteness requirement. *Id.* at 9. A plaintiff must demonstrate "that he has sustained or is immediately in danger of sustaining some direct injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (quotation marks and citations omitted).

### a.   Equal Protection Injuries

The *Barber* plaintiffs in category two – *i.e.*, the LGBT plaintiffs and Dr. Glisson – allege that HB 1523 violates their rights under the Equal Protection Clause of the Fourteenth Amendment.[23] Claims under the Equal Protection Clause can include both tangible and intangible injuries. As noted in *Heckler v. Matthews*,

---

[23] In discussing the Equal Protection claim, references to LGBT citizens should also be read to include unmarried-but-sexually-active citizens. The latter group may have been a collateral consequence of HB 1523.

discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

465 U.S. 728, 739-40 (1984) (quotation marks and citation omitted). "Stigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies some concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine." *CSE I*, 64 F. Supp. 3d at 917 (quotation marks and citation omitted).

The State first challenges standing on the basis that the plaintiffs' injuries are speculative and not imminent, arguing that the plaintiffs have not alleged the denial of any right or benefit as a result of HB 1523. It points to *Clapper v. Amnesty International, USA*, which held that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." 133 S. Ct. 1138, 1147 (2013) (quotation marks and citation omitted).

This language, however, supports that the plaintiffs *do* have imminent injuries. If it goes into effect on July 1, plaintiffs say, HB 1523 will subject them to a wide range of arbitrary denials of service at the hands of public employees and private businesses.

The plaintiffs also say that HB 1523 will limit the protections LGBT persons currently have under state, county, city, and public school anti-discrimination policies. In the City of Jackson, for example, a municipal ordinance provides protection from discrimination on the basis of religion, sexual orientation, and gender identity, among other characteristics. Docket No. 32-17, in *Barber*. This ordinance protects several of the plaintiffs. *Id.* The plaintiffs then point to

University of Southern Mississippi's (USM) anti-discrimination policy, which guarantees equal access to "educational, programmatic and employment opportunities without regard to" religion, sexual orientation, or gender identity. Docket No. 32-18, in *Barber*. If HB 1523 goes into effect, USM's policy cannot be fully enforced. USM employees who invoke a § 2 belief will enjoy enhanced protection to decline to serve others on the basis of sexual orientation, and USM will not be able to discipline those employees who violate its internal anti-discrimination policy.[24]

In this context, the imminent injury to the plaintiffs, other LGBT persons, and unmarried persons is exactly the same as the injury recognized by the Supreme Court in *Romer*. In striking down an amendment to Colorado's constitution, the Court found that:

> Amendment 2 bars homosexuals from securing protection against the injuries that these public accommodations laws address. That in itself is a severe consequence, but there is more. Amendment 2, in addition, nullifies specific legal protections for this targeted class in all transactions . . . . Not confined to the private sphere, Amendment 2 also operates to repeal and forbid laws or policies providing specific protection for gays or lesbians from discrimination by every level of Colorado government.

517 U.S. at 629.

A closer analogue is difficult to imagine. As in *Romer*, HB 1523 "withdraws from homosexuals, [transgender, and unmarried-but-sexually-active persons,] but no others, specific legal protection from the injuries caused by discrimination, and it forbids the reinstatement of these laws and policies." *Id.* at 627. If individuals had standing to file *Romer* before Amendment 2 went into effect, these plaintiffs may certainly do the same.

The State's argument overlooks the fundamental injurious nature of HB 1523 – the establishment of a broad-based system by which LGBT persons and unmarried persons can be subjected to differential treatment based solely on their status. This type of differential treatment

---

[24] Imagine that two USM students, who are a gay couple, walk into the cafeteria but are refused service because of the worker's religious views. Could that employee be disciplined for refusing service? It is not clear what remedy they would have to remove the sting of humiliation.

is the hallmark of what is prohibited by the Fourteenth Amendment. *See New York City Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979) ("The [Equal Protection] Clause announces a fundamental principle: the State must govern impartially."). To put it plainly, the plaintiffs' injuries are "certainly impending" today, and without Court intervention, the plaintiffs will suffer actual injuries. *Clapper*, 133 S. Ct. at 1147.

The State then argues that the plaintiffs lack standing because they are not the "objects" of HB 1523. The argument comes from *Lujan*'s statement that "standing depends considerably upon whether the plaintiff is himself an object of the" government's action or inaction at issue. *Lujan*, 504 U.S. at 561. The true objects of the law, the State claims, are those persons who want to freely exercise a § 2 belief. Docket No. 30, at 18, in *Barber*.

The Court is not persuaded. A robust record shows that HB 1523 was intended to benefit some citizens at the expense of LGBT and unmarried citizens. At oral argument, the State admitted that HB 1523 was passed in direct response to *Obergefell*, stating, "after *Obergefell*, citizens who hold the beliefs that are protected by 1523 were effectively told by the U.S. Supreme Court, *Your beliefs are garbage.*" Transcript of Hearing on Motion for Preliminary Injunction at 324, Barber v. Bryant, No. 3:16-CV-417 (S.D. Miss. June 24, 2016) [hereinafter Tr. of June 24].

It is therefore difficult to accept the State's implausible assertion that HB 1523 was intended to protect certain religious liberties and simultaneously ignore that the bill was passed because same-sex marriage was legalized last summer. *See Romer*, 517 U.S. at 626.

Members of the LGBT community and persons like Dr. Glisson will suffer a concrete and particular injury as a result of HB 1523. Part of the injury is stigmatic, *see CSE I*, 64 F. Supp. 3d at 917, but that stigmatic injury is linked to the tangible rights that will be taken away

on July 1, including the tangible rights *Obergefell* extended. There are almost endless explanations for how HB 1523 condones discrimination against the LGBT community, but in its simplest terms it denies LGBT citizens equal protection under the law. Thus, those plaintiffs who are members of the LGBT community, as well as Dr. Glisson, have demonstrated an injury in fact sufficient to bring their Equal Protection claim.

> **b.    Establishment Clause Injuries**

All plaintiffs have asserted Establishment Clause claims.

In Establishment Clause actions, the injury in fact requirement may vary from other types of cases. *See Doe v. Tangipahoa Parish Sch. Bd.*, 473 F.3d 188, 194 (5th Cir. 2006). "The concept of injury for standing purposes is particularly elusive in Establishment Clause cases." *Id.*

Plaintiffs can demonstrate "standing based on the direct harm of what is claimed to be an establishment of religion" or "on the ground that they have incurred a cost or been denied a benefit on account of their religion." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 129-30 (2011). Courts also recognize that taxpayers have standing to challenge direct government expenditures that violate the Establishment Clause. *Id.* at 138-39; *see Flast*, 392 U.S. at 106. The Supreme Court has found standing in a wide variety of Establishment Clause cases "even though nothing was affected but the religious or irreligious sentiments of the plaintiffs." *Catholic League for Religious & Civil Rights v. City & Cnty. of San Francisco*, 624 F.3d 1043, 1049-50 (9th Cir. 2010) (en banc) (collecting cases).

In *Croft v. Governor of Texas*, the Fifth Circuit concluded that a citizen had standing to challenge a public school's daily moment of silence because his children were enrolled in the school and were required to observe the moment of silence. 562 F.3d 735, 746 (5th Cir. 2009)

[hereinafter *Croft I*]. This injury was sufficient because the plaintiff and his family demonstrated that they were exposed to and injured by the mandatory moment of silence. *Id.* at 746-47.[25]

In our case, the State contends that the plaintiffs' alleged non-economic injuries are insufficiently particular and concrete. It cites *Valley Forge Christian College v. Americans United for Separation of Church and State*, which found that:

> [the plaintiffs] fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by the observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though that disagreement is phrased in constitutional terms.

454 U.S. 464, 485-86 (1982).

In *Valley Forge*, an organization and four of its employees who lived in the Washington D.C. area challenged the constitutionality of a land conveyance from a government agency to a religious-affiliated education program in Pennsylvania. *Id.* at 468-69. The plaintiffs had learned of the land conveyance from a press release. *Id.* at 469. They merely observed the alleged constitutional violation from out-of-state.

The facts in the present case are quite different. Here, the plaintiffs are 13 individuals who reside in Mississippi, a Mississippi church, and an advocacy organization with members in Mississippi. The plaintiffs may have become aware of HB 1523 from news, friends, or social media, but regardless of how they learned of the legislation, it is set to become the law of *their state* on July 1. It will undeniably impact their lives. The enactment of HB 1523 is much more than a "psychological consequence" with which they disagree, it is allegedly an endorsement and elevation by *their* state government of specific religious beliefs over theirs and all others.

_____

[25] The Fifth Circuit distinguished *Croft* from *Doe v. Tangipahoa Parish School Board*, where it had declined to find standing in a case challenging prayers at school board meetings because the plaintiffs had never attended a school board meeting.

A more applicable case is *Catholic League*. There, the plaintiffs included a Catholic civil rights organization and devout Catholics who lived in San Francisco. 624 F.3d at 1048. They sued over a municipal resolution that expressly denounced Catholicism and the Catholic Church's beliefs on same-sex couples. *Id.* at 1047. The appellate court found that they had standing to bring such a case against their local government.

Similarly, today's individual plaintiffs have attested that they are citizens and residents of Mississippi, they disagree with the religious beliefs elevated by HB 1523, HB 1523 conveys the State's disapproval and diminution of their own deeply held religious beliefs, HB 1523 sends a message that they are not welcome in their political community, and HB 1523 sends a message that the state government is unwilling to protect them. *See, e.g.*, Docket Nos. 32-2; 32-3; 32-5 (all in *Barber*).

