IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

Campaign for Southern Equality and
Susan Hrostowski,

                                    Plaintiffs,

        v.

Phil Bryant, Governor Of
Mississippi;
Jim Hood, Attorney General Of
Mississippi;                                        Cause No. 3:16-cv-442-CWR-LRA
John Davis, Executive Director Of
The Mississippi Department Of
Human Services; and
Judy Moulder, Mississippi State
Registrar Of Vital Records,

                                    Defendants.

## REPLY BRIEF IN SUPPORT OF THE MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

This Court's interpretation of the establishment clause is incompatible with *Gillette v. United States*, 401 U.S. 437 (1971), which specifically holds that the establishment clause permits Congress to discriminate among the conscientious scruples that it will recognize and accommodate. Neither the plaintiffs nor this Court has an answer to *Gillette*.

The plaintiffs falsely assert that HB 1523 "facially discriminate[s] between religious beliefs or faiths," while claiming the Selective Service Act of 1967 did not. *See* ECF No. 48 at 4. But there is absolutely nothing in HB 1523 that "facially discriminate[s] between religious beliefs or faiths." The statute simply lists three "beliefs" that people might hold for religious *or secular* reasons, and then it protects

those who hold those beliefs from being forced to act in a manner contrary to their conscientious scruples. The same regime appears in the Selective Service Act of 1967. It identifies a specific belief, pacifism, and protects those who adhere to that belief from military conscription. If the plaintiffs think that HB 1523 "facially discriminate[s] between religious beliefs or faiths" because the Southern Baptist Convention opposes same-sex marriage while the Episcopal Church supports it, then the Selective Service Act of 1967 also "facially discriminate[s] between religious beliefs or faiths" because Quakers are pacifists and other Christian denominations aren't.

The plaintiffs also are also wrong to say that HB 1523 fails to advance "an important government interest." ECF No. 48 at 4. HB 1523 protects conscientious objectors from being forced to participate in activities that violate their deeply held religious or moral beliefs, and that in itself is an "important government interest" regardless of whether the State's protection of conscientious scruples produces other collateral benefits. *See Olmer v. City of Lincoln*, 192 F.3d 1176, 1180 (8th Cir. 1999) (noting that government "has a legitimate interest in preserving the right of its citizens to exercise their religion freely. Such an interest, in the abstract, is undoubtedly substantial and important."). And in all events, *Gillette* never held that laws that protect specific conscientious scruples trigger "heightened scrutiny" under the establishment clause, nor has any other court decision of which we are aware. *See, e.g.*, *Peyote Way Church of God, Inc. v. Thornburgh*, 922 F.2d 1210 (5th Cir. 1991) (rejecting an establishment-clause challenge to drug laws that permit the use of peyote only in "bona fide religious ceremonies" of "the Native American church," without applying heightened scrutiny or demanding that the law serve an "important government interest"). *Gillette* held that the government needed only a "valid" and "secular" reason for protecting the conscientious scru-

ples of pacifists, and it did not apply heightened scrutiny to the plaintiffs' establishment-clause claim. *See Gillette*, 401 U.S. at 545–60.

The plaintiffs suggest that Professor Choper has characterized *Gillette* as applying heightened scrutiny to the establishment-clause claim in that case. *See* ECF No. 48 at 5. But the plaintiffs quote Professor Choper out of context and mislead the Court. Here is what Professor Choper actually said about *Gillette*:

> In *Gillette*, the Court considered arguments that the Selective Service Act violated both the establishment clause and the free exercise clause by exempting those opposed for religious reasons to "war in any form," but not those opposed only to "unjust wars." The Court devoted most of its attention to the establishment clause, reasoning that "despite free exercise overtones," the former claim constituted "the gist of the constitutional complaint." The establishment clause argument was that the Selective Service Act's draft exemption "impermissibly discriminat[ed] among types of religious belief and affiliation." *In holding that the draft exemption withstood the establishment clause challenge, the Court merely required a "valid secular reason" for the law: ease of administration of the draft system.*
>
> *When it turned to the free exercise claim*, the Court did not expressly employ the strict scrutiny standard. Instead, the Court simply held that the secular reasons advanced to meet the establishment clause challenge also constituted "governmental interests of a kind and weight sufficient to justify under the Free Exercise Clause the impact of the conscription laws on those who object to particular wars." But for the Court to find that administrative convenience qualifies as a "compelling" government interest would be at odds with the strict scrutiny approach.
>
> In my view, the best explanation for the result in *Gillette* is that the Court concluded that the Selective Service Act survived some form of heightened scrutiny. Even after finding that the government's interest in administrative convenience sufficed to meet the free exercise challenge, the Court went on to observe: "And more broadly, of course, there is the Government's interest in procuring the manpower necessary for military purposes, pursuant to the constitutional grant of power to Congress to raise and support armies."

Jesse H. Choper, *The Rise and Decline of the Constitutional Protection of Religious Liberty*, 70 Neb. L. Rev. 651, 559–60 (1991) (emphasis added).

Notice how Professor Choper carefully distinguished the establishment-clause claim in *Gillette* from the free-exercise claim. He observed that *Gillette* dispatched the establishment-clause claim by requiring that the government show *only* a "valid secular reason" for the law. *Id.* at 660. When it came to the free-exercise claim, Professor Choper argued that the Court had required something more than that—but that was *only* with respect to the free-exercise claim and not the establishment clause.

The plaintiffs have not brought a free-exercise claim in this case; they are challengiing HB 1523 *only* under the establishment clause. See ECF No. 1, at 40; ECF No. 3 at 11–26. For the plaintiffs to take Professor Choper's words about the *free-exercise* claim in *Gillette*, and imply that Professor Choper somehow agrees with their claim that the *establishment clause* requires heightened scrutiny of laws that protect specific conscientious scruples, is to misrepresent the work of a leading constitutional scholar.[1]

The plaintiffs' claim that HB 1523 will "injure other citizens" is equally groundless. It is *already legal* in Mississippi for individuals, businesses, and religious organizations to decline to participate in same-sex marriages or decline to provide counseling that violates their moral or religious beliefs. There is no state law that outlaws discrimination on account of sexual orientation or gender identity, and the anti-discrimination ordinance in Jackson must give way to the state's Religious Freedom Restoration Act. *See* Miss. Code Ann. § 11-61-1 (2014). HB 1523 simply clarifies that conduct that is already legal will remain legal if a local

---

[1] We have attached the full text of Professor Choper's article as an appendix to this brief. The relevant discussion appears on pages 559 and 560.

jurisdiction tries to outlaw it, or if a judge tries to recognize a "compelling governmental interest" in forcing people to participate in conduct that violates their deeply held religious beliefs or moral convictions.

The Court should also stay its preliminary injunction because it failed to enforce Mississippi severability law. *See* Miss. Code Ann. § 1-1-31 ("If any chapter, article, section, paragraph, sentence, clause, phrase or any part of the Mississippi Code of 1972 is declared to be unconstitutional or void, or for any reason is declared to be invalid or of no effect, the remaining chapters, articles, sections, paragraphs, sentences, clauses and phrases shall be in no manner affected thereby but shall remain in full force and effect."). That means the plaintiffs must establish Article III standing to challenge each discrete provision of HB 1523, and they must also show that each discrete provision in HB 1523 violates the establishment clause. The plaintiffs obviously lack standing to challenge sections 3(2) and 3(3)—none of the plaintiffs allege that they are foster children, or that they will suffer any type of injury on account of these provisions—yet this Court enjoined those provisions along with the rest of HB 1523.

The plaintiffs claim that the Court can ignore state severability law because the State "failed to preserve" the issue, ECF No. 48 at 9, but that is preposterous. The State specifically flagged the severability language for this Court in its response to the plaintiffs' motion for preliminary injunction, and it cited the severability language again at oral argument—as even the plaintiffs acknowledge. *See id.* at 10. Yet the CSE plaintiffs did not deign to file a reply in response to the State's brief, and neither the Barber plaintiffs nor the CSE plaintiffs presented *any* argument to this Court that HB 1523 is non-severable, either in their briefing or at the preliminary-injunction hearing. It is the *plaintiffs* that have failed to preserve *their* claim that HB 1523 is non-severable.

And even if there were no severability provision—or if the State had somehow "waived" severability even though it brought section 1-1-31 to this Court's attention—the court is *still* under an obligation to preserve as much of HB 1523 as possible. *See NFIB v. Sebelius*, 132 S. Ct. 2566, 2642 (2012) (Ginsburg, J., concurring in part and dissenting in part) ("[W]hen a court confronts an unconstitutional statute, its endeavor must be to conserve, not destroy, the legislature's dominant objective."); *Ala. State Fed'n of Labor, Local Union No. 103 v. McAdory*, 325 U.S. 450, 465 (1945) ("When a statute is assailed as unconstitutional we are bound to assume the existence of any state of facts which would sustain the statute in whole or in part."). The Court was therefore duty-bound to sever the provisions of HB 1523 and refrain from enjoining the enforcement of sections that inflict no injury on the plaintiffs (such as sections 3(2) and 3(3)), as well as the sections that shield conduct that is already protected by the first amendment. *See* HB 1523 § 3(1), 3(7); ECF No. 48 at 7 ("[T]he First Amendment already guarantees religious organizations the right to choose which weddings they will solemnize.").

Finally, the Court should not consider the material in the Kaplan declaration in deciding whether to issue a stay. *See* ECF No. 49. The relevant inquiry is whether the State is likely to prevail in its appeal of the preliminary injunction—and that appeal will consider the trial-court record only as it existed at the time of the preliminary-injunction order. The Kaplan declaration is an improper attempt to supplement the preliminary-injunction record after this Court has ruled and after the State has appealed.

The Court should, however, repudiate Ms. Kaplan's outlandish statement that HB 1523 violates the Constitution because it was drafted and promoted by conservative Christian organizations. See ECF No. 49 at 4 ("HB 1523 was drafted by the ADF [Alliance Defending Freedom], was promoted by the ADF and other conservative Christian groups, *and . . . as a result*, HB 1523 improperly and unconsti-

tutionally reflects the sectarian Christian values of these organizations.") (emphasis added). The first amendment protects the right of *everyone* to petition the government for a redress of grievances—and that includes conservative Christians and other faith-based organizations. Sectarian Christian organizations have used this constitutionally protected freedom to lobby for the abolition of slavery, and the Southern *Christian* Leadership Conference (emphasis added) was instrumental in securing passage of civil-right legislation in the 1960s. *See, e.g.*, David J. Garrow, *Bearing the Cross: Martin Luther King, Jr., and the Southern Christian Leadership Conference* (1986). Does Ms. Kaplan think that lobbying from *this* Christian organization taints the Civil Rights Act of 1964 or the Voting Rights Act of 1965? Ms. Kaplan suggests that it is only "*conservative* Christian groups" that are forbidden to draft or advocate for legislation under the establishment clause. *See* ECF No. 49 at 4. But the text of the establishment clause cannot support a distinction between legislation that is influenced by conservative Christian groups, and laws that are influenced by religious organizations that Ms. Kaplan approves of.

## CONCLUSION

The court should stay the preliminary injunction pending appeal.

Respectfully submitted.

Phil Bryant, in his official capacity as
Governor of the State of Mississippi

By: /s/ Drew L. Snyder
Drew L. Snyder (Bar No. 102546)
Office of Governor Phil Bryant
P.O. Box 139
Jackson, MS 39205
(601) 359-3150
drew.snyder@governor.ms.gov

Counsel for Phil Bryant,
in his official capacity as
Governor of the State of Mississippi

Dated: July 28, 2016

## CERTIFICATE OF SERVICE

I certify that on July 28, 2016, this document was served on counsel of record through the Court's CM/ECF Document Filing System.

 /s/ Drew L. Snyder 
Drew L. Snyder (Bar No. 102546)
Office of Governor Phil Bryant
P.O. Box 139
Jackson, MS 39205
(601) 359-3150
drew.snyder@governor.ms.gov

Counsel for Phil Bryant,
in his official capacity as
Governor of the State of Mississippi

# APPENDIX

Jesse H. Choper*

# The Rise and Decline of the Constitutional Protection of Religious Liberty**

## TABLE OF CONTENTS

I. The Early Insignificance of the Free Exercise Clause .... 652

   A. Free Exercise Violations Abridging the Freedom of Speech ............................................... 652

   B. Rejection of Free Exercise Claims Involving Religiously Motivated Conduct ........................ 653

II. The Court Vitalizes the Free Exercise Clause ............ 655

III. Rejection of Subsequent Free Exercise Claims ........... 659

   A. Government Interests in National Defense and Combatting Racial Discrimination in Education ..... 659

   B. Special Contexts: Military and Prison Affairs ....... 661

   C. Compelling Government Interest in an Exemption-Free Tax System ..................................... 663

   D. A Structural Distinction Limiting the Scope of the Free Exercise Clause ................................ 668

IV. Evaluating *Smith* ........................................ 670

V. The Remaining Protection of Religious Liberty Under the Free Exercise Clause ................................. 680

VI. The Aftermath of *Smith* .................................. 684

VII. Conclusion ............................................... 686

\* Dean and Earl Warren Professor of Public Law, University of California, Berkeley (Boalt Hall). B.S. 1957, Wilkes College; LL.B. 1960, University of Pennsylvania; D. Hu. Litt. 1967, Wilkes College. I wish to thank David T. Owen-Ball of the class of 1991 for his exceptionally able assistance in the preparation of this Article.