Plaintiff Taylor, for example, is "a sixth-generation Mississippian" and "former Navy combat veteran." Docket No. 32-8, in *Barber*. He is also a gay man engaged to be married next year. *Id.* Taylor thinks HB 1523 is hostile toward his religious values and targets LGBT persons. *Id.*

Dr. Glisson describes herself as "a member of the Southern Baptist Church co-founded by my grandparents" who has "studied and reflected upon my faith choice almost all my life." Docket No. 32-6, in *Barber*. "I am convinced that the heart of the Gospel is unconditional love. To condemn the presence of God in another human being, especially using faith claims or scripture to do so, is wrong and violates all of the tenets of my Christian faith." *Id.*

Dorothy Triplett explained her religious objections in detail. "I am a Christian, and nowhere in scripture does Jesus the Christ condemn homosexuality," she said. Docket No. 32-9, in *Barber*. "He instructed us to love our neighbors as ourselves. In St. Paul's Letter to the

Galatians 3:28: New Revised Standard Version (NRSV): 'There is no longer Jew or Greek, there is no longer slave or free, there is no longer male or female; for all of you are one in Christ Jesus.'" *Id.*

Based on their allegations and testimony, each individual plaintiff has adequately alleged cognizable injuries under the Establishment Clause. The "sufficiently concrete injur[ies]" here are the psychological consequences stemming from the plaintiffs' "exclusion or denigration on a religious basis within the political community." *Catholic League*, 624 F.3d at 1052; *see Awad*, 670 F.3d at 1123.

Their injuries are also imminent. HB 1523 is set to become law on July 1. "There is no need for [the plaintiffs] to wait for actual implementation of the statute and actual violations of [their] rights under the First Amendment where the statute" violates the Establishment Clause. *Ingebretson v. Jackson Public Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996).

## 2. Causation

The State next argues that the plaintiffs have not shown that their injuries have a causal connection to the defendants' conduct. It cites *Southern Christian Leadership Conference v. Supreme Court of Louisiana* for the proposition that an injury cannot be the result of a third party's independent action, and instead must be traceable to the named parties. 252 F.3d 781, 788 (5th Cir. 2001). The contention here is that any injuries will be caused by third parties – like a clerk who refuses to promptly issue a marriage license to a same-sex couple – and therefore that the plaintiffs should sue those third parties.

The argument is unpersuasive. On July 1, the plaintiffs will be injured by the state-sponsored endorsement of a set of religious beliefs over all others. *See Santa Fe*, 530 U.S. at 302; *Awad v. Ziriax*, 754 F. Supp. 2d 1298, 1304 (W.D. Okla. 2010). Regardless of any third-

party conduct, the bill creates a statewide two-tiered system that elevates heterosexual citizens and demeans LGBT citizens. The plaintiffs' injuries are therefore caused by the State – and specifically caused by the Governor who signed HB 1523 bill into law – and will at a minimum be enforced by officials like Davis and Moulder.

In addition, in similar cases under the Establishment and Equal Protection Clauses, the Supreme Court has found a state's governor to be a proper defendant for the causal connection requirement of standing. *E.g.*, *Wallace v. Jaffree*, 472 U.S. 38 (1985); *Romer,* 517 U.S. at 620.

Accordingly, the plaintiffs have demonstrated that there is a causal connection between their injuries and the defendants' conduct.

### 3.    Redressability

The final prong of standing requires the plaintiffs to demonstrate that a favorable judicial decision will redress their grievances. *Lujan*, 504 U.S. at 561. The State argues that "Plaintiffs would still be facing their same alleged injury tomorrow if the Court preliminary enjoins the named Defendants today." Docket No. 30, at 24, in *Barber*. It fails to support this claim with any further argument or facts.

"[W]hen the right invoked is that of equal treatment, the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler*, 465 U.S. at 740 (quotation marks and citation omitted). "By declaring the [statute] unconstitutional, the official act of the government becomes null and void." *Catholic League*, 624 F.3d at 1053.

Here, the harm done by HB 1523 would be halted if the statute is enjoined. Nothing in the plaintiffs' briefs, oral argument, or testimony indicates that they expect a favorable ruling to change the hearts and minds of Mississippians opposed to same-sex marriage, transgender

equality, or sex before marriage. They simply ask the Court to enjoin the enforcement of a state law that both permits arbitrary discrimination based on those characteristics and endorses the majority's favored religious beliefs. That is squarely within the Court's ability. *See Awad v. Ziriax*, 670 F.3d 1111, 1119 (10th Cir. 2012).

"Even more important, a declaratory judgment would communicate to the people of the plaintiffs' community that their government is constitutionally prohibited from condemning the plaintiffs' religion, and that any such condemnation is itself to be condemned." *Catholic League*, 624 F.3d at 1053.

The Court concludes that the individual plaintiffs have standing to bring these claims.

### 4.    Associational Standing

In some instances, organizations may bring suit on behalf of their members. To establish associational standing, the organization must show that: (1) its members would have standing to sue on their own behalf; (2) the interests it seeks to safeguard are germane to the organization's purpose; and (3) neither the claim asserted nor the requested relief necessitate the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n.*, 432 U.S. 333, 343 (1977).

JGMCC seeks associational standing as a church with many LGBT members and a community service ministry that promotes LGBT+ equality. Because members of the church have standing to bring suit on their own behalf – at least two of its members are individual plaintiffs – the first element of associational standing is satisfied. Ensuring that its members are not discriminated against on the basis of sexual orientation, gender identity, or religion is undoubtedly germane to its purpose. And JGMCC's facial challenge does not require the participation of individual members. JGMCC has associational standing.

The same is true for CSE. That organization also has a member participating in this lawsuit, is aligned with the arguments and relief sought in this suit, and need not have additional members to assert its particular cause of action. It has associational standing. *Accord CSE I*, 64 F. Supp. 3d at 918; *CSE III*, 2016 WL 1306202, at *11.

**B.     *Ex Parte Young***

The next issue is whether these defendants are properly named in this suit.

**1.     Legal Standard**

Under the Eleventh Amendment, citizens cannot sue a state in federal court. U.S. Const. amend. XI; *see Hutto v. Finney*, 437 U.S. 678, 699 (1978). In *Ex parte Young*, however, the Supreme Court carved out a narrow exception to this rule. 209 U.S. 123 (1908). The resulting *Ex parte Young* "fiction" holds that "because a sovereign state cannot commit an unconstitutional act, a state official enforcing an unconstitutional act is not acting for the sovereign state and therefore is not protected by the Eleventh Amendment." *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001) (en banc). When a plaintiff sues a state official in his official capacity for constitutional violations, the plaintiff is not filing suit against the individual, but instead the official's office, and can proceed with the constitutional claims. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).

The *Ex parte Young* fiction requires that the state officer have "some connection with the enforcement of the act" or be "specially charged with the duty to enforce the statute," and also that the official indicate a willingness to enforce it. *Ex parte Young*, 209 U.S. at 157, 158. The officer's authority to enforce the act does not have to be found in the challenged statute itself; it is sufficient if it falls within the official's general duties to enforce related state laws.

28

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*, 535 U.S. 635, 645 (2002) (quotation marks, citation, and brackets omitted).

### 2.    Discussion

All four defendants – the Governor, the Attorney General, the Executive Director of the Department of Human Services, and the Registrar of Vital Records – are state officials sued in their official capacities. These suits are effectively brought against their various offices. All four defendants also have a connection to the enforcement of HB 1523.

Although Governor Bryant is the chief executive of the State, *Ex parte Young* does not permit a suit against a governor solely on the theory that he is "charged with the execution of all of its laws." *Ex parte Young*, 209 U.S. at 157. A more specific causal connection is required. *Id.* That connection is satisfied here. The Governor is the manager and supervisor of his staff, so he is personally required to enforce HB 1523's terms prohibiting adverse action against any of his employees who exercise a § 2 belief. Since the Governor has also indicated his willingness to enforce HB 1523 to the full extent of his authority, he is a proper defendant. *See* CB Condez, *Mississippi Governor: Christians Would Line up for Crucifixion Before Abandoning Faith*, The Christian Times, June 2, 2016 ("'[HB 1523's critics] don't know that if it takes crucifixion, we will stand in line before abandoning our faith and our belief in our Lord and Savior Jesus Christ,' [Governor Bryant] said.").[26]

---

[26] The Governor's remarks are reminiscent of what Circuit Judge Tom P. Brady, later Mississippi Supreme Court Justice Brady, warned in his infamous Black Monday Speech. Judge Brady called on others to disobey *Brown v. Board of Education* by saying, "We have, through our forefathers, died before for our sacred principles. We can, if necessary, die again." Stephen J. Whitfield, A Death in the Delta: The Story of Emmett Till 10 (1988).

In Establishment and Equal Protection Clause cases in particular, governors are often properly included as named defendants. *See Romer,* 517 U.S. at 620 (Gov. Roy Romer); *Edwards v. Aguillard*, 482 U.S. 578 (1987) (Gov. Edwin W. Edwards); *Wallace,* 472 U.S. at 38 (Gov. George C. Wallace); *Croft v. Perry*, 624 F.3d 157 (5th Cir. 2010) (Gov. Rick Perry, as the sole defendant) [hereinafter *Croft II*]; *Croft I*, 562 F.3d at 735 (same).