\*\* An earlier version of this Article was delivered as the Roscoe Pound Lecture, University of Nebraska College of Law, March 7, 1991.

## I. THE EARLY INSIGNIFICANCE OF THE FREE EXERCISE CLAUSE

### A. Free Exercise Violations Abridging the Freedom of Speech

The scope of protection that the United States Supreme Court has accorded to the free exercise of religion under the first amendment has been quite limited. It was not until 1940, in *Cantwell v. Connecticut*,[1] that the Court first invalidated government action on free exercise grounds, also holding the free exercise provision of the first amendment applicable to the states through the fourteenth amendment. But free speech principles played a decisive role in that landmark case. *Cantwell* involved a group of Jehovah's Witnesses who canvassed a neighborhood playing anti-Catholic records on a portable phonograph in an effort to sell religious materials and solicit contributions. One member of the group was convicted under a state statute that required solicitors to obtain a license, which would not be issued without a state official's determination that the solicitor's cause was genuinely religious, charitable or philanthropic. The Court, objecting to the degree of discretion that the statute granted the official and relying on decisions involving freedom of speech, invalidated the statute as a prior restraint of both free speech and free exercise of religion.[2]

The Court's opinion in *West Virginia State Board of Education v. Barnette*[3] illustrates the point that virtually all cases thereafter finding a free exercise violation involved government regulation of religious *speech* or *belief*. In *Barnette*, Jehovah's Witnesses maintained that their religious bar on the worship of graven images prohibited their children from complying with a state requirement that public school students salute the flag of the United States while repeating the Pledge of Allegiance. The Court explicitly declined to decide the case on free exercise grounds in order to encompass the rights of those who might object to the requirement for non-religious reasons.[4] After finding that the flag salute ritual constituted symbolic speech, the Court held that the regulation violated the first amendment guarantee of freedom of expression because it compelled students to express acceptance of certain political ideas.[5]

Since the religious liberty claims in *Cantwell* and *Barnette*, as well

---

1. 310 U.S. 296 (1940).
2. *Id.* at 304-07 (relying on Near v. Minnesota, 283 U.S. 697 (1931)). See also *id.* at 303 n.3 (citing Schneider v. State, 308 U.S. 147 (1939)).
3. 319 U.S. 624 (1943).
4. *Id.* at 634-35 ("While religion supplies appellees' motive for enduring the discomforts of making the issue in this case, many citizens who do not share these religious views hold such a compulsory rite to infringe constitutional liberty of the individual." (footnote omitted)).
5. *Id.* at 633-34.

as in almost all freedom of religion cases, could have been vindicated without reference to the free exercise clause,[6] these cases are better understood as free speech cases, rather than as indicators of how the Court would evaluate governmental regulation of religious *conduct.*

## B. Rejection of Free Exercise Claims Involving Religiously Motivated Conduct

The more significant issue for religious liberty arises when a free exercise claim is pressed without the support of an alleged free speech violation. Under what circumstances do general government regulations of *conduct,* enacted for secular purposes (*i.e.,* without religious motivation), violate the free exercise clause if they conflict with an individual's religious tenets? Until 1963, the answer was never. In every earlier case involving generally applicable laws whose effect penalized or otherwise burdened conduct mandated by religious belief or, conversely, whose effect required or otherwise encouraged conduct forbidden by religious belief, the Court rejected the free exercise claim.

For example, in *Reynolds v. United States,*[7] a Mormon convicted of violating an antipolygamy statute raised the defense that he had acted in accordance with his religious precepts.[8] The Court, drawing a sharp distinction between beliefs and actions, held that while government regulations cannot interfere with mere religious belief and opinions, they may with practices that are "in violation of social duties or subversive of good order."[9]

In *Cantwell v. Connecticut,* the Court maintained this distinction, although softening it somewhat. The Court declared in a famous dictum that the free exercise clause "embraces two concepts, —freedom to believe and freedom to act,"[10] but reasoned that religious belief is entitled to "absolute" protection, whereas religious conduct remains "subject to regulation for the protection of society,"[11] although the government's "power to regulate [such conduct] must be so exercised as not, in attaining a permissible end, unduly to infringe the protected freedom."[12]

---

6. In fact, many of the Court's most prominent free speech rulings have involved religious expression or related activities such as proselytization or solicitation. *See* Choper, *Defining "Religion" in the First Amendment,* 1982 U. ILL. L. REV. 579, 581-82, and cases cited therein.

7. 98 U.S. 145 (1879).

8. Mormon doctrine required male members to practice polygamy, circumstances permitting, and held that the penalty for failure or refusal to practice polygamy "would be damnation in the life to come." *Id.* at 248.

9. 98 U.S. at 164.

10. Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

11. *Id.* at 303-04.

12. *Id.* at 304.

The principle originating in *Reynolds* and reiterated in *Cantwell*, that the government may generally regulate religious conduct to foster the welfare of society, led the Court to reject a free exercise claim in *Prince v. Massachusetts*.[13] A Jehovah's Witness was convicted of violating state child labor laws by furnishing her nine year-old niece with religious materials to sell on the street. She contended first that the laws violated her right (as her niece's legal guardian) to pass on her faith to her niece, and second that the laws infringed upon her niece's free exercise rights.[14] The Court initially declared that it was within the state's police power to enact "legislation appropriately designed" to protect children from "the crippling effects of child employment," and that "the validity of such a prohibition applied to children not accompanied by an older person hardly would seem open to question."[15] The Court then decided that the presence of an adult would not provide sufficient protection against the dangers the state sought to prevent, for street evangelism could "create situations difficult enough for adults to cope with and wholly inappropriate for children, especially of tender years, to face."[16] The Court deferred to the state as *parens patriae* in upholding the application of Massachusetts' child labor prohibition.

The Court again rejected a free exercise objection to a generally applicable law regulating conduct in *Braunfeld v. Brown*.[17] Orthodox Jewish merchants contended that a state statute requiring persons to close their businesses on Sunday violated their free exercise rights. Because their faith already required them to abstain from work on Saturday, the Jewish merchants were at a competitive disadvantage with others who closed only on Sunday. The Court rejected the claim, distinguishing between laws that *directly* burden free exercise by prohibiting the religious practice itself and those that cause only *indirect* burdens to be suffered, such as the economic consequences that the merchants were experiencing. In the former situation, the Court observed,

> to make accommodation between the religious action and an exercise of state authority is a particularly delicate task because resolution in favor of the State results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.[18]

The Sunday closing law, by contrast, "does not make unlawful any

---

13. 321 U.S. 158 (1944).
14. In accordance with her beliefs, Prince regularly distributed religious materials and solicited contributions on city streets, and the niece testified to her belief that failure to perform such work would result in her eternal condemnation. *Id.* at 161-63.
15. *Id.* at 168-69.
16. *Id.* at 169-70.
17. 366 U.S. 599 (1961).
18. *Id.* at 605 (citation omitted).

religious practices"; it "simply regulates a secular activity and operates
so as to make the practice of . . . [the merchants'] religious beliefs more
expensive."¹⁹ The Court did not hold in *Braunfeld* that all indirect
burdens upon the exercise of religion resulting from laws that are sec-
ular in purpose and effect are constitutionally permissible, however.
If "the State may accomplish its purpose by means which do not im-
pose such a burden," the law would be invalid as applied.²⁰

## II.  THE COURT VITALIZES THE FREE EXERCISE CLAUSE

In 1963 the Court abandoned *Braunfeld*'s distinction between di-
rect and indirect impacts upon religious conduct, and afforded reli-
gious action a level of constitutional protection that it had not before
enjoyed.  In *Sherbert v. Verner*,²¹ an employer discharged a mill
worker, a Seventh Day Adventist who, in accordance with her beliefs,
refused to work on Saturday when the mill shifted to a six-day work
week.  After failing to locate employment with a five-day work week
at any of the other mills in the area, the employee filed a claim for
state unemployment compensation.  She was denied benefits under a
statute that disqualified unemployed persons who failed to accept
"suitable work."  The Court held that "to condition the availability of
benefits upon . . . [her] willingness to violate a cardinal principle of her
religious faith effectively penalizes the free exercise of her constitu-
tional liberties."²²

The Court then applied what has come to be known as the test of
"strict scrutiny."  It first inquired whether "some compelling state in-
terest . . . justifies the substantial infringement of appellant's First
Amendment right."²³  The Court found no evidence to support a state
purpose in preventing "the filing of fraudulent claims by unscrupulous
claimants feigning religious objections to Saturday work," and no
other state interest was advanced.²⁴  Even if the state were able to
demonstrate that it had a sufficiently important interest at stake, the
Court continued, "it would plainly be incumbent upon . . . [it] to
demonstrate that no alternative forms of regulation would combat
such abuses without infringing First Amendment rights."²⁵

*Sherbert* distinguished *Braunfeld* on the ground that the economic
burden upon the Orthodox Jewish merchants was "saved by a coun-
tervailing factor which finds no equivalent in the instant case—a
strong state interest in providing one uniform day of rest for all work-

---

19. *Id.*
20. *Id.* at 607 (citing Cantwell v. Connecticut, 310 U.S. 296, 304-05 (1940)).
21. 374 U.S. 398 (1963).
22. *Id.* at 406.
23. *Id.*
24. *Id.* at 407.
25. *Id.*

ers."[26] Nevertheless, it is clear that a doctrinal shift had taken place with *Sherbert*: the *Braunfeld* Court upheld the statute on the basis of its direct versus indirect burdens distinction without employing a "strict scrutiny" analysis. For the *Braunfeld* Court, it was only important that the uniform day of rest was a *secular* governmental objective (not that it was an especially strong one) that could not be as effectively achieved by means that would not burden the free exercise of religion.[27]

The Burger Court reaffirmed *Sherbert*'s holding in *Thomas v. Review Board of the Indiana Employment Security Division*,[28] with (then Associate) Justice Rehnquist the only dissenter.[29] Thomas, a Jehovah's Witness, left his job as a metal worker after being transferred into a division that manufactured tank turrets because his religious beliefs prevented him from participating in the production of war materials. The state agency denied him unemployment benefits on the ground that he had not left for "good cause [arising] in connection with [his] work," as required by statute.[30] Having found a significant government-imposed burden on religious practice, the Court's opinion, written by Chief Justice Burger, applied *Sherbert*'s strict scrutiny standard: "The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."[31] Indiana argued that its interests in preventing a flood of unemployment claims from draining its fund and in avoiding employer inquiry into the religious beliefs of job applicants justified the burden, but the Court found no evidence suggesting that either interest was threatened.[32]

Six years later, *Hobbie v. Unemployment Appeals Commission*[33] presented the Court with facts virtually identical to those of *Sherbert* and *Thomas*. The state agency did not even attempt to demonstrate a

---

26. *Id.* at 408.
27. Braunfeld v. Brown, 366 U.S. 599, 607 (1961). Moreover, the *Braunfeld* Court was quite lenient in finding this second part of its test satisfied. The Orthodox Jewish merchants suggested an alternative means of providing for a weekly day of rest that would not restrict religious liberty; people who, for religious reasons, already observe a day of rest other than Sunday could be exempted from the law. In response the Court acknowledged, "A number of States provide such an exemption, and this may well be the wiser solution to the problem," but rejected the suggestion on the basis of speculation as to why it might not be an equally effective means of achieving the state's goal. *Id.* at 608-09 (footnote omitted).
28. 450 U.S. 707 (1981).
29. Justice Rehnquist would have applied *Braunfeld*'s distinction between direct and indirect burdens on religious practice to find that the state's "general statute, the purpose and effect of which is to advance the State's secular goals," did not violate the free exercise clause. *Id.* at 722-23 (Rehnquist, J., dissenting).
30. *Id.* at 712.
31. *Id.* at 718.
32. *Id.* at 718-19.
33. 480 U.S. 136 (1987).

compelling state interest as strict scrutiny requires, arguing instead
that the less rigorous standard that had recently been articulated by
Chief Justice Burger in *Bowen v. Roy*[34] should be applied.[35] Five Jus-
tices had expressly rejected the less rigorous standard in *Roy*, how-
ever.[36] In *Hobbie*, six Justices, including then newly appointed Justice
Scalia, joined in Justice Brennan's opinion for the Court reaffirming
the strict scrutiny approach.[37]

The high water mark for the protection of religious conduct under
the free exercise clause came a decade after *Sherbert* (and before
*Thomas* and *Hobbie*), when an effectively unanimous Court again em-
ployed the strict scrutiny approach in *Wisconsin v. Yoder*.[38] *Yoder*
involved a challenge by Amish parents of high school age-children to
Wisconsin's compulsory school attendance statute. The Amish led a
distinctive lifestyle,[39] and the parents believed that "by sending their
children to high school [beyond the eighth grade], they would not only
expose themselves to the danger of the censure of the church commu-
nity, but . . . also endanger their own salvation and that of their chil-

---

34. 476 U.S. 693 (1986). Harking back to the *Braunfeld* Court's deferential treatment
of laws imposing only indirect burdens upon religious conduct, the Chief Justice
proposed a special approach for free exercise challenges to government benefits
programs: "the Government meets its burden when it demonstrates that a chal-
lenged requirement for governmental benefits, neutral and uniform in its appli-
cation, is a reasonable means of promoting a legitimate public interest." *Id.* at
707-08. Only Justices Powell and Rehnquist joined in that particular section of
the Chief Justice's opinion in *Roy*, however.

35. Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 142 n.7 (1987).

36. Five members of the Court would have employed the strict scrutiny test to find a
free exercise violation on slightly different facts than the case presented. In *Roy*,
welfare administrators had assigned a social security number to a Native Ameri-
can girl despite her parents' belief that the social security number would harm
her spiritual development. If the government, rather than assigning the number
internally, were to require the parents to obtain and furnish a social security
number for her in order to apply for welfare benefits, these five justices would
have found that such a requirement did not pass the test of strict scrutiny.
Bowen v. Roy, 476 U.S. 693, 716 (1986)(Blackmun, J., concurring in part); 728-32
(O'Connor, Brennan, and Marshall, JJ., concurring in part and dissenting in
part); 733 (White, J., dissenting).

37. Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141 (1987).

38. 406 U.S. 205 (1972). Justice Douglas dissented in part, arguing that the majority
should not have assumed "that the only interests at stake in the case are those of
the Amish parents on the one hand, and those of the State on the other." *Id.* at
241. Given the importance of education for any child's future, new hearings
should have been held in order to ensure that the religious views of the Amish
children were in accord with those asserted by their parents. *Id.* at 244-46. Jus-
tice Douglas agreed with the Court, however, regarding the protection of relig-
iously grounded actions under the free exercise clause. *Id.* at 247.

39. As the Court summarized the evidence, "Their rejection of telephones,
automobiles, radios, and television, their mode of dress, of speech, their habits of
manual work do indeed set them apart from much of contemporary society." *Id.*
at 217.

dren."[40] The Court sympathized, finding that enforcing the state's compulsory attendance requirement would have a "severe" and "inescapable" impact upon Amish religious practice, an effect that "would gravely endanger if not destroy the free exercise of respondents' religious beliefs."[41]

Wisconsin responded in a manner reminiscent of *Reynolds*,[42] arguing that religiously based *actions* fall outside the protection of the free exercise clause, whereas religious *beliefs* receive absolute protection. The Court's opinion by Chief Justice Burger, citing *Sherbert* and *Cantwell*, declared that "in this context belief and action cannot be neatly confined in logic-tight compartments."[43] The Court also rejected Wisconsin's argument that its requirement was permissible because it was religiously neutral and "motivated by legitimate secular concerns."[44] Relying on *Sherbert*, the Court declared, "A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion."[45] The question was whether "the State's broader contention that its interest in its system of compulsory education is so compelling that even the established religious practices of the Amish must give way."[46]

In respect to this view, Wisconsin first argued that its compulsory education requirement served its interest in fostering intelligent participation in the democratic process and in developing its citizens' abilities to support themselves financially. In view of evidence that the Amish had functioned as a successful and self-sufficient society for over 200 years in the United States, however, the Court concluded that requiring an additional one or two years of compulsory formal education would produce "at best a speculative gain" in Amish abilities to meet their civic and economic responsibilities.[47]

Second, Wisconsin asserted its interest as *parens patriae* in protecting the right of Amish children to a secondary education. In response, the Court acknowledged that a compulsory education requirement is generally a reasonable means for the state to ensure access to education for its citizens. Absent evidence "that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens,"[48] however, the state may not in so doing

---

40. *Id.* at 209.
41. *Id.* at 218, 219.
42. *See supra* text accompanying notes 7-9.
43. Wisconsin v. Yoder, 406 U.S. 205, 220 (1972).
44. *Id.*
45. *Id.*
46. *Id.* at 221.
47. *Id.* at 227.
48. *Id.* at 234. The Court had earlier found that the Amish custom of employing children on the family farm presented no risk to their health and safety, and that the

interfere with the "primary role of the parents in the upbringing of their children," that of guiding "the religious future of the child."[49]

Thus, *Yoder* reaffirmed the *Sherbert* rule that a compelling state interest is required to justify governmental restriction of religiously motivated activity, even if the restriction takes the form of a religiously neutral government regulation enacted for secular reasons. As a result, religion attained a higher level of constitutional protection "than almost anything else—including the freedoms of expression and association, which we generally believe to be at the core of the democratic process."[50]

## III.  REJECTION OF SUBSEQUENT FREE EXERCISE CLAIMS

### A.  Government Interests in National Defense and Combatting Racial Discrimination in Education

Despite the establishment of the *Sherbert-Yoder* strict scrutiny standard, the Supreme Court has since rejected nearly all of the free exercise claims it has considered.[51] The results are more readily justified in some cases than in others. Two of the seemingly easier ones to explain are *Gillette v. United States*[52] and *Bob Jones University v. United States*,[53] in which the Court—either implicitly or explicitly—recognized government interests important, substantial, or compelling enough to justify burdens on religious liberty.

In *Gillette*, the Court considered arguments that the Selective Service Act violated both the establishment clause and the free exercise clause by exempting those opposed for religious reasons to "war in any form," but not those opposed only to "unjust wars."[54] The Court devoted most of its attention to the establishment clause, reasoning that

---

practice did not "present the undesirable economic aspects of eliminating jobs that might otherwise be held by adults." *Id.* at 229.

49. *Id.* at 232.

50. Choper, *The Free Exercise Clause: A Structural Overview and an Appraisal of Recent Developments*, 27 WM. & MARY L. REV. 943, 945 (1986). To illustrate, *Sherbert* and *Yoder* sustained free exercise challenges in the absence of any finding that the government had intended to restrict religious liberty in enacting the government regulations at issue. In contrast, in other areas of constitutional adjudication, the challenger must generally show government intent to burden the constitutional interest asserted. *See infra* notes 173-74 and accompanying text. Further, the free speech provision of the first amendment does not protect *conduct* unless the conduct is symbolic and the state has no independent reason (*i.e.*, no reason unrelated to the suppression of free expression) to regulate that conduct. Texas v. Johnson, 491 U.S. 397, 403 (1989). *See also* Choper, *supra* note 6, at 585-86 (no analogy to ban on adjudicating truth or falsity of statements about religious experiences).

51. *See* Choper, *supra* note 50, at 951-61.

52. 401 U.S. 437 (1971).

53. 461 U.S. 574 (1983).

54. Gillette v. United States, 401 U.S. 437, 441 (1971).

"despite free exercise overtones," the former claim constituted "the gist of the constitutional complaint."[55] The establishment clause argument was that the Selective Service Act's draft exemption "impermissibly discriminat[ed] among types of religious belief and affiliation."[56] In holding that the draft exemption withstood the establishment clause challenge, the Court merely required a "valid secular reason" for the law: ease of administration of the draft system.[57]

When it turned to the free exercise claim, the Court did not expressly employ the strict scrutiny standard. Instead, the Court simply held that the secular reasons advanced to meet the establishment clause challenge also constituted "governmental interests of a kind and weight sufficient to justify under the Free Exercise Clause the impact of the conscription laws on those who object to particular wars."[58] But for the Court to find that administrative convenience qualifies as a "compelling" government interest would be at odds with the strict scrutiny approach.[59]

In my view, the best explanation for the result in *Gillette* is that the Court concluded that the Selective Service Act survived some form of heightened scrutiny.[60] Even after finding that the government's interest in administrative convenience sufficed to meet the free exercise challenge, the Court went on to observe: "And more broadly, of course, there is the Government's interest in procuring the manpower necessary for military purposes, pursuant to the constitutional grant of power to Congress to raise and support armies."[61] This suggests that for the Court the combination of the powerful government interest in military preparedness and the difficulties in administering a draft exemption based on "just war" beliefs together justified the conclusion that the statutory discrimination among religious beliefs was based on a compelling, or substantial, or overriding government interest.

---

55. *Id.* at 449. The de-emphasis of the free exercise claim is significant because, under the establishment clause, the Court has applied a much more lenient test to laws that expressly deal with religion and have an effect that subjects some faiths to discriminatory treatment, than the strict scrutiny test it has applied under the free exercise clause to general, neutral laws that have an effect that conflicts with religious beliefs. Choper, *supra* note 50, at 960.

56. Gillette v. United States, 401 U.S. 437, 449 (1971).

57. *Id.* at 454-60.

58. *Id.* at 461.

59. *E.g.*, Sherbert v. Verner, 374 U.S. 398, 408-09 (1963)(administrative ease not a strong state interest unless granting an exemption would cause "an administrative problem of such magnitude . . . that such a requirement would have rendered the entire statutory scheme unworkable.") *See also* Craig v. Boren, 429 U.S. 190, 198 (1976)(administrative ease and convenience insufficient state interest even under intermediate scrutiny).

60. *See* Choper, *supra* note 50, at 960-61.

61. Gillette v. United States, 401 U.S. 437, 462 (1971).

By contrast, in *Bob Jones University*, the Court explicitly employed the free exercise clause's strict scrutiny test, holding—without dissent on this point—that the government's "fundamental, overriding interest in eradicating racial discrimination in education" was "compelling," and that "no 'less restrictive means' . . . [were] available to achieve the governmental interest."[62] The Court rejected the free exercise claim by ruling that the government's interest "substantially outweighs" the burden imposed by the Internal Revenue Service's denial of tax-exempt status to two private schools engaging in racial discrimination on the basis of their sincerely held religious beliefs.[63]

Thus, the Court had identified two types of government interests substantial enough to survive free exercise clause challenges: national defense and the national policy against racial discrimination in education, even though whether these government interests are "compelling" in the strict sense of the word has been persuasively challenged.[64]

## B. Special Contexts: Military and Prison Affairs

Two other cases in which the Court rejected free exercise claims can be explained because of their special contexts. The first, *Goldman v. Weinberger*,[65] arose in the area of military affairs. An Orthodox Jewish Air Force psychologist contended that the Air Force's efforts to prevent him from wearing his yarmulke on duty in a military hospital under a regulation which barred the wearing of headgear indoors infringed upon his first amendment freedom to exercise his religious

---

62. Bob Jones Univ. v. United States, 461 U.S. 574, 604 (1983). Justice Rehnquist, dissenting on grounds of statutory interpretation, agreed "that there is a strong national policy in this country opposed to racial discrimination," and "that Congress has the power to further this policy by denying § 501(c)(3) status to organizations that practice racial discrimination." *Id.* at 622 (Rehnquist, J., dissenting).

63. *Id.* at 604.

64. For criticism of the Court's labelling of these government interest as "compelling," see Greenawalt, *All or Nothing at All: The Defeat of Selective Conscientious Objection*, 1971 SUP. CT. REV. 31, 76 (in *Gillette*, government did not demonstrate "compelling," as opposed to "substantial," interest "since there was no demonstration that conscription itself would be seriously impaired by an extended exemption"); Freed & Polsby, *Race, Religion, and Public Policy: Bob Jones University v. United States*, 1983 SUP. CT. REV. 1, 22-24 & n.55 (refusal in *Yoder* to defer to government interest in universal compulsory education cannot be reconciled with recognition in *Bob Jones* of a compelling government interest in eliminating racial discrimination in education)[hereinafter *Race, Religion, and Public Policy*]; Laycock, *Tax Exemptions for Racially Discriminatory Religious Schools*, 60 TEX. L. REV. 259, 275 (1982) (national policy of fostering racial equality involved in *Bob Jones* "too attenuated to justify interference" with internal affairs of pervasively religious schools unless religious schools "so take over the public function of educating white students that desegregated education outside those church schools become impossible").

65. 475 U.S. 503 (1986).

beliefs. The Court, reasoning that "the military is, by necessity, a specialized society separate from civilian society" because it "must insist upon a respect for duty and a discipline without counterpart in civilian life,"[66] refused to apply the *Sherbert-Yoder* strict scrutiny standard. Justice Rehnquist, writing for a 5-4 majority, declared that although first amendment guarantees are not rendered "entirely nugatory in the military context," the standard is nevertheless highly deferential.[67] Thus, if "[t]he considered professional judgment of the Air Force is that the traditional outfitting of personnel in standardized uniforms" increases military effectiveness, the free exercise clause does not require the military to accommodate religious practices such as the wearing of the yarmulke.[68] The free exercise clause requires only that "the regulations challenged here reasonably and evenhandedly regulate dress in the interest of the military's perceived need for uniformity."[69]

Second, *O'Lone v. Estate of Shabazz*[70] involved a prison policy that prevented prisoners with outside work assignments from returning to the prison during the day except in the case of emergency. The policy, designed to minimize the security risk of traffic at the main gate, had the effect of preventing the Muslim prisoners from attending Jumu'ah, a weekly service held in the early afternoon on Fridays. The Court's analysis in the prison context was much the same as in the area of military affairs. While "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," nevertheless, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."[71] Therefore, "when a prison regulation impinges upon inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."[72] By another 5-4 vote, the Court upheld the policy.[73]

---

66. *Id.* at 506-07.
67. "In the context of the present case, when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 507.
68. *Id.* at 508-09.
69. *Id.* at 510.
70. 482 U.S. 342 (1987).
71. *Id.* at 348.
72. *Id.* at 349.
73. The Court has employed the same deferential policies in free speech cases arising in the military and prison contexts. *See, e.g.,* Greer v. Spock, 424 U.S. 828 (1976)(military); Parker v. Levy, 417 U.S. 733 (1974)(military); Procunier v. Martinez, 416 U.S. 396 (1974)(prison).