General Hood is the state's chief law enforcement officer, but his general duty to represent the state in litigation is inadequate to invoke the *Ex parte Young* exception. Like the Governor, though, HB 1523 prohibits General Hood from taking any action against one of his employees who acts in accordance with a § 2 belief. The Attorney General's Office employs hundreds of people across Mississippi, so he may very well be confronted with an HB 1523 issue.

Executive Director Davis, until authority is formally transferred to the new Department of Child Protective Services, is responsible for administering a variety of social programs. *See* Miss. Code Ann. § 43-1-51. HB 1523 has at least two sections that fall under his purview. *See* HB 1523 § 3(2)-(3). Under HB 1523, for example, DHS cannot take action against a foster or adoptive parent who violates DHS policies based on a § 2 belief. Davis's attorneys have given every impression that he will fully enforce his duties under HB 1523.

As discussed above, Registrar Moulder is responsible for executing state laws concerning registration of marriages. *See* Miss. Code Ann. § 51-57-43. HB 1523 adds a new responsibility to her existing obligations: she must record the recusal of any circuit clerk who refuses to issue a marriage license because of a § 2 belief. HB 1523 § 3(8)(a). Thus, she has a connection with HB 1523's enforcement. Her counsel has also indicated her intent to comply with her new duties.

Lastly, the plaintiffs' requested relief also satisfies the Eleventh Amendment and *Ex parte Young*. In both cases, they have requested declaratory and prospective injunctive relief that would enjoin the enforcement of HB 1523 and prevent state officials from acting contrary to well-established precedent. Courts frequently grant this type of relief against state officials in constitutional litigation. *See, e.g.*, *Romer*, 517 U.S. at 620; *Wallace*, 472 U.S. at 38.

Accordingly, the *Ex parte Young* exception to the Eleventh Amendment applies and these suits may proceed to seek declaratory and injunctive relief against these defendants.

## IV.     Motion for Preliminary Injunction

### A.     Legal Standard

To receive a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted). "Each of these factors presents a mixed question of fact and law." *Id.* (citation omitted).

"A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four . . . prerequisites." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

"The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

### B.      Substantial Likelihood of Success on the Merits

The movant's likelihood of success is determined by substantive law. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997). "To successfully mount a facial challenge, the plaintiffs must show that there is no set of circumstances under which [HB 1523] is constitutional. If the plaintiffs successfully show [it] to be unconstitutional in every application, then that provision will be struck down as invalid." *Croft II*, 624 F.3d at 164.

### 1.      The Equal Protection Clause

Under the Fourteenth Amendment, a state may not "deprive any person of life, liberty, or property, without due process of the law; nor deny any person within its jurisdiction equal protection of the laws." U.S. Const. amend. XIV, § 1.

The Equal Protection Clause of this Amendment means that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted). The primary intent of the Equal Protection Clause was to require states to provide the same treatment for whites and freed slaves concerning personhood and citizenship rights enumerated in the Civil Rights Act of 1866.[27]

The Equal Protection Clause is no longer limited to racial classifications. That is not because racial discrimination and racial inequality have ceased to exist. Rather, as discrimination against groups becomes more prominent and understood, we turn to the Equal Protection clause to attempt to level the playing field. *Compare Bradwell v. Illinois*, 83 U.S. 130 (1872) (denying women equal protection of the laws) *with United States v. Virginia*, 518 U.S. 515 (1996)

---

[27] United States Senator Jacob Howard introduced the Fourteenth Amendment in the Senate. "This abolishes all class legislation in the States and does away with the injustice subjecting one caste of persons to a code not applicable to another," he said. "It prohibits the hanging of a black man for a crime for which the white man is not to be hanged. It protects the black man in his fundamental rights as a citizen with the same shield which it throws over the white man. Is it not time, Mr. President, that we extend to the black man . . . the equal protection of law?" Cong. Globe, 39th Cong., 1st Sess. 2766 (1866).

(recognizing that women are entitled to equal protection of the laws). "A prime part of the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded." *Virginia*, 518 U.S. at 557; *see* Cass R. Sunstein, *Sexual Orientation and the Constitution: A Note on the Relationship Between Due Process and Equal Protection*, 55 U. Chi. L. Rev. 1161, 1163 (1988) ("The Equal Protection Clause . . . has been understood as an attempt to protect disadvantaged groups from discriminatory practices, however deeply engrained and longstanding."). One hundred and fifty years after its passage, the Fourteenth Amendment remains necessary to ensure that all Americans receive equal protection of the laws.

Sexual orientation is a relatively recent addition to the equal protection canon. In 1996, the Supreme Court made it clear that arbitrary discrimination on the basis of sexual orientation violates the Equal Protection Clause. *See Romer*, 517 U.S. at 635. Seven years later, the Court held that the Constitution protects LGBT adults from government intrusion into their private relationships. *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003).

"After *Romer* and *Lawrence*, federal courts began to conclude that discrimination on the basis of sexual orientation that is not rationally related to a legitimate governmental interest violates the Equal Protection Clause." *Gill v. Delvin*, 867 F. Supp. 2d 849, 856 (N.D. Tex. 2012). Now, *Obergefell* makes clear that LGBT citizens have "equal dignity in the eyes of the law. The Constitution grants them that right." 135 S. Ct. at 2608.

### a.     Animus

"The Constitution's guarantee of equality must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot justify disparate treatment of

that group." *Windsor*, 133 S. Ct. at 2693 (citation omitted). Laws motivated by "an improper animus" toward such a group require special scrutiny. *Id.*

When examining animus arguments, courts look at "the design, purpose, and effect" of the challenged laws. *Id.* at 2689; *see also Romer*, 517 U.S. at 627-28. The *Windsor* Court, for example, considered DOMA's title, one House Report from the bill's legislative history, and the law's "operation in practice." *Windsor*, 133 S. Ct. at 2693-94. From these it found that DOMA has a "principal purpose . . . to impose inequality," places same-sex couples in second-tier relationships, "demeans the couple, whose moral and sexual choices the Constitution protects," and "humiliates tens of thousand of children now being raised by same-sex couples." *Id.* at 2694. The Court concluded that "the history of DOMA's enactment and its own text demonstrate that interference with the equal dignity of same-sex marriages . . . was more than an incidental effect of the federal statute. It was its essence." *Id.* at 2693.

Animus was also a critical part of the Court's analysis in *Romer*, where plaintiffs brought a pre-enforcement facial challenge to Amendment 2 of the Colorado Constitution. 517 U.S. at 623. "[T]he impetus for the amendment and the contentious campaign that preceded its adoption came in large part from [anti-discrimination] ordinances that had been passed in various Colorado municipalities." *Id.* Voters approved Amendment 2 to invalidate those ordinances and preclude "all legislative, executive, or judicial action at any level of state or local government designed to protect the status of persons based on the homosexual, lesbian or bisexual orientation, conduct, practices or relationships." *Id.* at 620. In striking down Amendment 2 as an unconstitutional act of majority animus against a minority group, the Supreme Court wrote that "[a] state cannot so deem a class of persons a stranger to its laws." *Id.* at 635.

The State argues that the plaintiffs have failed to show that the motivation behind the passage of HB 1523 was driven by "animus," "irrational prejudice," or "desire to harm" anyone. Docket No. 30, at 36, in *Barber*. Certainly, discerning the actual motivation behind a bill can be treacherous. But *Romer* and *Windsor* are instructive. This Court need only apply *Romer* and *Windsor* to ascertain that the design, purpose, and effect of HB 1523 is to single out LGBT and unmarried citizens for unequal treatment under the law.

### 1. Design and Purpose

The State says the primary motivating factor behind HB 1523 was to address the denigration and disfavor religious persons felt in the wake of *Obergefell*. Tr. of June 24 at 324, 327. The sponsors of the bill presented it to their respective chambers as post-*Obergefell* legislation.[28] A number of news articles confirmed the same.[29]

HB 1523's title, the "Protecting Freedom of Conscience from Government Discrimination Act," obviously implies that the purpose of the legislation was to halt governmental discrimination.

The legislative debate fleshes out the intended meaning of that title. Senator Willie Simmons asked whether the government was discriminating against religious citizens. Senate Floor Debate at 28:44. Senator Branning responded, "it potentially could." *Id.* at 28:44. Later,

---

[28] Representative Gipson said HB 1523 would merely "add an additional layer of protection that currently does not exist in the post-*Obergefell*" world. H.B. 1523, Debate on the Floor of the Mississippi House of Representatives, at 6:24 (Feb. 19, 2016) (statement of Rep. Andy Gipson). Senator Branning introduced HB 1523 as "post-*Obergefell* balancing legislation . . . presenting a solution to the crossroads we find ourselves in today as a result of *Obergefell v. Hodges*." Senate Floor Debate at 2:16, 32:20. She later added that although Mississippians may have religious beliefs against gambling, the death penalty, alcohol, and payday loan interest rates, HB 1523 is "very specific to same-sex marriage." *Id.* at 37:20.

[29] As Speaker Gunn said shortly after the decision was handed-down, "I don't care what the Supreme Court says. Marriage will always be between one man and one woman in holy matrimony." Emily Wagster Pettus, *House Speaker Protested by Flag Supporters at Neshoba*, Hattiesburg American, July 30, 2015. Representative Andy Gipson agreed. "What the Supreme Court's decision does not and cannot change is the firmly held conviction of faith of myself and most Mississippians. We still believe that marriage is defined by God as the union of one man and one woman." Pender, *supra*. Representative Gipson is correct: the Supreme Court cannot change his beliefs, nor does it intend to.