## C.  Compelling Government Interest in an Exemption-Free Tax System

It is probably hardest to justify the outcome in *United States v. Lee*.[74] An Old Order Amish farmer and carpenter, the employer of several other Amish, refused to pay the employer's share of the social security tax on his employees' wages. He based his refusal on the Amish belief that it is sinful not to provide for financially dependent members of the community.[75] As a consequence of this belief, the Amish oppose both payment of social security taxes and receipt of social security benefits. The employer claimed that imposition of the social security taxes violated his free exercise rights and those of his Amish employees.

Chief Justice Burger's opinion for the Court applied the following version of the strict scrutiny standard: "The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest."[76] The Court found the government's interest in "assuring mandatory and continuous participation in and contribution to the social security system" to be "very high."[77] In support of its conclusion, the Court briefly referred to statements from congressional reports that the institution of a voluntary social security system would threaten its fiscal well-being.[78] The Court then considered whether "accommodating the Amish belief will unduly interfere with fulfillment of the governmental interest."[79] Because of the administrative difficulties of maintaining a "comprehensive social security system, which rests on a complex of actuarial factors," and because "we are a cosmopolitan nation made up of people of almost every conceivable religious preference," the Court unanimously upheld the government's position.[80]

The result in *Lee* is difficult to square with the standard of strict scrutiny.[81] The Court's finding of an overriding government interest in a compulsory social security system may be generally acceptable, but not in circumstances such as these, where non-participants would also be non-recipients who would very likely be able to sustain themselves during retirement. As Justice Stevens persuasively contends in his separate concurrence, an exemption for Amish employers "probably would benefit the social security system because the nonpayment of these taxes by the Amish would be more than offset by the elimina-

---

74.  455 U.S. 252 (1982).
75.  The Amish belief was based upon a literal interpretation of I *Timothy* 5:8: "But if any provide not . . . for those of his own house, he hath denied the faith, and is worse than an infidel." *Id.* at 255 n.3.
76.  *Id.* at 257-58.
77.  *Id.* at 258-59.
78.  *Id.* at 258.
79.  *Id.* at 259.
80.  *Id.*
81.  *See also* Choper, *supra* note 50, at 952-53.

tion of their right to collect benefits."[82] Nor is the only available alternative to mandatory participation a complete transformation to a voluntary system, which the Court implied by considering the effects of such a conversion.[83] Rather, the free exercise claim could have been fully satisfied simply by extending to Amish employers the same exemption that Congress had already granted self-employed Amish and other religious persons.[84]

The Court also reasoned that there is no principled way to distinguish the exemption desired in *Lee* from other instances in which individuals seek tax exemptions on religious grounds, e.g., an individual religiously opposed to paying income taxes as long as a portion of the federal budget is devoted to defense expenditures "would have a similarly valid claim."[85] Such persons would affect the income tax system quite differently, however, than would Amish employers affect the social security system. There would be a net loss to the income tax system if exemptions were granted to defense tax objectors, but since the Amish not only refuse to pay in but also decline to take out, nothing indicates that the social security system would suffer any net diminution in revenue.[86] Accordingly, even though the government may have a compelling interest in mandatory participation in the income tax system, no such compelling interest was present in *Lee*.

Instead, it is *Yoder*, not the hypothetical defense-spending-objector cases, that is difficult to distinguish from *Lee*. If the government interest in compulsory education in *Yoder* was not compelling because Amish practices constituted an adequate substitute, there would seem to be no reason in *Lee* that the government interest should not be discounted for the same reason. The Court attempted to distinguish *Yoder* by commenting that "it would be difficult to accommodate the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs."[87] But it seems likely that parents of a wide range of religious beliefs could create an equally significant problem by demanding exemptions for their children from compulsory public education systems.[88] Moreover, the Court's ac-

---

82. United States v. Lee, 455 U.S. 252, 262 (1982)(Stevens, J., concurring).
83. *Id.* at 258 (" '[W]idespread individual voluntary coverage under social security . . . would undermine the soundness of the social security program.' (quoting a Senate report). Moreover, a comprehensive national social security system providing for voluntary participation would be almost a contradiction in terms and difficult, if not impossible, to administer.").
84. *Id.* at 262 (Stevens, J., concurring). Justice Stevens added: "The Court's analysis supports a holding that there is virtually no room for a 'constitutionally required exemption' on religious grounds from a valid tax law that is entirely neutral in its general application." *Id.* at 263 (Stevens, J., concurring).
85. *Id.* at 260.
86. *See supra* text accompanying note 82.
87. United States v. Lee, 455 U.S. 252, 259-60 (1982).
88. *See* Freed & Polsby, *supra* note 64, at 24 n.55.

knowledgement of a compelling government interest in sound tax systems is very difficult to reconcile with *Sherbert* and its progeny, which played such a significant role in establishing the free exercise doctrine of strict scrutiny, in which the Court refused to grant "compelling" status to state interests in fiscally sound unemployment compensation systems.[89]

The highly questionable result in *Lee* may be seen as a sign of the Justices' discomfort with their free exercise doctrine's provision of a special exemption from ordinary government regulations. Apparently, the Court decided to draw the line at taxes, as it did in protecting government interests in national defense and the national policy against racial discrimination in education, even though this position is quite difficult to justify under the *Sherbert-Yoder* doctrine.

The Court recently followed *Lee*'s recognition of a compelling government interest in an exemption-free tax system in *Hernandez v. Commissioner of Internal Revenue*.[90] *Hernandez* involved members of the Church of Scientology who sought to deduct "fixed donations" paid to the Church for pastoral counseling sessions (called "auditing" or "training" sessions) on their federal income tax returns as charitable contributions. According to Church doctrine, the sessions were a necessary means of studying the tenets of Scientology and of increasing spiritual awareness.[91] In addition, the proceeds generated were the Church's primary source of income.[92] The Internal Revenue Service disallowed the deductions. The Supreme Court upheld the I.R.S.'s determination that the counseling fees were not "charitable contributions." Rather, the payments were "part of a quintessential *quid pro quo* exchange: in return for their money, petitioners received an identifiable benefit, namely, auditing and training sessions."[93]

The Scientologists argued that this violated their free exercise right by "plac[ing] a heavy burden on the central practice of Scientology."[94] In response, the Court first indicated its doubts as to the substantiality of the burden that the denial of an income tax deduction placed on the claimants. In contrast to the Amish employer in *Lee*, "[n]either the payment nor the receipt of taxes is forbidden by the Scientology faith generally, and Scientology does not proscribe the payment of taxes in connection with auditing or training sessions specifically."[95] Instead, the only burden imposed on the claimants' reli-

---

89. Sherbert v. Verner, 374 U.S. 398, 406-07 (1963); Thomas v. Review Bd., Ind. Employment Sec. Div., 450 U.S. 707, 718-19 (1981).
90. 490 U.S. 680 (1989).
91. *Id.* at 684-85.
92. *Id.* at 685.
93. *Id.* at 691.
94. *Id.* at 698.
95. *Id.* at 699.

gious conduct was that "as a result of the deduction denial, adherents have less money available to gain access to such sessions."[96] Even assuming the tax deduction denial was substantial enough to trigger application of strict scrutiny, however, on the basis of *Lee* "a substantial burden would be justified by the 'broad public interest in maintaining a sound tax system,' free of 'myriad exceptions flowing from a wide variety of religious beliefs.' "[97]

The Court's consistent pattern of rejecting free exercise claims in the tax context continued with its unanimous decision in *Jimmy Swaggart Ministries v. Board of Equalization*.[98] Jimmy Swaggart Ministries (JSM) contended that California's imposition of sales and use taxes upon its sale of religious materials at meetings and by mail violated the free exercise clause. JSM relied heavily upon earlier decisions that had invalidated flat license taxes imposed as a precondition to the sale of religious materials,[99] but the Court distinguished them as follows:

> [U]nlike the license tax in *Murdock*, which was 'in no way apportioned' to the 'realized revenues' of the itinerant preachers forced to pay the tax (citations), . . . [California's tax] is akin to a generally applicable income or property tax, which *Murdock* and *Follett* specifically state may constitutionally be imposed on religious activity.[100]

In fact, the Court's holding a year earlier in *Texas Monthly, Inc. v. Bullock*[101] had already undermined the vitality of both *Murdock* and *Follett*. In *Texas Monthly*, the Court held that a sales tax exemption for religious periodicals violated the establishment clause as "state sponsorship of religious belief."[102] *Texas Monthly* made it clear that "[t]o the extent that our opinions in *Murdock* and *Follett* might be

---

96. *Id.*
97. *Id.* at 699-700 (quoting *Lee*). Justice Scalia joined in Justice O'Connor's dissent, challenging the *Hernandez* Court's result as a violation of the establishment clause. The dissenters reasoned that, by allowing adherents of other faiths to deduct quid pro quo payments similar to those of the Scientologists, the government had put its "imprimatur on [all but] one religion." *Id.* at 712 (O'Connor, J., dissenting)(quoting Gillette v. United States, 401 U.S. 437, 450 (1971)). Just nine months before *Smith*, Justice Scalia did not register any criticism of the Court's free exercise doctrine. In addition, only 14 months before *Smith*, Justice Scalia had stated—again in the establishment clause context—that "the Free Exercise Clause of the First Amendment *required* religious beliefs to be accommodated by granting religion-specific exemptions from otherwise applicable laws." Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 38 (1989)(Scalia, J., dissenting)(emphasis in original). *See* McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. CHI. L. REV. 1109, 1121 (1990).
98. 493 U.S. 378 (1990).
99. *See* Murdock v. Pennsylvania, 319 U.S. 105 (1943) and Follett v. Town of McCormick, 321 U.S. 573 (1944)(invalidating flat license taxes found to operate as a prior restraint on the exercise of religious liberty).
100. Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 390 (1990).
101. 489 U.S. 1 (1989).
102. *Id.* at 15.

read . . . to suggest that the States and the Federal Government may never tax the sale of religious or other publications, we reject those dicta."[103]

After distinguishing the greatly weakened precedents of *Murdock* and *Follett*, the *JSM* opinion turned to the strict scrutiny test: "[T]he free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden."[104]  The Court never reached the issue of the status of California's interest in the soundness of its tax system, however, because it found that the state's generally applicable sales and use tax did not impose a burden substantial enough to trigger the application of strict scrutiny.

As in *Hernandez* and in contrast to *Lee*,[105] JSM's tenets did not prohibit the payment of the tax.[106]  Moreover, the tax was imposed upon the purchasers of the materials; the seller was only required to collect and remit the tax.[107]  Therefore, "the only burden on [JSM] is the claimed reduction in income resulting from the presumably lower demand for [JSM's] wares (caused by the marginally higher price) and from the costs associated with administering the tax."[108]  In such a case, the Court concluded (following *Hernandez*) that "to the extent that imposition of a generally applicable tax merely decreases the amount of money [JSM] has to spend on its religious activities, any such burden is not constitutionally significant."[109]

The result in *JSM* (as in *Hernandez*) is in tension with *Sherbert*.  In both cases the claimants incurred financial costs in the course of engaging in activity pursuant to their religious beliefs.  In both cases, the claimants sought special governmental accommodation in order to be relieved of the costs attached to their religiously motivated activity.  Indeed, in *JSM* (and *Hernandez*) the financial costs restricted the direct flow of funds to the church, yet the Court made no accommodation.

The *JSM* Court distinguished *Sherbert* and its progeny by contrasting the role of JSM's religious beliefs with the role religious belief had played in the unemployment compensation context:

> [B]ecause . . . [JSM's] religious beliefs do not forbid payment of the sales and use tax, . . . in no sense has the State "condition[ed] receipt of an important

---

103. *Id.* at 24.

104. Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 384-85 (1990)(quoting Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 699 (1989)).

105. *See supra* text accompanying note 95.

106. Jimmy Swaggart Ministries v. Board of Equalization, 493 U.S. 378, 391 (1990).

107. *Id.*

108. *Id.*

109. *Id.*

benefit upon conduct proscribed by a religious faith, or . . . denie[d] such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."[110]

The Court's distinction is based upon a characterization of the relationship between religious belief and government regulation, however, that is more rhetorical than real. The situation in *Sherbert* could have been similarly described, for Mrs. Sherbert's beliefs did not "forbid" her from relinquishing unemployment compensation. It is true, though, that the degree of economic disadvantage was greater for Mrs. Sherbert than for JSM (but perhaps not for the Church of Scientology in *Hernandez*). In any case, the Court deemed the financial cost levied upon JSM's religious activity not to be "constitutionally significant" under the free exercise clause, an inquiry never made in *Sherbert*.[111]

Although the Court might weigh in the balance the scope of a given burden and the resulting pressure it places on activities mandated or forbidden by religious doctrine, free exercise protection should probably not hinge upon that factor. Judicial inquiry into such matters as how important a specific religious tenet is for a believer or how heavily the government imposed burden affects a particular individual's adherence to his religious precepts places the courts in an undesirably intrusive posture. Moreover, a subsequent balancing of these considerations against the strength of the government interest involves a weighing of incommensurables that creates serious problems of judicial prerogative in constitutional adjudication. Thus, subject to the limitations set forth below,[112] the better focus should be on the substantiality of the government interest in regulating the activity.