35

though, she wholeheartedly agreed with one of her colleagues that the government does not want to protect people of faith, and that it is time for people of faith to say, 'enough is enough.' *Id.* at 50:30. She agreed that the bill would ensure that LGBT citizens would not be able to sue a baker, florist, or other business for declining to serve them. *Id.* at 53:36. She agreed that the intent of the bill was to "level the playing field," ensure that certain groups had equal rights but not "special rights," and not "reverse discriminate against people." *Id.* at 54:15 (quoting Sen. Filingane).

The Senate debate also revealed another purpose of HB 1523. Senator Simmons asked if a Baptist college's refusal to employ lesbian and gay citizens was a form of discrimination. *Id.* at 31:29. Senator Branning responded, "if this bill passed, it would not be." *Id.* at 31:29.

The title, text, and history of HB 1523 indicate that the bill was the State's attempt to put LGBT citizens back in their place after *Obergefell*. The majority of Mississippians were granted special rights to not serve LGBT citizens, and were immunized from the consequences of their actions. LGBT Mississippians, in turn, were "put in a solitary class with respect to transactions and relations in both the private and governmental spheres" to symbolize their second-class status. *Romer*, 517 U.S. at 627. As in *Romer*, *Windsor*, and *Obergefell*, this "status-based enactment" deprived LGBT citizens of equal treatment and equal dignity under the law. *Romer*, 517 U.S. at 635.

## 2.     Effect

Next up is the impact HB 1523 will have on LGBT Mississippians. Although the bill is far-reaching and could have consequences in many areas of daily life, *Romer* suggests that this Court should devote attention to HB 1523's effect on existing anti-discrimination laws and policies. The Court turns to that narrow issue now.

As a state law, HB 1523 would preempt, or invalidate, all city, county, and public school ordinances and policies that prohibit discrimination on the basis of sexual orientation or gender identity. *See* HB 1523 § 8(2)-(3). The same was true in *Romer*.

The plaintiffs submitted two policies that HB 1523 would invalidate in part: the City of Jackson's recent anti-discrimination ordinance and USM's anti-discrimination policy. Docket Nos. 32-17 and 32-18, in *Barber*. Both protect citizens from sexual orientation and gender identity discrimination in a variety of contexts.

HB 1523 would have a chilling effect on Jacksonians and members of the USM community who seek the protection of their anti-discrimination policies. If HB 1523 goes into effect, neither the City of Jackson nor USM could discipline or take adverse action against anyone who violated their policies on the basis of a § 2 belief.

The State attempts to distance HB 1523 from Amendment 2 in *Romer* by arguing that HB 1523 does not "expressly prohibit[] any law meant to protect gay or lesbian citizens from discrimination." Docket No. 30, at 40, in *Barber*. Sentences later, though, the State identifies the problem with its argument: "H.B. 1523 would invalidate local ordinances only to the extent those ordinances do not provide the same level of protection for religious freedom and free exercise as provided by H.B. 1523." *Id.* at 41. But no other local ordinance or policy purports to do what HB 1523 does. The State has not pointed to any existing anti-discrimination ordinance or policy that would survive HB 1523's preemptive reach.

In a last-gasp attempt to distinguish HB 1523 from Amendment 2, the State then contends that HB 1523 "is actually strikingly similar" to Jackson and USM's policies because they all prohibit discrimination on the basis of religion. *Id.* at 40-41. The argument ignores the critical difference: Jackson and USM's anti-discrimination policies provide equal protection

regardless of religion, sexual orientation, or gender identity. HB 1523 draws a stark line, with LGBT and unmarried-but-sexually-active citizens on one side, and everyone else on the other.

As in *Romer* and *Windsor,* the effect of HB 1523 would demean LGBT citizens, remove their existing legal protections, and more broadly deprive them their right to equal treatment under the law.

### b.  Scrutiny

This brings the Court to whether the government has a legitimate basis for HB 1523. While most laws classify and make distinctions, all laws do not violate equal protection. *Romer*, 517 U.S. at 631. The Supreme Court has attempted to reconcile this dilemma by holding that "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Id.* (citation omitted).

"When social or economic legislation is at issue, the Equal Protection Clause allows States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citation omitted). "But we would not be faithful to our obligations under the Fourteenth Amendment if we apply so deferential a standard to every classification. . . . Thus we have treated as presumptively invidious those classifications that disadvantage a suspect class, or that impinge upon the exercise of a fundamental right." *Plyler*, 457 U.S. at 216-17.

Neither the Supreme Court nor the Fifth Circuit "has recognized sexual orientation as a suspect classification or protected group; nevertheless, a state violates the Equal Protection Clause if it disadvantages homosexuals for reasons lacking any rational relationship to legitimate

governmental aims."[30] *Johnson v. Johnson*, 385 F.3d 503, 530-31 (5th Cir. 2004) (citation and brackets omitted). "Rational basis review places the burden of persuasion on the party challenging a law, who must disprove every conceivable basis which might support it." *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012) (quotation marks and citations omitted). "So the party urging the absence of any rational basis takes up a heavy load." *Id.* This means the government usually prevails.

Even under this generous standard, HB 1523 fails. The State contends that HB 1523 furthers its "legitimate governmental interest in protecting religious beliefs and expression and preventing citizens from being forced to act against those beliefs by their government." Docket No. 30, at 37-38, in *Barber*. This is a legitimate governmental interest, but not one with any rational relationship to HB 1523.

The Supreme Court "has long recognized that the government may accommodate religious practices without violating the Establishment Clause." *Cutter v. Wilkinson*, 544 U.S. 709, 713 (2005) (citations and ellipses omitted). The First Amendment, the Mississippi Constitution, and Mississippi's RFRA all protect Mississippi's citizens' religious exercise – and in a broader way than HB 1523. Mississippi's RFRA in particular states that the government "may substantially burden a person's exercise of religion *only* if it demonstrates that application of the burden to the person: (i) Is in furtherance of a compelling governmental interest; and (ii) Is the least restrictive means of furthering that compelling governmental interest." Miss. Code Ann.

---

[30] In *CSE I*, this Court discussed the doctrinal instability on the proper standard of review. 64 F. Supp. 3d at 928. "The circuit courts of appeal are divided on which level of review to apply to sexual orientation classifications. In the Second Circuit, homosexuals compose a quasi-suspect class that is subject to heightened scrutiny. In this circuit, sexual orientation classifications are subject to rational basis review." *Id.* (quotation marks, citations, and brackets omitted). Then as now, the Court questions whether sexual orientation should be afforded rational basis review. *Id.* ("If this court had the authority, it would apply intermediate scrutiny to government sexual orientation classifications."). *Obergefell* did not resolve the dispute. When Judge Jordan examined *Obergefell* earlier this year, however, he concluded that "the [Supreme] Court applied something greater than rational-basis review." *CSE III*, 2016 WL 1306202, at *13. As this Court is bound by Fifth Circuit precedent, it will consider HB 1523 under rational basis review.

§ 11-61-1(5)(b) (emphasis added). Its plain language provides substantial protection from governmental discrimination on the basis of religious exercise.

Mississippi's RFRA grants *all* people the right to seek relief from governmental interference in their religious exercise, not just those who hold certain beliefs. This critical distinction between RFRA and HB 1523 cannot be overlooked.

Although states are permitted to have more than one law intended to further the same legitimate interest, HB 1523 does not advance the interest the State says it does. Under the guise of providing additional protection for religious exercise, it creates a vehicle for state-sanctioned discrimination on the basis of sexual orientation and gender identity. It is not rationally related to a legitimate end.

The State then claims that HB 1523 "is about the people of conscience who need the protection of H.B. 1523, and does not 'target' Plaintiffs."[31] Docket No. 30, at 3, in *Barber*. The argument is unsupported by the record. It is also inconceivable that a discriminatory law can stand merely because creative legislative drafting limited the number of times it mentioned the targeted group. The Court cannot imagine upholding a statute that favored men simply because the statute did not mention women.

The State next focuses on marriage licenses. It contends that because HB 1523 does not allow the denial, delay, or impediment of marriage licenses, that licenses are issued on the same terms as opposite-sex couples. Thus, the State argues, there is no differential treatment that would constitute a violation of the Equal Protection Clause. *Id.* at 6. The only way a same-sex couple could be treated differently, it says, is if the issuance of their marriage license was "*impeded or delayed as a result of any recusal.*" *Id.*

---

[31] Rather than protect its citizens from "government discrimination," HB 1523 could actually subject more citizens to federal civil rights lawsuits. Persons feeling emboldened by HB 1523 may not understand that the law provides immunity only from State sanctions.

To the contrary, the recusal provision itself deprives LGBT citizens of governmental protection from separate treatment. "A law declaring that in general it shall be more difficult for one group of citizens to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense." *Romer*, 517 U.S. at 633. There cannot be one set of employees to serve the preferred couples and another who is 'willing' to serve LGBT citizens with a "clear conscience," as Senator Branning put it. Such treatment viscerally confronts same-sex couples with the same message of inferiority and second-class citizenship that was rejected in *Romer*, *Lawrence*, *Windsor*, *CSE I*, *Obergefell*, and *CSE II*.