## D. A Structural Distinction Limiting the Scope of the Free Exercise Clause

Finally, in rejecting a free exercise claim in *Lyng v. Northwest In-*

---

110. *Id.* at 391-92 (quoting Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141 (1987)).

111. *Id.* at 391.

112. *See infra* text accompanying notes 217-21. For example, if granting an exemption would violate the establishment clause by coercing, compromising, or influencing religious belief, the exemption should not be granted. In my view, *Sherbert* was wrongly decided for that reason. Choper, *The Religion Clauses of the First Amendment: Reconciling the Conflict*, 41 U. Pitt. L. Rev. 673, 691 (1980)(*Sherbert* exemption violates establishment clause because the sole purpose of the exemption was to aid religion and compulsorily raised tax funds would be used to subsidize that aid); Choper, *supra* note 50, at 950 n.25 (exempting religious activity from state unemployment compensation laws violates establishment clause by using compulsory tax funds for religious purposes). Similarly, exempting religious activity from state tax laws violates the establishment clause by increasing the tax burden upon others. Thus, in my view, *Swaggart* was correctly decided.

*dian Cemetery Protective Association,*[113] the Court devised a structural distinction between, on the one hand, the "incidental effects" of the government's conduct of its own internal affairs and, on the other hand, the government "penalizing" or "coercing" religiously motivated conduct (by making it criminal) or inducing an individual to engage or refrain from engaging in religiously motivated conduct (through denial of civil benefits). In *Lyng,* American Indians sought to prevent the United States Forest Service from building a road through a section of a national forest that had historically been used for religious purposes because completion of the road would "virtually destroy the . . . Indians' ability to practice their religion."[114]

The Court declined to apply strict scrutiny, invoking its ruling in *Bowen v. Roy* that the free exercise clause "simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens."[115] Even though "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment,"[116] a different approach is required for judicial inquiry into government conduct of internal procedures:

> [I]ncidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, . . . [nor to] penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens . . . , [cannot] require government to bring forward a compelling justification for its otherwise lawful actions.[117]

Because of the remedy that the challengers were seeking, *Lyng* differed structurally in an additional way from all of the cases in which the Court had accepted a free exercise claim. In *Yoder* and in the unemployment compensation cases (as well as in the five justice dictum in *Bowen v. Roy*),[118] the challengers simply sought exemptions for themselves, requiring the government to make limited accommodations in the pursuit of its objectives. In *Lyng,* by contrast, the challengers sought to have the government abandon altogether the road

---

113. 485 U.S. 439 (1988).

114. *Id.* at 451 (quoting the finding of the Ninth Circuit below in Northwest Indian Cemetery Protective Ass'n v. Peterson, 795 F.2d 688, 693 (1986)).

115. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 448 (1988)(quoting Bowen v. Roy, 476 U.S. 693, 699 (1986)(government assignment and internal use of social security number for a two year-old girl did not violate free exercise rights of parents who believed that obtaining a social security number for their daughter would adversely affect her spiritual well-being)). The Court's holding in *Roy* was limited to the situation in which the government, in conducting its internal affairs, did not also require applicants to engage in conduct that violated their religious beliefs. *See supra* note 36.

116. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988).

117. *Id.* at 449-51.

118. *See supra* notes 36 and 115.

that it intended to build.[119] The Court has granted remedies that would force the government to abandon an entire program only when the government's objective was religious in nature, as in the school prayer cases.[120] Although the matter is not uncomplicated,[121] there is much to be said for the Court's view that, rather than weighing the effect on the government's interest of granting an exemption for a given free exercise claim in the balance, those claims seeking a remedy that would require the government to abandon its program entirely should be structurally distinguished and the free exercise exemption ordinarily denied.

## IV. EVALUATING *SMITH*

In *Employment Division, Department of Human Resources v. Smith*,[122] two drug rehabilitation counselors were fired from their jobs with a private drug rehabilitation organization when, after agreeing as a condition of employment not to use illegal drugs,[123] they ingested peyote for sacramental purposes at a ceremony of the Native American Church. In Oregon, the possession of peyote, a controlled substance, was a felony. When the drug counselors applied for state unemployment compensation, the agency held them to be ineligible under a state rule that disqualifies employees discharged for work-related "misconduct."[124] The drug counselors appealed, relying on *Sherbert*, *Thomas* and *Hobbie* for the proposition that a state "cannot condition the availability of unemployment insurance on an individ-

---

119. Since the Forest Service had considered "at least two [other routes for the proposed roadway] that circumnavigated the high country altogether," Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 462 (1988)(Brennan, J., dissenting), at the very least the government would have had to build the road over different route, if not abandon the plan altogether.

120. Wallace v. Jaffree, 472 U.S. 38 (1985); School Dist. v. Schempp, 374 U.S. 203 (1963); Engel v. Vitale, 370 U.S. 421 (1962).

121. For example, one might well question the degree of difference between the remedy of requiring the government to build a road a few miles away from its preferred site and requiring the government to exempt certain individuals from a general government program like the draft. *See* Williams & Williams, Volitionalism and Religious Liberty, 76 CORNELL L. REV. 769, 906-910 (1991).

122. 485 U.S. 660 (1988)(*Smith I*); Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595 (1990)(*Smith II*).

123. The drug rehabilitation organization's policy statement on drug and alcohol abuse provided, in pertinent part:

> In keeping with our drug-free philosophy of treatment, and our belief in the disease concept of alcoholism, and associated complex issues involved in both alcoholism and drug addiction, we require the following of our employees:
> 1. Use of an illegal drug or use of prescription drugs in a nonprescribed manner is grounds for immediate termination from employment. . . .

Employment Div., Dep't of Human Resources v. Smith, 485 U.S. 660, 662 n.3 (1988).

124. Employment Div., Dep't Human Resources v. Smith, 110 S. Ct. 1595, 1598 (1990).

ual's unwillingness to forgo conduct required by his religion."[125] Following an intermediate state appellate court's reversal of the Board's decision,[126] the Oregon Supreme Court first held that the denial of unemployment benefits did not violate the religion provisions of the Oregon Constitution because the employer—rather than the state—was responsible for the imposition on religious freedom.[127] The Oregon Supreme Court then ruled in favor of the drug counselors, however, on federal free exercise grounds.[128]

The first time the case came before the United States Supreme Court, the dispute was framed in terms of two issues: (1) whether the sacramental use of peyote is a criminal offense in Oregon, and (2) whether prohibition of such religiously motivated conduct violates the free exercise clause, for if it does not then "it certainly follows that [Oregon] may impose the lesser burden of denying unemployment compensation benefits to persons who engage in that conduct."[129] The Court reasoned that in *Sherbert, Thomas* and *Hobbie* "the conduct that gave rise to the termination of employment was perfectly legal, . . . [but t]he results . . . might well have been different if the employees had been discharged for engaging in criminal conduct."[130] In support

---

125. *Id.*
126. The cases of the two dismissed drug counselors, Alfred Smith and Galen Black, which raised identical legal issues and presented almost identical facts, proceeded in tandem through state administrative proceedings and through the state courts. In *Black*, an Oregon appellate court reversed the decision of the Employment Appeals Board, concluding that the denial of benefits to a person discharged for engaging in a religious act constituted a substantial burden on free exercise rights that was not justified by the state's interest in protecting its unemployment fund from depletion. Black v. Employment Div., 707 P.2d 1274 (Or. Ct. App. 1985). In *Smith*, the appellate court reversed the Board's decision and remanded for further consideration in light of *Black*. Smith v. Employment Div., 709 P.2d 246 (Or. Ct. App. 1985).
127. "If claimant's freedom to worship has been interfered with, that interference was committed by his employer, not by the unemployment statutes." Smith v. Employment Div., Dep't of Human Resources, 301 Or. 209, 216, 721 P.2d 445, 448 (1986). *See also* Black v. Employment Div., Dep't of Human Resources, 301 Or. 221, 224-25, 721 P.2d 451, 453 (1986). "An employer may impose conditions on employment that conflict with the employee's particular religious practices or beliefs. If the employe violates the conditions imposed, the employe is not eligible for benefits when the violation is 'a wilful violation of the standards of behavior which an employer has the right to expect of an employe.'" Smith v. Employment Div., Dep't of Human Resources, 301 Or. 209, 721 P.2d 445, 448 (1986)(quoting Oregon's statutory definition of work-related "misconduct").
128. Black v. Employment Div., Dep't of Human Resources, 301 Or. 221, 721 P.2d 451 (1986); Smith v. Employment Div., Dep't of Human Resources, 301 Or. 209, 721 P.2d 445 (1986). The United States Supreme Court consolidated the two cases when it granted Oregon's petition for certiorari. 480 U.S. 916 (1987). For further procedural details, see Smith v. Employment Div., Dep't of Human Resources, 485 U.S. at 661-67 (1988).
129. Employment Div., Dep't of Human Resources v. Smith, 485 U.S. 660, 670 (1988).
130. *Id.*

of its reasoning, the Court pointed out:

> We have held that bigamy may be forbidden, even when the practice is dictated by sincere religious convictions. If a bigamist may be sent to jail despite the religious motivation for his misconduct, surely a State may refuse to pay unemployment compensation to a marriage counselor who was discharged because he or she entered into a bigamous relationship. The protection that the First Amendment provides to *"legitimate* claims to the free exercise of religion" . . . does not extend to conduct that a State has validly proscribed.[131]

Accordingly, the Court vacated the decisions of the Oregon Supreme Court for determination of the first question.[132]

The Oregon Supreme Court held that the drug counselors' religiously inspired use of peyote fell under the prohibition of the Oregon criminal statute because peyote was listed as a controlled substance and the statute provided for no exception for sacramental use.[133] The Oregon Supreme Court also held, however, that enforcement of statutory prohibitions of possession or use of peyote against those using it for sacramental purposes would violate the first amendment.[134]

The second time the United States Supreme Court addressed *Smith*, it held, "Oregon may, consistent with the Free Exercise Clause, deny [the drug counselors'] unemployment compensation when their dismissal results from use of the drug."[135] Justice Scalia (writing for a majority of five) concluded that state prohibition of the religious use of peyote is permissible under the free exercise clause,[136] expressly declining to apply the traditional strict scrutiny test: "[T]he sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the [strict scrutiny] test inapplicable to . . . challenges [to] across-the-board criminal prohibitions on a particular form of conduct."[137]

Because of the peculiar facts of the case, I agree with the Court's result. It is important to emphasize that the case did not involve a criminal prosecution for the sacramental use of peyote. Nor did it involve a denial of unemployment benefits for a firing that was caused by an employer's change in the terms of employment after hiring an employee;[138] nor even an employee's change of religious views after

---

131. *Id.* at 671 (quoting Wisconsin v. Yoder, 406 U.S. 205, 215 (1972)(citations omitted)(emphasis in Employment Div., Dep't of Human Resources v. Smith, 485 U.S. 660 (1988)).

132. Employment Div., Dep't of Human Resources v. Smith, 485 U.S. 660, 674 (1988).

133. Smith v. Employment Div., 307 Or. 68, 72-73, 763 P.2d 146, 148 (1988).

134. *Id.* at 76, 763 P.2d at 150.

135. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1606 (1990).

136. *Id.* at 1599.

137. *Id.* at 1603.

138. As was the case in *Sherbert, supra* text accompanying note 22, and *Thomas, supra* text accompanying note 30.

beginning employment.[139] All of these instances may pose difficult questions under the free exercise clause. In *Smith*, however, the denial of benefits should have been upheld on the ground that the employees were estopped from making an "end run" on the unemployment compensation system—making a promise to the employer concerning its powerful interest in drug counselors abstaining from the use of drugs, breaking that promise, and then seeking to obtain benefits.[140]

I do not, however, agree with the Court's reasoning. In view of the Court's recent history of rejecting most free exercise claims, the Court's conclusion was not surprising. But the outcome was not entirely predictable, either. As strongly argued in Justice Blackmun's dissent, it was doubtful that the state had a compelling interest in not granting an exemption.[141] In any event, the Court's much broader rationale that the free exercise clause does not mandate any exemptions for religious conduct that conflicts with generally applicable government regulations was *very* surprising and *wholly* unexpected, especially in light of the fact that Justice Scalia had recently joined in the Court's strong reaffirmation of the compelling state interest standard in *Hobbie*,[142] rejecting a less rigorous standard originally proposed in

---

139. As in Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 138 (1987)(after two and one-half years of employment, the claimant joined the Seventh-day Adventist Church and refused to work on her Sabbath, from sundown on Friday to sundown on Saturday).

140. The Oregon Supreme Court held that the denial of benefits did not violate the Oregon Constitution on this basis. *See supra* note 127 and accompanying text.

141. Justice Blackmun rejected each of the three interests that Oregon advanced as "compelling." First, regarding the state's proclaimed interest "in protecting the health and safety of its citizens from the dangers of unlawful drugs," Justice Blackmun responded:

> The carefully circumscribed ritual context in which respondents used peyote is far removed from the irresponsible and unrestricted recreational use of unlawful drugs. The Native American Church's internal restrictions on, and supervision of, its members' use of peyote substantially obviate the State's health and safety concerns.