On this point, it is important to note that HB 1523's supposed protection against any delayed service applies only to marriage licenses and some health care issues. Tr. of June 24 at 339. The other areas of permissible discrimination – counseling, fertility services, etc. – do not place any duty on the recusing individual to ensure that LGBT citizens receive services.[32]

The State is correct that no one can predict how many LGBT citizens may be denied service under HB 1523. But it cannot be disputed that the broad language of the bill "identifies persons by a single trait and then denies them protection across the board." *Romer,* 517 U.S. at 633. Thus, the State cannot prevail on its argument that HB 1523's plain language does not create a separate system designed to diminish the rights of LGBT citizens.

The deprivation of equal protection of the laws is HB 1523's very essence. *See Windsor*, 133 S. Ct. at 2693. It violates the Fourteenth Amendment.

---

[32] There is an almost endless parade of horribles that could accompany the implementation of HB 1523. Although the Court cannot imagine every resulting factual scenario, HB 1523's broad language "identifies persons by a single trait and then denies them protection across the board." *Romer,* 517 U.S. at 633.

### 2.     The Establishment Clause

#### a.     General Principles

The First Amendment begins with the words, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . ." U.S. Const. amend. I.

"The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution." *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 668 (1970). The Supreme Court has "struggled" to chart a path respecting both of them. *Id.* It is a thankless task. Part of the difficulty lies in the fact that each Clause is "cast in absolute terms" and would "clash with the other" if taken to its logical conclusion. *Id.* at 668-69; *see also Lynch v. Donnelly*, 465 U.S. 668, 678 (1984).

The Supreme Court has repeatedly rejected the notion that *states* may establish religion because the text of the Establishment Clause only references *Congress. See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 8 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). In truth, "[t]he very language of the Establishment Clause represented a significant departure from early drafts that merely prohibited a single national religion, and the final language instead extended [the] prohibition to state support for religion in general." *McCreary Cnty.*, 545 U.S. at 878 (quotation marks and citation omitted).

Another popular misconception holds that the Establishment Clause is in error since the Constitution does not contain the phrase "separation of Church and State." Adherents of this belief have read the text correctly but missed its meaning. "There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated." *Zorach v. Clauson*, 343 U.S. 306, 312 (1952).

42

Nor was the Establishment Clause forced upon the sovereign states by an overreaching federal government. Far from being a federal mandate, the Clause "was the democratic response of the American community to the particular needs of a young and growing nation, unique in the composition of its people." *McCollum v. Bd. of Ed. of Sch. Dist. No. 71, Champaign Cnty., Ill.*, 333 U.S. 203, 215-16 (1948) (Frankfurter, J., concurring).

In any event, the Supreme Court has emphasized that "there is room for play in the joints" between the two Clauses. *Locke v. Davey*, 540 U.S. 712, 718 (2004) (quotation marks and citation omitted). It has sought to "chart a course that preserve[s] the autonomy and freedom of religious bodies while avoiding any semblance of established religion." *Walz*, 397 U.S. at 672.

### b.    Historical Context

America as a whole is "a rich mosaic of religious faiths." *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1849 (2014) (Kagan, J., dissenting). Here, 80% of Mississippians identify as Christians.[33] Tr. of June 24 at 250.

Given the pervasiveness of Christianity here, some Mississippians might consider it fitting to have explicitly Christian laws and policies. They also might think that the Establishment Clause is a technicality that lets atheists and members of minority religions thwart their majority (Christian) rule.[34]

The public may be surprised to know the true origins of the Establishment Clause. As chronicled by the Supreme Court, history reveals that the Clause was not originally intended to protect atheists and members of minority faiths. It was written to protect Christians from other Christians. *See Wallace*, 472 U.S. at 52 & n.36. Only *later* were other faith groups protected.

---

[33] A full 30% of Mississippians are white evangelical Christians. Tr. of June 24 at 250.
[34] The feeling is understandable. Headlines trumpet perceived anti-Christian conduct, inflaming passions. *See, e.g.*, Kate Royals, *Brandon Band Reportedly Not Allowed to Perform Christian Hymn*, The Clarion-Ledger, Aug. 22, 2015. But, of course, "[t]he First Amendment is not a majority rule." *Town of Greece*, 134 S. Ct. at 1822.

The story behind this begins with the colonists.[35] "It is a matter of history that [the] practice of establishing governmentally composed prayers for religious services was one of the reasons which caused many of our early colonists to leave England and seek religious freedom in America." *Engel v. Vitale*, 370 U.S. 421, 425 (1962). For decades at a time in 16th- and 17th-century England, Christian sects fought each other to control the Book of Common Prayer, in order to amend it and advance their particular beliefs. *Id.* at 425-27. The fighting was disruptive and deadly. *Id.* at 426. Those in power occasionally executed their opponents. *Id.* at 427 n.8. Some of the persecuted fled to America. *Id.* at 425.

The Puritans, for example, were originally a religious minority in England that "rejected the power of the civil government to prescribe ecclesiastical rules." C. Scott Pryor & Glenn M. Hoshauer, *Puritan Revolution and the Law of Contracts*, 11 Tex. Wesleyan L. Rev. 291, 309 (2005). They specifically opposed the monarch's "requirement that clergy wear particular vestments while celebrating the liturgy." *Id.* at 308 n.94 (quotation marks and citation omitted). Today it is *inconceivable* that the *government* could require clergy to wear particular clothing.[36] But the Puritans were disparaged for their opposition and other beliefs. *Id.* at 309. Thousands left.

In the New World, several colonies established their particular Christian beliefs as their official religion. *Engel*, 370 U.S. at 427-28; *see also McCollum*, 333 U.S. at 214 (Frankfurter, J., concurring). That again proved unsatisfactory.

---

[35] "History provides enlightenment; it appraises courts of the subtleties and complexities of problems before them." *Jaffree v. Wallace*, 705 F.2d 1526, 1532 (11th Cir. 1983).

[36] In seeing the Establishment Clause as a sword wielded against the majority, we forget that the Establishment Clause is actually a shield protecting religion from governmental meddling. Who wants the government dictating their priest, rabbi, or imam's clothing? It's difficult to imagine a greater violation of American law and custom. *See, e.g.*, *McCollum*, 333 U.S. at 232 ("If nowhere else, in the relation between Church and State, 'good fences make good neighbors.'") (Frankfurter, J., concurring); *Engel*, 370 U.S. at 430 ("the people's religions must not be subjected to the pressures of government"); *Engel*, 370 U.S. at 431 ("[The Establishment Clause's] first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government *and to degrade religion*."); *see also Lee v. Weisman*, 505 U.S. 577, 589-90 (1992).

For one, state-established religion was perceived as a *British* custom – not something independent, revolutionary Americans would want to retain. *Engel*, 370 U.S. at 427-28. Baptists especially "chafed under any form of establishment." *Larson v. Valente*, 456 U.S. 228, 244 & n.19 (1982). They argued that if the British had no right to tax Americans, then it was also unjust for them to be taxed to support an official religion they denied. *Id.*

And then there was the division-of-power problem. In Virginia, the established Episcopal Church became a minority when the Presbyterians, Lutherans, Quakers, and Baptists banded together "into an effective political force." *Engel*, 370 U.S. at 428. Faced with the prospect of losing power, James Madison and Thomas Jefferson persuaded the Virginia Assembly to pass its famous "Virginia Bill for Religious Liberty." *Everson*, 330 U.S. at 12.[37]

By the time the Constitution was adopted, therefore,

> there was a widespread awareness among many Americans of the dangers of a union of Church and State. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services. They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power. . . . The First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the . . . Government would be used to control, support or influence the kinds of prayer the American people can say—that the people's religions must not be subjected to the pressures of government for change each time a new political administration is elected to office.

*Engel*, 370 U.S. at 429-30; *see Lee v. Weisman*, 505 U.S. 577, 591-92 (1992) ("in the hands of government what might begin as a tolerant expression of religious views may end in a policy to indoctrinate and coerce").

---

[37] "Madison's vision—freedom for all religion being guaranteed by free competition between religions—naturally assumed that every denomination would be equally at liberty to exercise and propagate its beliefs. But such equality would be impossible in an atmosphere of official denominational preference." *Larson*, 456 U.S. at 245.

This history involved disputes between Christians. Americans were weary of the British and then Colonial back-and-forth between Catholics and Protestants, Episcopalians and Presbyterians, and so on. It was better to have a neutral government than to constantly struggle for power – or live under the yoke of a rival sect for decades at a time.