Unemployment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1618 (1990)(Blackmun, J., dissenting). Moreover, Justice Blackmun found it significant that the federal government and the twenty-three states which exempt the religious use of peyote from their drug laws "all find their (presumably compelling) interests in controlling the use of dangerous drugs compatible with an exemption for religious use of peyote." *Id.* at 1618 n. 5 (Blackmun, J., dissenting). Second, with respect to the state's "interest in abolishing drug trafficking," Justice Blackmun points out that "[t]here is . . . practically no illegal traffic in peyote." *Id.* at 1620 (Blackmun, J., dissenting). Finally, turning to the state's "interest in the uniform, fair, and certain enforcement of its drug laws," Justice Blackmun maintains that this argument "could be made in almost any free exercise case. (citation omitted). This Court, however, consistently has rejected similar arguments in past free exercise cases, and it should do so here as well." *Id.* (citations omitted).

142. Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141-42 (1987).

*Bowen v. Roy* by Chief Justice Burger, who was joined only by Justices Powell and Rehnquist.[143]

Justice Scalia's opinion for the Court is quite straightforward in addressing the relevant issues. After acknowledging that the compelling state interest standard was the prevailing approach,[144] Justice Scalia argues that "[i]n recent years we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all."[145] He then fairly describes how the test has been watered down in past judicial applications: "Although we have sometimes purported to apply the *Sherbert* test in contexts other than . . . [the area of unemployment compensation], we have always found the test satisfied."[146]

Justice Scalia is less persuasive, however, in suggesting that the unemployment compensation cases can be distinguished on the ground that they arose "in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct."[147] Arguing that "a distinctive feature of unemployment compensation programs is that their eligibility criteria invite consideration of the particular circumstances behind an applicant's unemployment,"[148] Justice Scalia declares: "[O]ur decisions in the unemployment cases stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason."[149]

"Individualized" exemptions and the opportunity for consideration of particular circumstances exist, however, for a great many types of

---

143. Bowen v. Roy, 476 U.S. 693, 707-08 (1986). Justices White and Stevens, who joined Justice Scalia's opinion in *Smith*, had also reaffirmed the strict scrutiny standard in *Hobbie*. Justice White, like Justice Scalia, joined the *Hobbie* majority's position. Hobbie v. Unemployment Appeals Comm'n, 480 U.S. 136, 141-42 (1987). Justice Stevens' rationale for applying the standard, however, would have restricted its scope considerably. *Id.* at 147-48 (Stevens, J., concurring)(strict scrutiny applies when the state, in administering benefits, treats religious claims for exemptions less favorably than other claims for exemptions).

144. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1602 (1990).

145. *Id.* Justice Scalia may be said to have somewhat overstated his point. He portrays *Bowen v. Roy* as a case in which the Court "declined to apply *Sherbert* analysis . . . [and] held the statute's application to the plaintiffs valid regardless of whether it was necessary to effectuate a compelling interest." *Id.* But a majority of the Court in that case expressly called for the application of strict scrutiny and would have found a free exercise violation if the government, in administering welfare benefits, required applicants to obtain a social security number in violation of their religious beliefs. *See supra* note 36.

146. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1602 (1990)(citing United States v. Lee, 455 U.S. 252 (1982), and Gillette v. United States, 401 U.S. 437 (1971)).

147. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1603 (1990).

148. *Id.*

149. *Id.*

regulations.[150] Further, "*most* of the Supreme Court's free exercise cases resemble the unemployment compensation cases in that they involve individuated governmental assessments of the claimant's circumstances."[151] To illustrate, the Oregon statute involved in *Smith* prohibited possession of a "controlled substance" unless prescribed by a medical practitioner,[152] the Selective Service Act in *Gillette* exempted various groups including those opposed to "war in any form,"[153] and the Sunday closing law in *Braunfeld* applied only to retail merchants selling specifically listed items.[154] Thus, as Professor Michael McConnell concludes: "The unemployment cases cannot be distinguished on this ground."[155]

Justice Scalia disposed of the non-unemployment compensation precedents by contending that: "[T]he only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections."[156] This assertion does hold true for many free speech/free exercise cases, such as *Cantwell*[157] and *Barnette*.[158] *Yoder*,[159] however, cannot legitimately be described as involving a "hybrid" claim. Justice Scalia argues that the additional constitutional protection involved in *Yoder* was "the right of parents, acknowledged in *Pierce v. Society of Sisters*,[160] . . . to direct the education of their children."[161] But *Yoder* "expressly stated that parents do *not* have the right to violate the compulsory education laws for nonreligious reasons."[162] Moreover, attributing the result in

---

150. *See* Laycock, *The Remnants of Free Exercise*, 1990 S. Ct. Rev. 1, 50 ("American statutes are riddled with exceptions and exemptions for various special interests, small businesses, private citizens, and government agencies.").

151. McConnell, *supra* note 97, at 1123 (citing as examples United States. v. Lee, 455 U.S. 252, 260 (1964); Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 442 (1988) and O'Lone v. Estate of Shabazz, 482 U.S. 342, 346 (1987)).

152. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1602 (1990).

153. Gillette v. United States, 401 U.S. 437, 442 n.5 (1971).

154. Braunfeld v. Brown, 366 U.S. 599, 601 n.1 (1961).

155. McConnell, *supra* note 97, at 1124.

156. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1601 (1990).

157. Cartwell v. Connecticut, 310 U.S. 296 (1940); *see supra* text accompanying note 2.

158. West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624 (1943); *see supra* text accompanying notes 3-5.

159. Wisconsin v. Yoder, 406 U.S. 205 (1972).

160. 268 U.S. 510 (1924).

161. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1601 (1990).

162. McConnell, *supra* note 97, at 1121 (referring to Wisconsin v. Yoder, 406 U.S. 205, 215-16 (1972)). "Thus, according to *Yoder* parents have no right independent of the Free Exercise Clause to withhold their children from school. . . .". *Id.* By contrast, it is clear that in decisions such as *Cantwell* and *Barnette* there was a

*Yoder* to its combination of free exercise rights with a substantive due process right[163] of parents to direct their children's education is especially ironic for Justice Scalia, who rejects use of the due process clause "to invent new [constitutionally protected substantive interests]," especially—as in the case of compulsory education laws—when there is "a societal tradition of enacting laws *denying* the interest."[164]

Justice Scalia's contention that free exercise claims have been accepted only in "hybrid situations"[165]—situations involving a free exercise interest in combination with another constitutional right—also overlooks *Bowen v. Roy* where, without referring to any other constitutionally protected interest in support of their conclusion, five Justices found that requiring welfare applicants to violate their religious beliefs by obtaining and furnishing a social security number would not pass the test of strict scrutiny under the free exercise clause.[166]

Finally, Justice Scalia contends that the application of the "compelling government interest" test has only very limited application in other fields: the Court subjects "to the most exacting scrutiny laws that make classifications based on race or on the content of speech,"[167] but not "race-neutral laws that have the *effect* of disproportionately disadvantaging a particular racial group . . . [or] generally applicable laws unconcerned with regulating speech that have the *effect* of interfering with speech."[168] Justice Scalia cautions that a broader application of strict scrutiny than is common in other fields—to "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice"—would necessarily lead to one of two undesirable results. First, the test could end up being diluted: "watering it down here would subvert its rigor in the other fields where it is applied."[169] Alternatively, if the test were to be "applied across the

---

freedom of speech right independent of the free exercise of religion right. *See supra* text accompanying note 6.

163. *Pierce* explicitly acknowledged that its holding comes "[u]nder the doctrine of Meyer v. Nebraska," which was based on the substantive scope of the fourteenth amendment's due process guarantee. Pierce v. Society of Sisters, 268 U.S. 510, 534 (1925). *See* Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

164. Michael H. v. Gerald D., 491 U.S. 110, 122 n.2 (1989)(emphasis in original)(rejecting natural father's substantive due process claim to parental rights over a child born into a woman's existing marriage with another man).

165. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1602 (1990).

166. *See supra* note 36.

167. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1604 n.3 (citations omitted).

168. *Id.* (citations omitted)(emphasis in original).

169. *Id.* at 1605. The feared "watering down" of the compelling government interest test, however, has already occurred. *See supra* note 64 and accompanying text (challenging the Court's recognition of national defense and the national policy against racial discrimination in education as "compelling" state interests); *supra* notes 74-97 (criticizing recognition of a compelling state interest in an exemption-

board, to all actions thought to be religiously commanded, . . . society
. . . would be courting anarchy."[170] Justice Scalia warns, "[I]t is horri-
ble to contemplate that federal judges will regularly balance against
the importance of general laws the significance of religious prac-
tice,"[171] a process that becomes increasingly dangerous "in direct pro-
portion to the society's diversity of religious beliefs, and its
determination to coerce or suppress none of them."[172]

Although generally accurate, Justice Scalia's point is slightly over-
stated. It is true that in the area of differential treatment on the basis
of race, strict scrutiny is applied only to instances of intentional racial
discrimination, and not to government actions having only a racially
disproportionate impact.[173] In the area of freedom of speech, how-
ever, heightened scrutiny has been applied in some instances where
the regulation has a restrictive effect without more.[174]

McConnell argues that Justice Scalia's aversion to the scope of ju-
dicial discretion in the balancing process is in tension with "most areas
of constitutional law."[175]

> There is no particular reason to believe that judgments under the Free Exer-
> cise Clause are any more discretionary or prone to judicial abuse than judg-
> ments under the Commerce Clause, the Due Process Clause, or the Free
> Speech Clause, to take a few examples from the current catalog of compelling
> interest or balancing tests. Unless *Smith* is the harbinger of a wholesale re-
> treat from judicial discretion across the range of constitutional law, there

---

free tax system); *see also* McConnell, *supra* note 97, at 1127 ("it must be conceded
that the Supreme Court before *Smith* did not really apply a genuine 'compelling
interest' test").

170. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1605
(1990).

171. *Id.* at 1606 n.5.

172. *Id.* at 1605.

173. Washington v. Davis, 426 U.S. 229 (1976).

174. *See* Jamison v. Texas, 318 U.S. 413 (1943)(government regulation of handbills and
littering); Hague v. CIO, 307 U.S. 496 (1939); Schneider v. State, 308 U.S. 147
(1939); and Lovell v. City of Griffin, 303 U.S. 444 (1938). *See also* United States v.
O'Brien, 391 U.S. 367, 377 (1968)(the effect of a statute "unrelated to the suppres-
sion of free expression" upon communicative activity may be "no greater than is
essential to the furtherance of" the government interest); Choper, *Thoughts on
State Action: The "Government Function" and "Power Theory" Approaches*, 1979
WASH. U.L.Q. 757, 766 ("state action also may be held to abridge freedom of
speech even though the purpose of the challenged legal restraint is not directed
to suppressing communication, but rather is intended to accomplish some in-
dependent, nonspeech-related regulatory end.") Another exception would likely
be found in connection with other favored substantive constitutional rights (such
as the right to privacy or the right to vote on an equal basis), where heightened
scrutiny would probably be applied to government regulations in the absence of
any indication that the government intended the burdensome effects to occur.
*See, e.g.*, Choper, *The Requirement of Intentional Discrimination*, in 2 J. CHOPER,
Y. KAMISAR & L. TRIBE, THE SUPREME COURT: TRENDS AND DEVELOPMENTS
1979-80, 9, 26-27 (1980).