"[T]he Establishment Clause must be interpreted by reference to historical practices and understandings." *Town of Greece*, 134 S. Ct. at 1819 (quotation marks and citation omitted). The essential insight from history is that the First Amendment was originally enacted to prohibit a state from creating second-class Christians. And while the law has expanded to protect persons of other faiths, or no faith at all, the core principle of government neutrality between religious sects has remained constant through the centuries.[38, 39]

---

[38]      In 1833, Justice Joseph Story wrote that "[t]he real object of the amendment was, not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating christianity; but to exclude all rivalry among christian sects." *Wallace*, 472 U.S. at 52 n.36 (quoting 2 J. Story, Commentaries on the Constitution of the United States § 1877, at 594 (1851)). (Despite the 1851 date, the Commentaries were first published in 1833.)
        In 1870, "Judge Alphonso Taft, father of the revered Chief Justice, . . . stated the ideal of our people as to religious freedom as one of 'absolute equality before the law, of all religious opinions and sects.'" *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 214-15 (1963).
        In 1871, the Court found that American "law knows no heresy, and is committed to the support of no dogma, the establishment of no sect." *Watson v. Jones*, 80 U.S. 679, 728 (1871).
        In 1890, the Court held that the First Amendment was intended "to prohibit legislation for the support of any religious tenets." *Davis v. Beason*, 133 U.S. 333, 342 (1890), *abrogated by Romer*, 517 U.S. at 620.
        In 1952, the Court wrote that Americans "sponsor an attitude on the part of government that shows no partiality to any one group. . . . The government must be neutral when it comes to competition between sects." *Zorach*, 343 U.S. at 313-14.
        In 1968, the Court held that a state could not "aid, foster, or promote one religion *or religious theory* against another," and that the First Amendment "forbids . . . the preference of a religious doctrine." *Epperson*, 393 U.S. at 104, 106 (emphasis added). That case in particular concluded that Arkansas and Mississippi's "anti-evolution" statutes violated the Establishment Clause by giving preference to "a particular interpretation of the Book of Genesis by a particular religious group." *Id.* at 101, 103 & n.11.
        In 1971, the Court found that "as a general matter it is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization." *Gillette v. United States*, 401 U.S. 437, 450 (1971) (upholding religious exemption law where "no particular sectarian affiliation or theological position is required.").
        In 1982, the Court wrote that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244.
        In 1985, Justice Sandra Day O'Connor wrote that the Establishment Clause "preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred." *Wallace*, 472 U.S. at 70 (O'Connor, J., concurring).
        In 1987, the Court invalidated a Louisiana law giving "preference to those religious groups which have as one of their tenets the creation of humankind by a divine creator." *Edwards*, 482 U.S. at 593.

### c.      HB 1523

The question now is whether, in light of history and precedent, HB 1523 violates the

Establishment Clause. The Court concludes that it does in at least two ways.

### i.      HB 1523 Establishes Preferred Religious Beliefs

First, HB 1523 establishes an official preference for certain religious beliefs over others.

---

In 1989, the Court said it had "come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization." *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 590 (1989), *abrogated by Town of Greece*, 134 S. Ct. at 1811. "Whatever else the Establishment Clause may mean . . . , it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed." *Id.* at 605.

Also in 1989, the Court wrote that it was "settled jurisprudence that the Establishment Clause prohibits government from . . . [placing] an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 8-9 (1989) (quotation marks and citations omitted).

In 1992, the Court held that "the central meaning of the Religion Clauses of the First Amendment . . . is that all creeds must be tolerated and none favored." *Lee*, 505 U.S. at 590.

In 1994, the Court reaffirmed that "proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of neutrality toward religion, favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994) (quotation marks and citations omitted). *Kiryas Joel* struck down a New York statute that delegated state authority "to a group defined by its character as a religious community, in a legal and historical context that gives no assurance that governmental power has been or will be exercised neutrally." *Id.*

In 1995, the Court held that the Establishment Clause is satisfied "when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 839 (1995).

In 2005, the Court wrote that there is "[m]anifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the understanding, reached after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens." *McCreary Cnty.*, 545 U.S. at 860 (quotation marks, citations, and ellipses omitted).

In 2010, the Court justified a cross on public property in part by noting that its placement "was not an attempt to set the *imprimatur* of the state on a particular creed." *Salazar v. Buono*, 559 U.S. 700, 715 (2010).

All in all, "[i]t is firmly established that the government violates the establishment clause if it discriminates among religious groups." Erwin Chemerinsky, Constitutional Law § 12.2.2 (5th ed. 2015).

[39] The Arkansas law struck down in *Epperson* was adapted from a Tennessee law that had already been repealed. One commenter had this to say about the Tennessee law:

> Much wonder has been expressed both in this country and in Europe as to the factors which made such legislation possible. These factors were three in number: (1) an aggressive campaign by a militant minority of religious zealots of the "Fundamentalist" faith; (2) lack of knowledge of modern scientific and religious thought in the rural districts which control Tennessee politically; (3) political cowardice and demagogy.

William Waller, *The Constitutionality of the Tennessee Anti-Evolution Act*, 35 Yale L.J. 191 (1925).

Under applicable precedent, "when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions" or "differentiate[s] among sects." *Hernandez v. C.I.R.*, 490 U.S. 680, 695 (1989) (citation omitted).

"We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In an Establishment Clause challenge, though, a court must also take consider "the context in which the statute was enacted and the reasons for its passage." *Salazar v. Buono*, 559 U.S. 700, 715 (2010); *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 473 (5th Cir. 2001).

Section 2 of HB 1523 begins, "[t]he sincerely held religious beliefs or moral convictions protected by this act are the belief or conviction that: . . . ." HB 1523 § 2. It then enumerates three beliefs entitled to protection. In the remainder of the bill, every protection from discrimination is explicitly tied to the § 2 beliefs.

On its face, HB 1523 constitutes an official preference for certain religious tenets. If three specific beliefs are "protected by this act," it follows that every other religious belief a citizen holds is *not* protected by the act. Christian Mississippians with religious beliefs contrary to § 2 become second-class Christians. Their exclusion from HB 1523 sends a message "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members." *McCreary Cnty.*, 545 U.S. at 860. The same is true for members of other faith groups who do not subscribe to the § 2 beliefs.

The State suggests that the bill is neutral because it does not name a denomination. The argument is foreclosed by *Larson*, which struck down a Minnesota statute that had made

"explicit and deliberate distinctions between different religious organizations" without identifying any denomination by name. 456 U.S. at 246 n.23.

For Reverends Barber, Burnett, Fortenberry, and Hrostowski (who are Presbyterian, United Methodist, United Methodist, and Episcopalian, respectively), their religious values cause them to believe that same-sex couples may marry in a Christian ceremony blessed by God. They also believe that same-sex couples may consummate that marriage as any other. As Rev. Dr. Hrostowski testified, "sex is a gift from God, and it is precious and wonderful and should be treated as such," but § 2's definition of sex is "incomplete because now holy matrimony is available to again both straight and gay couples." Tr. of June 23 at 126.

The Reverends, however, are not entitled to any of the protections of HB 1523. The bill instead shows the State's favor for the exact *opposite* beliefs by giving special privileges to citizens who hold § 2 beliefs. In so doing the State indicates that the Reverends hold disfavored, minority beliefs, while citizens who hold § 2 beliefs are preferred members of the majority entitled to a broad array of special legal immunities. *See McCreary Cnty.*, 545 U.S. at 860.[40]

The First Amendment prohibits states from putting their thumb on the scales in this way. Laws must make religious rights and protections available "on an equal basis to both the Quaker and the Roman Catholic." *Larson*, 456 U.S. at 245, 246 n.23. "[L]egislators—and voter—are required to accord to their own religions the very same treatment given to small, new, or unpopular denominations." *Id.* at 245, 246 n.23. But HB 1523 favors Southern Baptist over

---

[40] One of the more unique conflicts between religious belief and § 2 was elicited during Rabbi Jeremy Simons' testimony. He explained that as early as 1800 years ago, Judaism recognized "four distinct genders that are possible, male, female, then a category called tumtum, which is someone whose gender is essentially ambiguous, unable to be ascertained and then androgenous, someone who displays both sex characteristics." Tr. of June 23 at 105. Rabbi Simons said that rabbis in that era "truly struggle[d] with it, in what to do in these cases where it is ambiguous. But what you don't see is them condemning the child or saying that this child cannot be a part of the community or is any less human or holy than anyone else." *Id.*

Unitarian doctrine, Catholic over Episcopalian doctrine, and Orthodox Judaism over Reform

Judaism doctrine, to list just a few examples.[41]

Some Jewish and Muslim citizens may sincerely believe that their faith prevents them

from participating in, recognizing, or aiding an interfaith marriage. *See, e.g.*, Alex B. Leeman,

*Interfaith Marriage in Islam: An Examination of the Legal Theory Behind the Traditional and*

*Reformist Positions*, 84 Ind. L.J. 743, 755-56 (2009) (relaying that under "classical Shari'a

regulations: a Muslim man may marry a Christian or Jewish woman but no other unbeliever; a

Muslim woman may not marry a non-Muslim under any circumstances. . . . Some Muslim clerics

. . . have discouraged interfaith unions altogether."); Zvi H. Triger, *The Gendered Racial*

*Formation: Foreign Men, "Our" Women, and the Law*, 30 Women's Rts. L. Rep. 479, 520

(2009) ("Interfaith marriage is not simply prohibited by Judaism; it is also not recognized (if

performed elsewhere) due to its categorization as an inherently meaningless act. . . . Although

Israeli law does not allow interfaith marriages regardless of the sex of the Jewish partner, Israeli

culture[] disproportionately scorns Jewish women who cohabit with or marry non-Jewish men.").

Why should a clerk with such a religious belief not be allowed to recuse from issuing a marriage

license to an interfaith couple, while her coworkers have the full protections of HB 1523?