175. McConnell, *supra* note 97, at 1144.

should be some explanation of why the problem in this field is more acute than it is elsewhere.[176]

Although the *process* of exercising judicial discretion is no more unrestrained or subject to abuse in the religious liberty context than in other constitutional areas, a comparison of the potential *scope* of free exercise balancing with the constitutional areas McConnell mentions demonstrates that there is special reason for seeking to limit judicial discretion in the former instance. First, it is true that judicial oversight of state regulations under the commerce clause potentially involves a great many cases and invokes a process of ad hoc balancing, often accompanied with substantial interjection of judicial policy predilections. There is an important difference, however, between commerce clause adjudication and judicial review under the free exercise clause:

> When the Court rules on a contention that state or local laws . . . improperly impose upon domains over which the national government is empowered (usually the areas of interstate or foreign commerce and thus violative of the commerce clause . . .), . . . the Court does *not* exercise the momentous power of judicial review. . . . [T]he Court does not speak the final constitutional word. The federal political branches do. The Court's decisions on the federalism limits on state's actions may be revised by ordinary federal statutes.[177]

Second, regarding the scope of judicial balancing under the due process clause, McConnell appears to be referring to procedural due process cases such as *Mathews v. Eldridge*.[178] But the Court has not applied its balancing test here beyond the quite restricted context of government deprivations of constitutionally protected liberty or property interests.[179] As for judicial balancing on substantive due process issues, the Court has repeatedly refused to apply a balancing test outside the narrow context of privacy interests in child rearing and education, family relationships, procreation, marriage, contraception and abortion.[180]

Finally, turning to freedom of speech, the use of judicial balancing is greatly limited in this area. Laws that directly regulate speech or that make the exercise of free speech rights more burdensome[181] are relatively rare, comprising only a tiny fraction of the total number of government regulations in effect. In contrast, if under the free exercise clause the courts were to apply strict scrutiny to every govern-

---

176. *Id.*
177. J. CHOPER, JUDICIAL REVIEW AND THE NATIONAL POLITICAL PROCESS: A FUNCTIONAL RECONSIDERATION OF THE ROLE OF THE SUPREME COURT 207 (1980).
178. 424 U.S. 319 (1976).
179. W. LOCKHART, Y. KAMISAR, J. CHOPER & S. SHIFFRIN, CONSTITUTIONAL LAW: CASES-COMMENTS-QUESTIONS 632-44 (7th ed. 1991).
180. *See, e.g.*, Bowers v. Hardwick, 478 U.S. 186 (1986)(homosexual activity); Whalen v. Roe, 429 U.S. 589 (1977)(names of persons obtaining certain drugs).
181. As in the effect of antilittering ordinances upon dissemination of handbills. *See supra* note 174 and accompanying text.

ment regulation having the effect of restricting individual religious freedom, because of the diversity of religious beliefs in the United States—a phenomenon which appears likely to increase—virtually "every regulation of conduct that does not protect an interest of the highest order" would be open to challenge; "religious exemptions from civic obligations of almost every conceivable kind" could be constitutionally required.[182] Even the most common and mundane government requirements, such as photographs on driver's licenses,[183] Social Security numbers,[184] and such activities as building roads[185] or running a selective service system,[186] can conflict with religious beliefs. Government regulations do not intrude upon commerce clause, due process clause, or free speech clause interests with nearly such breadth. Nor does one's approval of the results reached by courts granting exemptions from government regulations on free exercise grounds[187] mean that the courts would not be more deeply involved here than in other areas.

Sympathizing with Justice Scalia's concern, however, does not mean that limiting principles cannot be found (though none is completely free of flaws). At a minimum, the Court has required that religious beliefs must be in "good faith" or sincerely held.[188] There is also the approach that the conduct for which an exemption is sought must involve a central tenet of one's religious beliefs.[189] Finally, as I have suggested elsewhere, the Court could limit its review to situations where the individual's religious belief carries extratemporal consequences.[190]

---

182. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1605 (1990). Justice O'Connor has expressed a similar concern in the establishment clause context: "[C]haos would ensue" if every government regulation "that ostensibly promotes a secular interest [but] . . . has an incidental or even a primary effect of helping or hindering a sectarian belief" were invalid. Wallace v. Jaffree, 472 U.S. 38, 69-70 (1985)(O'Connor, J., concurring in judgment).

183. Quaring v. Peterson, 728 F.2d 1121 (8th Cir. 1984), *aff'd by equally divided court sub nom.*, Jensen v. Quaring, 472 U.S. 478 (1985).

184. Bowen v. Roy, 476 U.S. 693 (1986).

185. Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988).

186. Gillette v. United States, 401 U.S. 437 (1971).

187. *See* McConnell, *supra* note 97, at 1142-43.

188. United States v. Ballard, 322 U.S. 78, 84 (1944). *See also* Thomas v. Review Bd., 450 U.S. 707, 716 (1981)("The narrow function of a reviewing court . . . is to determine whether . . . petitioner terminated his work because of an honest conviction that such work was forbidden by his religion.")

189. Sherbert v. Verner, 374 U.S. 398, 406 (1963). *See* Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 474 (1988)(Brennan, J., dissenting)("I believe it appropriate, therefore, to require some showing of 'centrality' before the Government can be required either to come forward with a compelling justification for its proposed use of federal land or to forego that use altogether.")

190. For the suggestion that the expectation of extratemporal consequences could be used as a limiting principle to free exercise claims, see Choper, *supra* note 6, at 597:

In addition, there are other devices available that may reduce the impact of traditional free exercise doctrine on the government's ordinary ability to regulate. Just as Congress has required religious objectors to military service to engage in alternative forms of service, and state lawmaking bodies have required that religious objectors to Sunday closing laws remain closed on their Sabbath rather than on Sunday, courts could suggest that an alternative burden be imposed upon individuals granted religious exemptions that does not conflict with their beliefs. The precise contours of the alternative burden would have to vary with differing contexts, of course. But in this manner, religious objectors would be relieved of pressures to violate their beliefs, and would not markedly benefit from their religious scruples relative to others. This would minimize any incentive to file fraudulent claims, and reduce the likelihood that government exemption would induce people to adopt certain beliefs, thus avoiding establishment clause problems.[191] Religious conduct would be accommodated without risking a potentially overwhelming number of free exercise challenges.

## V.  THE REMAINING PROTECTION OF RELIGIOUS LIBERTY UNDER THE FREE EXERCISE CLAUSE

An important question concerns the extent of protection that remains for religious liberty after *Smith*, apart from the security afforded by free speech principles. First, some observers have found a promising potential avenue in Justice Scalia's contention that there is a category of "hybrid" free exercise claims which remain covered by the test of strict scrutiny.[192] The hybrid category could include combi-

---

[A] forceful explanation and pragmatic justification for the free exercise clause's special exemption from otherwise universal governmental regulation is the fact that the commands of religious belief, at least as conventionally perceived, have a unique significance for the believer, thus making it particularly cruel for the government to require the believer to choose between violating those commands and suffering meaningful temporal disabilities.

As evidence that no limiting principle is without shortcomings, see Greenawalt, *Religion as a Concept in Constitutional Law*, 72 CALIF. L. REV. 753, 803-04 (1984); Ingber, *Religion or Ideology: A Needed Clarification of the Religion Clauses*, 41 STAN. L. REV. 233, 274-77 (1989); Note, *Religion and Morality Legislation: A Reexamination of Establishment Clause Analysis*, 59 N.Y.U. L. REV. 301, 346-52 (1984); Note, *Defining "Religion" in the First Amendment: A Functional Approach*, 74 CORNELL L. REV. 532 (1989).

191.   "[T]he Establishment Clause should forbid government action that . . . is likely to result in coercing, compromising, or influencing religious beliefs. . . . [An Establishment Clause problem arises when] the advantage for religion . . . [is] so great as to impermissibly induce nonbelievers to profess religious belief and ultimately undergo genuine conversions." Choper, *supra* note 112, at 686, 698 (1980).

192.   *See, e.g.*, Laycock, *supra* note 150, at 47; Marshall, *The Concept of Offensiveness in Establishment and Free Exercise Jurisprudence*, 66 IND. L.J. 351, 354 (1991).

nations of free exercise rights with such other constitutionally based
liberties as the right of parents to control their children's education—
the right that Justice Scalia maintains was recognized in *Yoder*[193]—or
perhaps with the right to refuse medical treatment discussed in
*Cruzan v. Director, Missouri Department of Health.*[194] I do not think
that the notion of a hybrid category holds much promise, however, for
the reasons stated earlier.[195] This prediction has been confirmed by
lower federal and state courts, which have acknowledged the doc-
trine's existence but have not relied on it to uphold a claim of constitu-
tional violation that could not have been sustained without the free
exercise clause.[196]

   Second, one could infer from several passages in the opinion that

193. *See supra* text accompanying notes 165-66.
194. 110 S. Ct. 2841 (1990). The *Cruzan* majority simply assumed that the Due Process
     Clause of the Fourteenth Amendment guarantees individuals the right to refuse
     medical treatment. *Id.* at 2851-52. Five Justices, however, expressly supported
     the view that the Constitution affords heightened protection for the right to re-
     fuse medical treatment. *Id.* at 2856-57 (O'Connor, J., concurring); *id.* at 2865
     (Brennan, Marshall, and Blackmun, JJ., dissenting); and *id.* at 2885-86 (Stevens,
     J., dissenting).
195. *See supra* notes 156-66 and accompanying text.
196. Although no free exercise claimant has yet successfully invoked the "hybrid
     claims" exception in federal court, four courts of appeal have recognized it. *See*
     Vandiver v. Harding County Bd. of Educ., 925 F.2d 927, 932-33 (6th Cir. 1991)(find-
     ing no constitutionally protected interest other than free exercise claim impli-
     cated); American Friends Serv. Comm. Corp. v. Thornburgh, 941 F.2d 808, 810-11
     (9th Cir. 1991)(holding that an employer's "right to hire" "has been accorded in-
     sufficient constitutional protection to place it alongside the cases *Smith* cites as
     examples of 'hybrid claims.'"); National Labor Relations Bd. v. Hanna Boys
     Center, 940 F.2d 1295, 1305 (9th Cir. 1991)(declining to rule on applicability of
     exception because even if it were found to apply, government would prevail
     under test of strict scrutiny); Intercommunity Center for Justice and Peace v.
     Immigration and Naturalization Serv., 910 F.2d 42, 44-45 (2d Cir. 1990)(recogniz-
     ing the exception but finding that "[n]o such hybrid concerns are at issue here.");
     Salvation Army v. Department of Community Affairs, 919 F.2d 183, 200-01 (3d
     Cir. 1990)(remanding for further proceedings regarding possible infringement of
     *freedom to associate* for free speech purposes, which in combination with free
     exercise claim could form valid hybrid).
          At the state court level, the "hybrid claims" exception was successfully in-
     voked in *Zummo v. Zummo*, 394 Pa. Super. 30, 574 A.2d 1130 (1990), but the deci-
     sion could just as effectively have rested on the right recognized in *Pierce v.
     Society of Sisters*, see supra notes 160-163 and accompanying text. The case in-
     volved a father's challenge to a court order prohibiting him from taking his chil-
     dren to religious services over the mother's objection that her faith conflicted
     with that of the father. In finding for the father, *Zummo* cited *Yoder* for the
     rule, applicable in cases involving hybrids of free exercise and parental rights,
     that "parental authority in matters of religious upbringing may be encroached
     upon, only upon a showing of a 'substantial threat' of 'physical or mental harm to
     the child, or to the public safety, peace, order, or welfare.'" Zummo v. Zummo,
     394 Pa. Super. 30, 47, 574 A.2d 1130, 1138 (1990)(quoting Wisconsin v. Yoder, 406
     U.S. 205, 230 (1972)).

its highly restrictive approach to the free exercise clause is applicable only to criminal laws.[197] I doubt that this will prove to be a serious limitation on the *Smith* holding.[198] In many instances, Justice Scalia simply speaks of "generally applicable" laws without mentioning this factor.[199] Moreover, criminal prohibitions of religious conduct are generally considered to require a higher level of scrutiny and to present a stronger case for recognizing a free exercise exemption than civil regulations, mainly because criminal penalties can be more burdensome, as in the case of imprisonment, and because an individual convicted of a criminal violation must endure a social stigma unassociated with civil sanctions.[200]

Third, Justice Scalia suggests that a special category exists for cases arising in contexts like that of unemployment compensation that lend themselves to "individualized governmental assessment" of free exercise claims. This exception, however, if rigorously applied, would

---

197. To illustrate, at various points the opinion speaks in terms of Oregon's "general criminal prohibition," "generally applicable criminal laws," and "an across-the-board criminal prohibition." Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1597, 1602-03 (1990).

198. The Third Circuit expressly rejected this limitation on the scope of the holding in *Smith* in Salvation Army v. Dep't of Community Affairs, 919 F.2d 183, 194-96 (3d Cir. 1990). After proposing its first three reasons for rejecting the criminal/civil distinction, the *Salvation Army* Court added:

> Finally, and most importantly, the rationale of the *Smith* opinion is not logically confined to cases involving criminal statutes. Justice Scalia's primary argument is a structural analysis of the effect of the compelling interest test. . . . "[What the 'compelling government interest' test] would produce . . . [in the free exercise area]-a private right to ignore generally applicable laws-is a constitutional anomaly." We see no reason why application of the compelling interest test to free exercise exemption claims concerning criminal statutes would be any more of a "constitutional anomaly" than application to civil statutes.

*Id.* at 195-96 (citation omitted).

The Sixth Circuit followed *Salvation Army* in *Vandiver*, agreeing that "the Supreme Court would not 'have been as concerned as it was to distinguish and explain numerous previous free exercise cases that address "civil" statutes' were the *Smith* holding limited to the criminal context alone." Vandiver v. Board of Educ., 925 F.2d 927, 932 (6th Cir. 1991)(quoting Salvation Army v. Dep't of Community Affairs, 919 F.2d 183, 195 (3d Cir. 1990)). For additional cases, see Lupu, *Reconstructing the Establishment Clause: The Case Against Discretionary Accommodation of Religion*, 140 U. PA. L. REV. 555, 572 n.56 (1991).

199. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1600, 1601, 1603 (1990).

200. *See* Braunfeld v. Brown, 366 U.S. 599, 605 (1961). The Court's holding in *Smith I* is itself premised upon the view that if criminal penalties are found to be permissible, then it logically follows that civil sanctions are permissible as well:

> For if a State has prohibited through its criminal laws certain kinds of religiously motivated conduct without violating the First Amendment, it certainly follows that it may impose the lesser burden of denying unemployment compensation benefits to persons who engage in that conduct.