---

[41] *See* Southern Baptist Convention, Position Statements ("We affirm God's plan for marriage and sexual intimacy – one man, and one woman, for life. Homosexuality is not a 'valid alternative lifestyle.'"); Unitarian Universalist Association, Marriage Equality ("UU congregations and clergy have long recognized and celebrated same-sex marriages within our faith tradition."); U.S. Conference of Catholic Bishops, Issues and Action, Same Sex Unions, Backgrounder on Supreme Court Marriage Cases ("The USCCB supports upholding the right of states to maintain and recognize the true meaning of marriage in law as the union of one man and one woman."); Docket No. 2-1, at 11-13, in *CSE IV* (letter from the Bishop of The Episcopal Church in Mississippi permitting same-sex religious marriage as of June 3, 2016); Tr. of June 23 at 97-110 (expert testimony on views of same-sex marriage and transgender persons among Jewish denominations); Seth Lipsky, *U.S. Gay Marriage Ruling Puts Orthodox Jews on Collision Course With American Law*, Haaretz, June 28, 2015; *see generally* Docket No. 2-2, at 7, in *CSE IV* (resolution of the United Church of Christ supporting same-sex religious marriage); Brief for President of the House of Deputies of the Episcopal Church, et al. as Amici Curiae Supporting Petitioners, Obergefell v. Hodges, 135 S. Ct. 2584 (2015) (Nos. 14-556, 14-562, 14-571, 14-574); Brief for Major Religious Organizations as Amici Curiae Supporting Respondents, Obergefell v. Hodges, 135 S. Ct. 2584 (2015) (Nos. 14-556, 14-562, 14-571, 14-574). To be clear, Rabbi Simons' testimony indicated that the term "Orthodox" encompasses a variety of different sects of Judaism, some of which may permit same-sex marriage. Tr. of June 23 at 108-09. Most Jews in Mississippi belong to the Reform denomination and support same-sex marriage, he said. *Id.* at 96.

The State argues that there is no religious preference because some members of *all* religious traditions are opposed to same-sex marriage. That is, because some Unitarians, some Episcopalians, and some Reform Jews oppose same-sex marriage, HB 1523 is neutral between religious sects. *See* Docket No. 38-2, at 2, in *Barber*.

Every group has its iconoclasts. The larger the group, the more likely it will have someone who believes the sun revolves around the Earth, a doctor who thinks smoking unproblematic, or a Unitarian opposed to same-sex religious marriage. But most people in a group share most of that group's beliefs. That is the point of being in a *group*. And in the HB 1523 context, the State has favored certain *doctrines*, regardless of how many individuals deviate from official doctrine on an issue.[42]

The State's *we-prefer-some-members-of-all-religions* argument also fails to understand another function of the Establishment Clause. "Intrafaith differences . . . are not uncommon among followers of a particular creed," the Supreme Court once wrote, in its typical understated fashion. *Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 715-16 (1981); *see Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015). It is precisely because those internal disputes are common – and contentious – that the framers long ago decided that the government should stay out of those battles, for the benefit of both sides. *See, e.g.*, Sarah McCammon, *Conservative Christians Grapple With Whether 'Religious Freedom' Includes Muslims*, National Public Radio, June 29, 2016 (describing one ongoing internal debate).

Rev. Burnett's testimony illustrates the problem nicely. She said her church, the United Methodist Church, opposes same-sex religious marriage but is in the process of reconsidering its

---

[42] The Supreme Court has rejected this kind of sophistry: "the Establishment Clause forbids subtle departures from neutrality, religious gerrymanders, as well as obvious abuses." *Gillette v. United States*, 401 U.S. 437, 452 (1971). Courts are expected to look beyond superficial explanations. *Stone v. Graham*, 449 U.S. 39, 41 (1980) (per curiam); *see Edwards v. Aguillard*, 482 U.S. 578, 585-86 (1987) (invalidating Louisiana statute under the Establishment Clause although the statute's "stated purpose" was "to protect academic freedom").

position. Tr. of June 23 at 158. Rev. Burnett objected to what she perceived as the State of Mississippi's attempt to weigh in on that doctrinal debate via HB 1523. *Id.* at 159.

Governor Bryant is also a member of the United Methodist Church. *See* David Brandt, *Mississippi Church a Window into National Gay Rights Debate*, Assoc. Press, Apr. 12, 2016. There are same-sex couples in his congregation. *Id.*

HB 1523 violates the Establishment Clause because it chooses sides in this internal debate. In so doing it says persons like Gov. Bryant are favored and persons like Rev. Burnett are disfavored. So the fact that some members of all religions oppose same-sex marriage does not mean the State is being neutral. It means the State is inserting itself into any number of intrafaith doctrinal disputes, tipping the scales toward some believers and away from others. That is something it cannot do. "[T]he people's religions must not be subjected to the pressures of government." *Engel*, 370 U.S. at 430.

The State then argues that HB 1523 is defensible as supporting moral values, not religious beliefs. As the testimony in this case showed, however, religious beliefs are inextricably intertwined with moral values. Plus, the Free Exercise Clause only protects "beliefs rooted in *religion*." *Thomas*, 450 U.S. at 713 (citations omitted and emphasis added). So the State cannot simultaneously contend that HB 1523 is a reasonable accommodation of religious exercise and that it protects only moral beliefs. If HB 1523 was passed to encourage exclusively moral values, it was not passed to further the free exercise of religion.

Because § 2 "clearly grants denominational preferences of the sort consistently and firmly deprecated in [Supreme Court] precedents," the law must be treated as "suspect" and subject to strict scrutiny. *Larson*, 456 U.S. at 246-47. That means § 2 "must be invalidated unless it is justified by a compelling governmental interest, and unless it is closely fitted to further that

interest." *Id.* The *Lemon* test need not be applied. *Id.* at 252 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)); *see also Hernandez*, 490 U.S. at 695; *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 339 (1987).[43]

"For an interest to be sufficiently compelling to justify a law that discriminates among religions, the interest must address an identified problem that the discrimination seeks to remedy. [The government] must identify an actual concrete problem – mere speculation of harm does not constitute a compelling state interest." *Awad*, 670 F.3d at 1129 (quotation marks, citations, and brackets omitted).

As mentioned, the State says HB 1523 is justified by a compelling government interest in accommodating the free exercise of religion. The underlying premise of this interest is that members of some religious sects believe that any act which brings them into contact with same-sex marriage or same-sex relationships makes the believer complicit in the same-sex couples' sin, in violation of the believer's own exercise of religion. *See* Douglas Nejaime & Reva B. Siegel, *Conscience Wars: Complicity-Based Conscience Claims in Religion and Politics*, 124 Yale L.J. 2516, 2522-23 & n.23 (2015). The idea is that baking a cake for a same-sex wedding "makes a baker complicit in a same-sex relationship to which he objects." *Id.* at 2519.

The problem is that the State has not identified any actual, concrete problem of free exercise violations. Its defense speaks in generalities, but "Supreme Court case law instructs that overly general statements of abstract principles do not satisfy the government's burden to articulate a compelling interest." *Awad*, 670 F.3d at 1130 (collecting cases). Mississippi has run

---

[43] The Court need not consider the bill's "secular purpose." *See Doe*, 240 F.3d at 468; Chemerinsky § 12.2.2 (noting similarities between neutrality analysis and elements of the *Lemon* test). If it did, however, it would conclude that HB 1523 "was not motivated by any clearly secular purpose – indeed, the statute had *no* secular purpose," for the reasons listed in *Wallace*, 472 U.S. at 56. *See also Edwards*, 482 U.S. at 592.

into the same hurdle Oklahoma did in *Awad*: its attorneys have not identified "even a single instance" where *Obergefell* has led to a free exercise problem in Mississippi. *Id.*

In this case, moreover, it is difficult to see the compelling government interest in favoring three enumerated religious beliefs over others. "[T]he goal of basic 'fairness' is hardly furthered by the Act's discriminatory preference" for one set of beliefs. *Edwards*, 482 U.S. at 588. It is not within our tradition to respect one clerk's religious objection to issuing a same-sex marriage license, but refuse another clerk's religious objection to issuing a marriage license to a formerly-divorced person. The government is not in a position to referee the validity of Leviticus 18:22 ("Thou shalt not lie with mankind, as with womankind: it is abomination.") versus Leviticus 21:14 ("A widow, or a divorced woman, or profane, or an harlot, these shall he not take.").[44, 45]

Even if HB 1523 had encouraged the free exercise of *all* religions, it does not actually contribute anything toward that interest. Again, as discussed above, a clerk with a religious objection to same-sex marriage may invoke existing constitutional and statutory defenses without HB 1523. *E.g.*, *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 140 (1987). The State has not identified a purpose behind HB 1523 "that was not fully served by" prior laws. *Wallace*, 472 U.S. at 59.

Finally, the State claims that HB 1523 is akin to a federal statute permitting persons to opt-out of performing abortions. The comparison is inapt. For one, that statute is neutral to the extent it prohibits retaliation against doctors who decline to provide abortions as well as doctors

---

[44] All quotes from and citations to the Bible are drawn from the King James Version.

[45] We do not single out religious beliefs in this way. No state law explicitly allows persons to decline to serve a payday lender based on a religious belief that payday lending violates Deuteronomy 23:19. No state law explicitly allows recusals because of a belief that wearing "a garment mingled of linen and wool[]" is forbidden. *Leviticus* 19:19. If a marriage license was withheld for "foolish talking" or "jesting," *see* Ephesians 5:4, we would undoubtedly have many fewer marriages.

who choose to provide abortions. *See* 42 U.S.C. § 300a-7(c)-(e). HB 1523 is not so even-handed. Tr. of June 24 at 327.