Employment Div., Dep't of Human Resources v. Smith, 485 U.S. 660, 670 (1988).

apply in most free exercise cases, as demonstrated above.[201] Indeed, Justice Scalia's argument for this exception is difficult to reconcile with the result in *Smith* itself.[202] This exception thus seems to hold little promise.[203]

*Smith* does, however, expressly preserve three separate substantive areas of free exercise protection. First, Justice Scalia acknowledges that the government may not deliberately discriminate by imposing "special disabilities on the basis of religious views or religious status."[204] In this regard, the courts would handle the free exercise claim in much the same way as a claim of intentional racial discrimination or regulation of speech on the basis of content. Statutes employing religious classifications, such as the statute in *McDaniel v. Paty*, however, are highly unusual. It remains to be seen whether the Court is still willing to find violations of the free exercise clause (or establishment clause)[205] in respect to facially neutral laws that have a markedly disproportionate impact on some religions.[206]

Second, Justice Scalia points out that the government may not question the validity of religious beliefs and "punish the expression of religious doctrines it believes to be false."[207] Third, he observes that religious organizations enjoy certain immunities from judicial scrutiny

---

201. *See supra* notes 147-155 and accompanying text.

202. As McConnell observes:

> If *Smith* is viewed as an unemployment compensation case, the distinction is obviously spurious. If *Smith* is viewed as a hypothetical criminal prosecution for peyote use, there would be an individual governmental assessment of the defendants' motives and actions in the form of a criminal trial.

McConnell, *supra* note 97, at 1124.

203. Three federal courts of appeal have acknowledged the "individualized governmental assessment" exception, but no free exercise claimant has yet invoked it successfully. *See* Vandiver v. Harding County Bd. of Educ., 925 F.2d 927, 933-34 (6th Cir. 1991)(no evidence that challenger's religious beliefs affected the exercise of official discretion); American Friends Serv. Comm. Corp. v. Thornburgh, 941 F.2d 808, 811 (9th Cir. 1991)(exception inapplicable because statute involved "does not set up a procedure for exemptions based on 'individualized governmental assessment' "); National Labor Relations Bd. v. Hanna Boys Center, 940 F.2d 1295, 1305 (9th Cir. 1991)(no ruling on applicability of exception because even if it were found to apply, government would prevail under test of strict scrutiny); Intercommunity Center for Justice and Peace v. Immigration and Naturalization Serv., 910 F.2d 42, 45 (2d Cir. 1990)(exception inapplicable because statute involved "does not provide for a discretionary exemption that is applied in a manner that fails to accommodate free exercise concerns.").

204. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1599 (1990)(citing McDaniel v. Paty, 435 U.S. 618 (1978)(state may not bar members of the clergy from serving as state legislators)).

205. See Larson v. Valente, 456 U.S. 228 (1982). See also Choper, *supra* note 48, at 957-961.

206. See Williams & Williams, *supra* note 121, at 889-896.

207. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1599 (1990)(citing United States v. Ballard, 322 U.S. 78, 86-88 (1944)(religious fun-

684 NEBRASKA LAW REVIEW [Vol. 70:651

of the decisions of the religious authorities, *e.g.*, the government may not decide which of competing factions within a religious organization owns (and may use) the organization's facilities by lending "its power to one or the other side in controversies over religious authority or dogma."[208]

Yet there are potential alternative sources for constitutional protection of the second and third types of free exercise interests:

> The free speech clause has been interpreted to place definite strictures on the state's ability to penalize or award civil damages for the making of false statements. . . . [In addition, t]here is much to be said for interpreting the freedom of association guarantee to mandate . . . [a] rule of judicial deference for all intra-organizational disputes involving the ideological tenets of the group.[209]

Therefore, the scope of the free exercise clause has receded far from the high-water mark of *Yoder*,[210] now offering only one form of immunity that is in no way available under the speech and association provisions of the first amendment: protection against express government discrimination on the basis of religion. Yet the establishment clause has been interpreted to provide this type of protection as well,[211] which means that the free exercise clause now offers virtually no unique form of constitutional protection.

## VI. THE AFTERMATH OF *SMITH*

This major change in free exercise protection will probably have little effect upon future results in the Supreme Court, because despite its former doctrine, the Court generally did not protect free exercise interests significantly. But *Smith* will have a major impact upon the disposition of free exercise claims in the lower federal and state courts, which were taking the compelling government interest test seriously and requiring exemptions for religious activities in a substantial number of cases each year.

---

draisers cannot be punished for communication of allegedly fraudulent religious beliefs)).

208. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1599 (1990)(citing, among others, Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 445-52 (1969)(civil courts may not interpret religious doctrine in order to resolve internal disputes of religious organizations)).

209. Choper, *supra* note 6, at 586.

210. *See supra* notes 35-51 and accompanying text.

211. *E.g.*, Larson v. Valente, 456 U.S. 228, 244 (1982)("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); Gillette v. United States, 401 U.S. 437, 450 (1971)("[A]s a general matter it is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization."). In addition, the due process clause of the fifth amendment has been interpreted to bar federal discrimination on the basis of religion. United States v. Sisson, 297 F.Supp. 902, 910-11 (D. Mass. 1969).

Although limits to, or modifications of, the Court's former doctrine were needed, the *Smith* approach is too unprotective of religious liberty. Virtually all possibilities for government accommodation of free exercise interests now depend completely on the political process. This result, as Justice Scalia admitted, "may fairly be said . . . [to] place at a relative disadvantage those religious practices that are not widely engaged in. . . ."[212] In my view, this places smaller, less influential religious groups at too great a disadvantage. There is too great a risk that such groups, left without judicial recourse when generally applicable government regulations threaten to infringe upon their religious liberty, will be subjected to serious restrictions upon their ability to practice their beliefs.[213]

The problem may be illustrated by the facts of *Smith* itself. The Native Americans believed in the use of peyote as a *sacramental act*; much more was at stake than some general religious tenet regarding the propriety of a particular course of conduct outside the sphere of religious worship (such as religious beliefs regarding school attendance or military service). On the other hand, the government's interest in criminal prohibition of religious peyote use appears to be rather insignificant.[214] Indeed, at the time that *Smith* was decided, Oregon itself had only once sought to prosecute for religious peyote use.[215] Further, it is difficult to reconcile a ban on the use of peyote by members of the Native American Church with the statutory exemption granted the sacramental use of wine for Catholics and Jews during Prohibition.

The fact that twenty-three states and the federal government exempt the sacramental use of peyote from their criminal laws may indicate, however, that judicial review is not that important; legislatures apparently will take care of the problem. On the other hand, those legislative exemptions may themselves have been adopted in response to the holding of the California Supreme Court in *People v. Woody*[216] that individuals using peyote for religious reasons could not be prosecuted criminally, a holding based on the first amendment and greatly influenced by *Sherbert v. Verner*.[217]

---

212. Employment Div., Dep't of Human Resources v. Smith, 110 S.Ct. 1595, 1606 (1990).

213. For careful assessments of the potential impact of *Smith* upon religious freedom, see Laycock, *supra* note 147, at 12, 56; McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 HARV. L. REV. 1409, 1419 (1990).

214. *See* the detailed discussion *supra* note 138.

215. Employment Div., Dep't of Human Resources v. Smith, 110 S. Ct. 1595, 1617 n.3 (1990)(Blackmun, J., dissenting)(referring to State v. Soto, 21 Or. App. 794 537 P.2d 142 (1975), *cert. denied*, 424 U.S. 955 (1976)).

216. 61 Cal.2d 716, 394 P.2d 813, 40 Cal. Rptr. 69 (1964).

217. The Congressional Record indicates that, when Congress decided to exempt the religious use of peyote from the Drug Abuse Control Amendments of 1965, it did

More broadly, the abandonment of judicial review of generally applicable laws that restrict religious conduct presents a significant problem that Justice Scalia's opinion does not adequately consider: legislatures are highly imperfect protectors of individual constitutional rights. Legislatures can be careless, insensitive or even overtly hostile to particular religious interests, they can be unaware of certain religious needs because a group is obscure or inadequately organized, or they may simply not have the time to consider a religious exemption request, all to the same effect.[218] "For a variety of reasons, therefore, we cannot always rely on legislatures to protect minority religious conduct."[219] Courts are imperfect, too, but judicial review at least provides religious groups and individuals a second chance to be heard.[220]

## VII. CONCLUSION

Without judicial review of generally applicable laws, governmental regulation would be permitted to intrude into too wide a range of areas of religious life in the United States.[221] In my view, rather than

---

so in response to *Woody*. *See* Smith v. Employment Division, 307 Or. 68, 74-75, 763 P.2d 146, 149 (1988).

218. Laycock, *Formal, Substantive, and Disaggregated Neutrality Toward Religion*, 39 DEPAUL L. REV. 993, 1015-16 (1990).

219. *Id.* at 1016. Congress has been considering the Religious Freedom Restoration Act, which would reverse the doctrinal effects of *Smith* by requiring free exercise exemptions unless the government:

    demonstrates that application of the burden to the person —
    (A) is essential to further a compelling governmental interest; and
    (B) is the least restrictive means of furthering that compelling governmental interest.

Religious Freedom Restoration Act of 1991, HR 2797, 102nd Cong., 1st Sess. (LEXIS, Genfed library, Bltext file).

   Whether Congress has power under section 5 of the fourteenth amendment to enact a bill like the Religious Freedom Restoration Act is discussed in Choper, *Congressional Power to Expand Judicial Definitions of the Substantive Terms of the Civil War Amendments*, 67 MINN. L. REV. 299 (1982). On the other hand, given the likelihood that state-enacted free exercise exemptions would differ from one another and thus result in a nationwide pattern of religiously based discrimination, Congress might base the Religious Freedom Restoration Act on its commerce power, the clause upon which the Pregnancy Discrimination Act amendment to Title VII of the 1964 Civil Rights Act was based. *Constitutional Law Conference*, 59 U.S.L.W. 2272, 2280 (1990)(reporting the view of Professor Laurence H. Tribe). In the event the bill passes and a court is called upon to strike down a state restriction on religious practices, the court would be interpreting an act of Congress rather than scrutinizing the state rule under the free exercise clause.

220. J. CHOPER, *supra* note 177, at 60-128; Laycock, *supra* note 150, at 10-16.

221. In Professor Douglas Laycock's view, foreseeable (and in some cases pending) governmental intrusions include the subjection of religious organizations to most forms of taxation, the regulation and review of the employment and disciplinary policies of religious organizations, the regulation of religious schools and home

abandoning its traditional role of judicial review, the Court should apply heightened scrutiny for the purpose of granting an exemption in defined types of free exercise cases: (1) granting the exemption must not violate the establishment clause;[222] (2) the exemption must not require the government to abandon its entire regulatory program;[223] (3) the individual's beliefs must be sincerely held;[224] (4) any violation of those beliefs must entail extratemporal consequences;[225] and (5) the court could suggest that an alternative burden be imposed.[226]

Some problems would appear to be quite easy to decide under this approach. For example, if a student seeks an exemption from a school's uniform dress policy for gym class because her religious beliefs forbid her to bare her legs,[227] or if an individual views the picture on a driver's license as a graven image forbidden by the second commandment,[228] exemptions should be granted. The government has only the most modest interest in religious objectors being forced to conform to such regulations.[229] By contrast, a plainly overpowering state interest in children's health is implicated when, for religious reasons, parents neglect to provide medical care for serious medical needs of their children, and exemptions in such circumstances should be denied.

Other cases are less readily soluble. When, as in *Yoder*, an individual objects for religious reasons to attending high school, or, as in *Gillette*, to being drafted; or when, as in *Smith*, an individual seeks to use mind altering drugs for sacramental purposes;[230] or when, as in *Bob Jones*, a religious organization engages in discrimination on the basis of race (or sex), one may debate whether or not the government has a sufficiently strong interest at stake. In such closer cases, there is much to commend McConnell's formulation of the test of heightened scrutiny: "Is the governmental interest so important that the govern-

---

schooling, the imposition of public school curricula offensive to religious belief, the requirement of zoning board approval for new ministries, the imposition of minimum wage laws upon religious employers, and the application of equal access regulations to religious facilities. Laycock, *supra* note 150, at 39-41, 43-44, 47, 56.

222. *See supra* notes 112 and 191.
223. *See supra* text accompanying note 120.
224. *See supra* note 188 and accompanying text.
225. *See supra* note 190 and accompanying text.
226. *See supra* note 191 and accompanying text.
227. Mitchell v. McCall, 273 Ala. 604, 143 So.2d 629 (1962).
228. Quaring v. Peterson, 728 F.2d 1121 (8th Cir. 1984), *aff'd by equally divided court sub nom.*, Jensen v. Quaring, 472 U.S. 478 (1985).
229. *See also* State v. Hershberger, 462 N.W.2d 393 (Minn. 1990)(state law requiring that slow-moving vehicles display special emblem, as applied to Amish buggy-driver).
230. Assuming that, unlike the plaintiffs in *Smith*, the individual has not voluntary promised to refrain from using peyote under circumstances in which the state has an important interest in preventing drug use; *see supra* text accompanying note 140.

ment would impose a burden of this magnitude on the majority in order to achieve it?"[231] Careful application of such a formulation would ensure that minority religious groups are not subjected to curtailment of their religious freedom simply because they lack the influence that mainstream groups can bring to bear upon the legislative process, and would probably result in upholding the free exercise claim in most instances.

---

231. McConnell, *supra* note 97, at 1147.