It is true that part of the abortion statute permits individuals or entities to opt-out of performing all abortions. *Id.* § 300a-7(b). That still is not analogous to HB 1523. If doctors can opt-out of all abortions, the apples-to-apples comparison would let clerks opt-out of issuing all marriage licenses. A clerk who transfers from the marriage licensing division to the court filings division, for example, would be honoring her religious beliefs by declining to be involved in a same-sex marriage, but would not be picking and choosing which persons to serve.

The Court now turns to why that kind of selective service is unlawful.

### ii.     HB 1523's Accommodations Injure Other Citizens

HB 1523 also violates the First Amendment because its broad religious exemption comes at the expense of other citizens.

Supreme Court precedent has repeatedly upheld "legislative exemptions [for religion] that did not, or would not, impose substantial burdens on nonbeneficiaries while allowing others to act according to their religious beliefs." *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (collecting cases). A religious accommodation which does no harm to others is much more likely to survive a legal challenge than one which does.

*Estate of Thornton v. Caldor* is a good example of this principle at work. In that case, a Connecticut statute gave workers an "absolute right not to work on their chosen Sabbath." 472 U.S. 703, 704-05 (1985). Donald Thornton invoked the statute and chose not to work on Sundays. The resulting conflict with his employer led Thornton to quit. Litigation ensued.

The Supreme Court invalidated the Connecticut law. The statute violated the Establishment Clause by requiring that "religious concerns automatically control over all secular

interests at the workplace." *Id.* at 709. The statute did not take into account "the imposition of significant burdens on other employees required to work in place of the Sabbath observers." *Id.* at 710. "Other employees who have strong and legitimate, but non-religious, reasons for wanting a weekend day off have no rights under the statute," the Court found, and it was wrong to make them "take a back seat to the Sabbath observer." *Id.* at 710 n.9. Because "[t]he statute has a primary effect that impermissibly advances a particular religious practice," it violated the First Amendment. *Id.* at 710.

HB 1523 fails this standard. The bill gives persons with § 2 beliefs an absolute right to refuse service to LGBT citizens without regard for the impact on their employer, coworkers, or those being denied service. Like *Caldor*, it contains "no exception [for] when honoring the dictates of [religious] observers would cause the employer substantial economic burdens or when the employer's compliance would require the imposition of significant burdens on other employees required to work in place of the [religious] observers." *Caldor*, 472 U.S. at 709-10.

*Burwell v. Hobby Lobby* confirms this 'do no harm' principle. In that case, the Court relieved three closely-held corporations from federal contraceptive regulations which substantially burdened the corporate owners' religious beliefs. 134 S. Ct. at 2759. At first blush that sounds analogous to HB 1523: if the corporate owners could opt-out of the federal regulation, why can't clerks opt-out of serving same-sex couples? The difference is that the *Hobby Lobby* Court found that the religious accommodation in question would have "precisely zero" effect on women seeking contraceptive coverage, and emphasized that corporations do not "have free rein to take steps that impose disadvantages on others." *Id.* at 2760 (quotations marks, citation, and ellipses omitted). The critical lesson is that religious accommodations must be

considered in the context of their impact on others. *See also Bullock*, 489 U.S. at 14 (striking down Texas law requiring non-religious periodicals to subsidize religious periodicals).

Unlike *Hobby Lobby*, HB 1523 disadvantages recusing employees' coworkers and results in LGBT citizens being personally and immediately confronted with a denial of service. The bill cannot withstand the *Caldor* line of cases. As Judge Learned Hand once said, "[t]he First Amendment gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities." *Caldor*, 472 U.S. at 710 (quotation marks, citation, and ellipses omitted).

For these reasons, the plaintiffs are substantially likely to succeed on their claim that HB 1523 violates the First and Fourteenth Amendments.[46, 47]

## C.       Irreparable Harm

The plaintiffs are then required to demonstrate "a substantial threat of irreparable harm if the injunction is not granted." *Opulent Life Church,* 697 F.3d at 288. They must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). "An injury is irreparable only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citation omitted).

---

[46] A point of clarification is in order. The Establishment Clause claim brought by all of the plaintiffs is substantially likely to succeed in declaring § 2 of the bill unconstitutional. The *Barber* plaintiffs' Equal Protection Clause claim is also substantially likely to secure that result as to § 2, but may in fact enjoin the entire bill, as in *Romer*. The question is moot at this juncture because an injunction as to § 2 renders every other section inoperable as a matter of law. The result is that the HB 1523 is entirely "immobilized." *Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612, 2632 n.1 (2013) (Ginsburg, J., dissenting)

[47] In Establishment Clause cases, a finding of substantial likelihood of success on the merits has led the Fifth Circuit to suggest that the final three factors of preliminary injunctive relief require only cursory review. *See Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993). Nevertheless, the Court will proceed to the conclusion of the formal legal analysis.

The plaintiffs have sufficiently shown that HB 1523 represents an imminent and "substantial threat to [their] First Amendment rights. Loss of First Amendment freedoms, even for minimal periods of time, constitute irreparable injury." *Ingebretsen*, 88 F.3d at 280 (citations omitted). This applies with equal force to the Equal Protection claim, since the plaintiffs are substantially likely to be irreparably harmed by the unequal treatment HB 1523 sets out for them. *CSE I*, 64 F. Supp. 3d at 950.

As a result, this element is satisfied. *Accord Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 166 (5th Cir. 1993).

### D. Balance of Hardships

Here, the plaintiffs must show that the injuries they will suffer if HB 1523 goes into effect outweigh any harm that an injunction may do to the State. If a court has found irreparable harm, a party opposing injunctive relief will "need to present powerful evidence of harm to its interests" to prevent the scales from weighing in the movant's favor. *Opulent Life Church*, 697 F.3d at 297. On the other hand, "the injunction usually will be refused if the balance tips in favor of defendant." 11A Charles A. Wright et al., Fed. Prac. & Proc. § 2948.2 (3d ed.).

The State contends that granting an injunction will result in the "irreparable harm of denying the public interest in the enforcement of its laws." Docket No. 28, at 34, in *CSE IV* (quotation marks and citation omitted). This argument will be taken up with the public interest factor.

The State also says that enjoining HB 1523 would impose a hardship on conscientious objectors who are presently being denied the free exercise of their religion. Even setting aside the State's lack of support for this contention, the Fifth Circuit has not looked favorably upon this argument in similar Establishment Clause litigation. An injunction that enjoins HB 1523 will

preserve the status quo, so it "would not affect [citizens'] existing rights to the free exercise of religion and free speech. Therefore, [citizens] continue to have exactly the same constitutional right to pray as they had before the statute was enjoined." *Ingebretsen*, 88 F.3d at 280. Since *Ingebretsen* was decided, moreover, Mississippi has exacted its own RFRA to provide additional protection to religious Mississippians.

The Court concludes that the plaintiffs' constitutional injuries outweigh any injury the State suffers from an injunction that preserves the status quo.

### E.     Public Interest

Lastly, the plaintiffs must show that a preliminary injunction will not disserve the public interest. "Focusing on this factor is another way of inquiring whether there are policy considerations that bear on whether the order should issue." Wright et al. § 2948.4.

The State argues that the public interest is served by enforcing its democratically adopted laws. The government certainly has a powerful interest in enforcing its laws. That interest, though, yields when a particular law violates the Constitution. In such situations "the public interest is not disserved by an injunction preventing its implementation." *Opulent Life Church*, 697 F.3d at 298 (citations omitted); *accord Ingebretsen*, 88 F.3d at 280.

In this case, it is also relevant that Mississippi has been subjected to widespread condemnation and an economic boycott as a result of HB 1523's passage. *See*, Docket Nos. 32-11 (letter to Mississippi's leaders from nearly 80 CEOs urging HB 1523's repeal as "bad for our employees and bad for business"); 32-12 (statement of Mississippi Manufacturers Association opposing HB 1523); 32-13 (statement of Mississippi Economic Council opposing HB 1523); 32-19 (newspaper article indicating opposition to HB 1523 from nearly every Mayor on the Mississippi Gulf Coast); 32-20 (statement of the Gulf Coast Business Council describing "the

growing list of negative impacts" of HB 1523 on the State economy), all in *Barber*; *see also* Sherry Lucas, *MS Theater Groups Worry About HB 1523 Fallout*, The Clarion-Ledger, June 13, 2016 (reporting that copyright holders are presently prohibiting Mississippians from performing West Side Story, Footloose, Wicked, Godspell, and Pippin). The public interest is served by bringing this boycott to an end.

### F.    Other Considerations

The plaintiffs have made other First Amendment arguments and noted a preemption theory concerning 42 U.S.C. § 1983. In light of the substantive claims addressed above, and appreciating "the haste that is often necessary" in preliminary injunction proceedings, the Court declines to take up those other theories of relief at this time. *Monumental Task Comm., Inc v. Foxx*, --- F. Supp. 3d ---, 2016 WL 311822, at *3 (E.D. La. Jan. 26, 2016).

## V.    Conclusion

Religious freedom was one of the building blocks of this great nation, and after the nation was torn apart, the guarantee of equal protection under law was used to stitch it back together. But HB 1523 does not honor that tradition of religion freedom, nor does it respect the equal dignity of all of Mississippi's citizens. It must be enjoined.

The motions are granted.

**IT IS HEREBY ORDERED** that the defendants; their officers, agents, servants, employees, and attorneys; and any other persons who are in active concert or participation with the defendants or their officers, agents, servants, employees, or attorneys; are hereby preliminarily enjoined from enacting or enforcing HB 1523.

**SO ORDERED**, this the 30th day of June, 2016.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

60